**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ADAM DOBSON<br><br>                               Plaintiff,<br><br>            v.<br><br>THE MILTON HERSHEY SCHOOL<br>AND SCHOOL TRUST<br>and<br>THE MILTON HERSHEY SCHOOL TRUST<br>and<br>THE BOARD OF MANAGERS OF THE MILTON<br>HERSHEY SCHOOL<br>and<br>THE HERSHEY TRUST COMPANY, AS TRUSTEE OF<br>THE MILTON HERSHEY SCHOOL TRUST,<br><br>                              Defendants. | C.A. NO.:<br><br>_____<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT**

Plaintiff Adam Dobson ("Adam"), by and through his attorneys Dilworth Paxson LLP,

brings this Complaint and avers as follows:

This case involves a school – entrusted with children of limited means and troubled

backgrounds – who callously and tragically discarded one of its students, after he resided there

for almost nine years, a youth struggling with the disability of significant, but treatable,

depression and related mental health issues.  Because the school is set up to be a surrogate

family for students, complete with group "homes" for living and "house parents," Adam's

sudden separation from his familial unit on account of the school's wrong-headed decision to

expel him because of his disability led to wide-ranging and significant emotional and economic

damages, as well as the loss of scholarship opportunities.

Adam was a poster-child for MHS, his happy face appearing on MHS marketing

material. Adam cheerfully toiled for hours in the MHS Admissions Office for no pay, and was

invited to numerous enrollment fairs throughout the northeast to encourage families to send their children to MHS. But after seeking professional help with adolescent depression, he was ignored and terminated, as a "liability" to MHS.  MHS's actions failed miserably to meet the standards of care required of a residential school of its nature.  MHS even exacerbated Adam's depression by attempting "conversion therapy" to change his sexual preference.  It then applied its informal two-hospitalization rule to terminate Adam after he needed a second short term stay at a mental health facility. Despite being one of the children at MHS with the highest social need, Adam was terminated by MHS and released back to a poor, unstable and at-risk environment, contrary to any reasonable treatment of his depression, which needed supervised and controlled – treatment available at the MHS, where he was safe.

MHS's conduct is made all the more egregious because the shameful way MHS handled this young man's disability is not an isolated incident; rather, it is one of many violations of the Americans with Disabilities Act perpetrated by the school over the past several years, with one such occurrence leading to a settlement agreement with the United States of America explicitly prohibiting the school from engaging in such conduct.  In this case, MHS coldly embarked on a strategy to terminate Adam's enrollment, in direct violation of a settlement agreement the school previously signed with the United States of America that prohibited the exact kind of discrimination that the school perpetrated against Adam, a vulnerable child with a diagnosed disability under federal law.  The school's failure to strictly comply with federal law leaves childrens' lives hanging in the balance.

## PARTIES

1.     Adam Dobson is an adult male individual and is a citizen of the State of New York, currently residing at 15 Ann Street, Apartment 2, New York, New York 10038.

2.      Defendants The Milton Hershey School and The Milton Hershey School Trust refer to themselves collectively as the "Milton Hershey School and School Trust," which they describe as being an integrated tax-exempt organization composed of a not-for-profit corporation, acting as Manager under the Deed of Trust, and the Trust itself, filing one Federal Form 990 (hereinafter referred to as "MHS" or the "School" or the "School Trusts" as the context implies) with its principal address at 711 Crest Lane, Hershey, Pennsylvania 17033. MHS is organized, exists and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania.  MHS operates its residential school in Dauphin County, Pennsylvania, soliciting students for admission throughout the Commonwealth, including in Philadelphia County.  With approximately $12 billion in assets, MHS is the world's wealthiest residential school, and serves children in grades K through 12.  Its stated mission is to nurture and educate children in social and financial need to lead fulfilling and productive lives.  The School Trust was and continues to be a charitable trust qualified under Section 501(c)(3) of the Internal Revenue Code of 1986 with its principal address at Hershey Trust Company, 100 Mansion East Road, P. O. Box 445, Hershey, Pennsylvania  17033.  The School Trust is organized, exists and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania and engages in activity throughout Pennsylvania, including in Philadelphia County.  The School Trust's purpose is to maintain "a permanent institution for the residence and accommodation of poor children . . . and the maintenance, support, and education . . . of such children."  The School Trust funds the School, owns a controlling interest in The Hershey Company, a publicly-traded corporation, and wholly owns The Hershey Trust Company, its trustee, and the Hershey Entertainment and Resorts Company ("HERCO"), which oversees resort properties along with an amusement park called Hersheypark.

3.     Defendant The Board of Managers of the Milton Hershey School (hereinafter, the "Board of Managers") was and continues to be a non-profit corporation acting as Manager of the School, with its principal address at P. O. Box 830, Hershey, Pennsylvania 17033-0830. The Board of Managers is organized, exists, and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania, engaging in activity throughout the Commonwealth, including in Philadelphia County. The Board of Managers was identified in the School's Deed of Trust (providing for the establishment and operation of MHS) as the governing body of MHS. These managers have broad discretion to utilize the assets of the School Trust in accordance with the Deed of Trust, in order to ensure the perpetuity of the School and oversee its operation.

4.     Defendant The Hershey Trust Company (hereinafter the "Trustee") was and continues to be a Pennsylvania for-profit corporation, with its principal place of business located at 100 Mansion Road East, in Derry Township, Hershey, Pennsylvania 17033-0445. The Hershey Trust Company is organized, exists, and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania and engages in activity throughout the Commonwealth, including in Philadelphia County. The Trustee was organized for the purpose of serving as trustee of the School Trust and continues to serve in this role. The Trustee is wholly owned by the Milton Hershey School and School Trust.

5.     The School, the School Trust, and the Trustee share a self-perpetuating, interlocking and integrated governance structure. The members of the School's Board of Managers are the same persons as the members of the board of directors of the Trustee. The School's Board of Managers and the board of directors of the Trustee will be collectively referred to herein as the "Trust/School Boards." These board members pay themselves

extraordinary sums of compensation, from charitable assets, but have failed in their oversight of MHS policies and have failed to include within their membership a single residential childcare expert, or any member with the requisite experience in working with at-risk children.

6.       Each member of the Trust/School Boards is currently paid in excess of $100,000 per annum by the Trustee, which generally includes a $30,000 retainer and $6,500 for every day of meetings, with each Committee Chair receiving additional compensation as well.   Some of them also appoint themselves to boards of MHS's for-profit controlled entities, thereby amassing additional fees that can exceed $500,000 per year for a single director in the aggregate.   Because the School Trust wholly owns the Trustee and HERCO, School Trust assets, meant for poor children, are used to pay approximately $2,000,000 annually of this board compensation to already wealthy board members.

7.       The Trust/School Boards have been put on notice that MHS teenagers were being expelled for depression and took no action to correct this illegal activity.

8.       All named defendants will be collectively referred to herein as "Defendants."

9.       At all times relevant hereto, Defendants acted by and through their agents, servants and employees, each of whom acted within the scope of his or her job duties.

## JURISDICTION AND VENUE

10.       Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this matter because the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11.       Additionally, pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over the subject matter of Plaintiffs' claims under the Americans with Disabilities Act ("ADA"), the Fair Housing Act ("FHA") and the Fair Labors Standards Act (the "FLSA").

12.     Under federal question jurisdiction, this Court would have supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

13.     This action is authorized by 42 U.S.C. § 12188 and 42 U.S.C. § 3613.

14.     Venue is proper in the Eastern District of Pennsylvania by virtue of, among other things, 28 U.S.C. § 1391(b)(1) because The School, the School Trust, the Trustee and the Board of Managers are all entities that reside in this judicial district, pursuant to 28 U.S.C. §1391(c).

15.     Defendants actively solicit and enroll students in this judicial district, and give preferential admission to students from this judicial district.

16.     According to the MHS website, the School provides a "cost-free, private, coeducational home and school for children from families of low income, limited resources, and social need. The School is funded by a trust established by Milton S. Hershey and his wife Catherine. Milton Hershey School offers a positive, structured home life year-round and an excellent pre-kindergarten through 12th grade education."

17.     MHS regularly conducts business in this judicial district in a variety of ways.  In particular, MHS regularly conducts enrollment fairs to solicit students in counties located within this judicial district, including Berks, Bucks, Chester, Lancaster, Northampton, Montgomery and Philadelphia Counties.  Defendants also mass market in these area counties, reaching out specifically (including by means of television and radio) to recruit children and persuade them to enroll, as well as to solicit potential employee houseparents.  Indeed, the yearly enrollment of students from these counties is of such a number that Defendants provide separate charter bus services to and from Philadelphia, King of Prussia, and Lancaster for Thanksgiving, Christmas, Easter and summer breaks.

18.   The School's Deed of Trust requires first level preferential admission to students born in certain counties in Pennsylvania, including Lancaster County, which is located in this judicial district. The Deed of Trust also requires second level preferential admission to students residing in this judicial district, including in Philadelphia County, over students born in other states. A true and correct copy of the Deed of Trust is attached hereto as Exhibit "A."

19.   Approximately 17 percent of MHS students are from the Philadelphia area. The School has formed partnerships with post-secondary institutions in Philadelphia and arranges special guidance and assistance for School graduates at these institutions, including the Art Institute of Philadelphia, the Community College of Philadelphia, LaSalle University, and Temple University, through the auspices of the MHS Alliance School Programs.

20.   At least one member of the Board of Managers resides in this jurisdiction and conduct the business of the School from this judicial district.

21.   Finally, the School's alumni association, which serves as a spokesperson and recruiting agent for Defendants, has chartered chapters of the Milton Hershey School Alumni Association in both Philadelphia and Lancaster Counties, both of which are within this judicial district.

22.   The School Trust, the Trustee and the Trust/School Boards, by virtue of their self-described status as organizations "integrated" and "interlocking" with the School, also regularly engage in the same kind of business in this judicial district.

## FACTS

### ADAM DOBSON, A SWEET AND TENDER CHILD

23.   Adam was born on May 4, 1995. He was admitted to MHS on or about August 2004, having recently turned nine years old (third grade). Adam's father passed away when Adam was six months old. During his time at MHS, Adam's mother struggled with emotional

and financial difficulties.  Adam attended, excelled, and thrived at MHS for more than eight years.

24.    Adam was by all accounts a model student during his eight years at MHS. Indeed, it is believed that school records will demonstrate that Adam was a high-achiever and an outgoing and sensitive child.  He also consistently maintained the highest levels of conduct, designated as "Spartan" or "Gold" by the School.  In ninth grade, Adam achieved "All Spartan" status on account of his academic excellence.   He thrived at the School and had a promising future.  He worked endless hours promoting the School in its admissions office after classes, during nights and on weekends.

25.    But merely because Adam suffered from treatable teenage depression, MHS officials would expel him from the school at the very end of his junior year, completely disregard Adam's high-achieving student standing, rupture all his existing social bonds with friends, houseparents, teachers, coaches, counselors, and other staff, destroy the home he had found at MHS, take away his entire support structure, banish him from MHS, stigmatize and marginalize him, and send Adam back to the very environment from which he had been rescued at the age of nine, in total disregard of his well-being and with completely predictable results.

### THE SPECIAL, CUSTODIAL RELATIONSHIP EXISTING BETWEEN THE DEFENDANTS AND STUDENTS ENROLLED AT THE SCHOOL

26.    MHS is a private residential school for children in financial and social need from pre-kindergarten through 12th grade.  It was tailor-made for young Adam, who faced severe financial and social needs upon presenting for enrollment.

27.    MHS currently enrolls approximately 2,000 students and solicits applications for admission from children between the ages of 4 and 15.

28.     The School spends approximately $100,000 per year per enrolled student.   MHS also provides for up to approximately $80,000 in higher education benefits to each qualifying graduate.

29.     According to the School, its students live "in large, comfortable homes with 10 to 14 students in their own age group.   A pair of married houseparents oversee each home, providing the structure that children need and taking an active interest in their development."

30.     The School also advertises to prospective students and their parents or guardians that MHS "aims to create a family-like atmosphere for students" with houseparents and other students becoming a student's "extended family."

31.     MHS promotional materials represent that, "[o]ur students live at the School and our program is *year-round*.   So the Student home and houseparents are at the core of each child's stability and safety while they are here" (emphasis added).

32.     Indeed, MHS openly describes itself as "a private residential school with surrogate parenting responsibilities."

33.     In court documents recently filed by MHS in the Eastern District of Pennsylvania (*Mother Smith v. MHS*), MHS further described the special type of custodial relationship between the School and its students as follows:

> The Milton Hershey School educates children in a unique, home-like environment. … the School is designed and operated to raise and care for children, and to fulfill a parental role for most of the year.
>
> * * *
>
> [T]he School operates a home-like residential setting in conjunction with its educational program that is a fundamental part of its program.  Students reside at the school 24 hours a day, 7 days a week, for most of the year, living in family style residences. … students often also reside at the School for most of the year, not just during the school year.

*See* p. 2 and 6-7 of Milton Hershey School's Answer with Affirmative Defenses to Amended Complaint and Counter-Claim for Declaratory Judgment in *Mother Smith* (E.D. Pa. 11-cv-07391 at Dkt. #10), a true and correct copy of which is attached hereto as Exhibit "B."

34.     Elsewhere in the same filing, MHS explained the broad scope of primary and physical custodial control it exercises over its enrolled students by virtue of its status as the students' primary caregiver, as follows:

> [T]he School provides a unique all-encompassing program for these children, including an education, housing in a family setting, food, clothing, medical, dental and psychological care, and recreational opportunities, with no financial obligation to the family.

*Id.* at 17.

35.     Also in those documents, MHS refers to the "comprehensive nature of the care provided by the School" to students and touts "the unique 24/7 residential nature of its programs and services" as well as its "unique residential private school setting" that includes "a very closely-knit community" with an "extended [school] year." *Id.* at 3, 21 and 23.

36.     In connection with a settlement reached in the above-noted proceeding, MHS confirmed that "it stands *'in loco parentis'* to all children attending the School" *See* ¶ 19 of the ADA Settlement Agreement discussed in more detail below (emphasis added).

37.     The breadth of MHS's custody over students extends to controlling both parental visitation schedules at the School and so-called "overnight" visits taken by students, which are often visits between the students and their natural parents and/or guardians.

38.     Indeed, MHS's desire to affirmatively undertake its surrogate family role is so pronounced that it prohibits parent-child interaction during the first month that a child is enrolled in MHS, even for children as young as four, working to create a new dynamic.

39.     The School monitors and regulates every aspect of children's lives, creating a virtual surrogate institutional family.  MHS even regulates the love lives of its students, and requires, among other things, that "Students must be at least 15 years of age and in Senior Division to begin dating," and that "[d]ating arrangement must be set up with and approved by houseparents."

40.     These and other  MHS practices illustrate that MHS is deliberate in its effort to substitute its student home/MHS "school family" for the biological families of enrolled students, thereby heightening its own duties to these children, in good times and bad.

41.     Any subsequent removal from MHS is the equivalent of removal from a child's natural family, with traumatic consequences greater even in many cases than the original traumatization of entering MHS.

**THE UNITED STATES' DEPARTMENT OF JUSTICE RECENTLY FOUND THAT THE DEFENDANTS HAVE DISCRIMINATED AGAINST STUDENTS WITH DISABILITIES AND OTHERWISE FAILED TO ABIDE BY THE AMERICANS WITH DISABILITIES ACT**

42.     In or around April of 2011, a 13 year old boy, going by the pseudonym "Abraham Smith," sought admission for fall enrollment at the School.

43.     At the time he sought admission, Abraham Smith was HIV positive.

44.     The School subsequently denied Abraham Smith enrollment based on the claim that his "documented needs are beyond the scope of the Milton Hershey School programs," which, as will be described at length below, is very similar to the reason given for denying Adam continued residence at the School beyond 11th grade.

45.     In November of 2011, Abraham's mother, identified as "Mother Smith," filed a complaint captioned *Mother Smith, on behalf of herself as parent and natural guardian on*

*behalf of Abraham Smith v. Milton Hershey School*, C.A. No. 11-CV-07391-CDJ (E.D. Pa.) (the "HIV Case").

46.     In the HIV Case, Mother Smith alleged that the School violated Title III of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12181, *et seq.*, and its implementing regulation, 28 C.F.R. Part 36, as well as committed common law torts, by refusing to consider Abraham Smith for enrollment in the School due to the fact that he is HIV positive.

47.     Subsequently, the United States, through the Department of Justice ("DOJ"), initiated an investigation, at DJ #202-63-162, of the School's actions regarding Abraham Smith, ultimately resulting in a Settlement Agreement between The United States of America, The Milton Hershey School, and Mother Smith (on behalf of herself and Abraham Smith) dated September 12, 2012 (the "ADA Settlement Agreement").  A true and correct copy of the ADA Settlement Agreement is attached hereto at Exhibit "C."

48.     As a result of the investigation by the Department of Justice, and as reflected in the terms of the ADA Settlement Agreement, the United States made the following key findings:

(1)     the School is a covered entity under the ADA, as it operates a place of public accommodation within the meaning of 42 U.S.C. § 12182(a); is a private entity within the meaning of 42 U.S.C. § 12181(6); and is considered a place of public accommodation because it affects commerce and is a place of education within the meaning of 42 U.S.C. § 12181(7);

(2)     the School violated the ADA by rejecting Abraham Smith's application for admission to the School based on the fact that he has HIV, hereby denying him the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the School, in violation of 42 U.S.C. § 12182 and 28 C.F.R. §§ 36.201 and 36.301; and

(3)     the School discriminated against Mother Smith by denying Abraham Smith's application for admission to the School based on the fact that he has HIV, hereby denying Mother Smith, among other things, privileges, advantages, accommodations or other opportunities because of Abraham

Smith's known disability, in violation of 42 U.S.C. § 12182(b)(1)(E) and 28 C.F.R. §36.205.

*Id.* at ¶¶ 6-22.

49.    The ADA Settlement Agreement went on to impose several continuing obligations on MHS, including the enactment and enforcement of a non-disclosure and equal opportunity policy applicable to its programs and services for all students.   This policy was required to expressly provide, among other things that,

(1)    the School does not discriminate against applicants or students on the basis of any disability (including but not limited to HIV);

(2)    applicants and students with any sort of disabilities have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, and accommodations provided by the School; and

(3)    the School shall make reasonable modifications to its policies, practices and procedures when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with any sort of disabilities.

*Id.* at ¶¶ 23-35.

50.    The ADA Settlement Agreement at paragraph 26 further required the School to "develop and provide training on title III of the ADA" (a) to all persons with responsibilities for educating students and/or for providing medical, dental psychological, behavioral, or social work-related care to students; (b) to all persons involved in the admissions process; and (c) to all School administrators and officers.  *Id.* at ¶ 26.

51.    Finally, the ADA Settlement Agreement at paragraph 43 provided the United States with the continuing opportunity to review the School's compliance with the ADA Settlement Agreement and/or Title III of the ADA.   Should the School fail to comply, the United States retained the right to initiate an enforcement action to enforce the ADA Settlement Agreement or Title III of the ADA.  *Id.* at ¶ 43.

52.     As required by the ADA Settlement Agreement, MHS has developed a non-discrimination and equal opportunity policy entitled "Milton Hershey School (MHS) Student, Applicant and General Public Non-Discrimination and Equal Opportunity Policy," Policy No. 2.05.1, effective date December 4, 2012 (the "Equal Opportunity Policy").  A true and correct copy of the Equal Opportunity Policy is attached hereto as Exhibit "D."

53.     The Equal Opportunity Policy includes the following "Policy Statement":

> Milton Hershey School ("MHS" or the "School") will not tolerate any form of harassment or discrimination on the basis of race, color, religion, sex, disability or need for accommodation, association with or relationship to person with a disability, or any other class or status protected under federal, Pennsylvania, or local law (collectively "Protected Characteristics"), against any applicant for admission, enrolled student, or any other individual(s) who participate(s) in the programs, services, and activities of the School. ... Individuals protected by this policy, other than applicants and students, would include parent/sponsors and visitors touring the School or attending public events.
>
> * * *
>
> This Equal Opportunity Policy ("EO Policy" or "Policy") prohibits all forms of discrimination in all programs, services and activities of the School, including, but not limited to, admissions, academic and educational programs, other terms, conditions or privileges of education or enrollment at the School, and all activities open to the general public.

*Id.* at 1.

54.     The Equal Opportunity Policy goes on, in a section entitled "Disability Discrimination is Prohibited," to mandate the following protections for students enrolled at the School:

> The School is committed to preventing discrimination against persons with disabilities, and complying with the federal Americans with Disabilities Act ("ADA") and all similar Pennsylvania and local laws ... . All applicants for admission and currently enrolled students with disabilities ... will have an equal opportunity to participate in and benefit from all goods, services,

facilities, privileges, advantages, accommodations, or programs provided by or at MHS.

\* \* \*

The School will not exclude persons with disabilities … from participation in, or deny them the benefits of, the full and equal enjoyment of its goods, services, facilities, privileges, advantages or accommodations on the basis of their disability.

\* \* \*

*Applicants who are otherwise qualified for admission to the School will not* be denied enrollment or *have their enrollment discontinued solely on the basis of their disability*.

\* \* \*

Applicants and students with disabilities … have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, and accommodations provided by the School.

\* \* \*

The School will make reasonable modifications to its policies, practices, and procedures when the modifications are necessary to afford goods, services, programs, facilities, privileges, advantages, or accommodations to all individuals with disabilities.

*Id*. at 2-3 (emphasis added.)

55.    Pursuant to the ADA, the term "disability" means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(a).

56.    The ADA defines "mental impairment" to include "[a]ny mental or psychological disorder, such as … emotional or mental illness." 28 C.F.R. § 36.104.

57.    Further, it is well-established that emotional conditions such as anxiety and depression are disabilities included within the meaning of "disability" under the ADA.

58.     Thus, one of the things that the Defendants promised (through the ADA Settlement Agreement and the Equal Opportunity Policy) to root out and eliminate from the School was discrimination based on emotional or mental illnesses, including anxiety and depression. Adam's treatment at the hands of MHS will demonstrate that illegal discrimination at MHS continues in the mental health arena.

59.     However, despite (a) the prior finding of discrimination by MHS against a disabled student; (b) the repeated promises made by MHS to the United States in the ADA Settlement Agreement; and (c) the clear requirements of MHS's own Equal Opportunity Policy designed to prevent future instances of discrimination, upon information and belief, Defendants refused to implement or inadequately implemented, among things, (1) safeguards to prevent discrimination against students suffering from emotional or mental illnesses, including anxiety and depression; or (2) any type of reasonable modifications to afford goods, services, programs, facilities, privileges, advantages, or accommodations to students suffering from emotional or mental illnesses, including anxiety and depression.

60.     Despite the promises made and stated intentions of the School in the ADA Settlement Agreement and the Equal Opportunity Policy, the Defendants have failed to follow their own directives when caring for Adam, who MHS knew suffered from a serious but treatable form of depression, resulting in acts of discrimination against Adam on account of his disability.

61.     Indeed, and notwithstanding the DOJ's prior investigation, the ADA Settlement Agreement and the Equal Opportunity Policy, the DOJ is currently pursuing *another* investigation into whether the School is compliant with the ADA and the Fair Housing Act, which has been ongoing for more than a year – the second such investigation in four years.

**THE COMMONWEALTH OF PENNSYLVANIA OFFICE OF ATTORNEY GENERAL RECENTLY FOUND THAT THE DEFENDANTS HAVE VIOLATED A PRIOR REFORM AGREEMENT DESIGNED TO CURB EXCESSIVE MHS BOARD COMPENSATION AND TO REQUIRE THE RECRUITMENT OF QUALIFIED BOARD MEMBERS**

62.     The ADA Settlement Agreement is not the only agreement with the government that MHS has violated.  In fact, MHS is currently in violation of a 2013 agreement with the Commonwealth of Pennsylvania, Office of Attorney General, as detailed in a February 8, 2016 letter, a true and correct copy of which is attached hereto as Exhibit "E."

63.     Among other violations, the February 8, 2016 letter from the Office of Attorney General noted that the MHS board has failed "to exercise its best efforts in a timely manner to secure new board members with experience in early childhood education as well as at-risk dependent children."

64.     The letter also detailed that the MHS board violated a conflict of interest policy and that a stock trade of Hershey Company stock carried out by two members of the Board was one of several "matters of concern … ."

65.     Upon information and belief, MHS has spent at least $4,200,000 of the Trust's assets in just the last 12 months on legal fees to investigate these claims of wrongdoing among its own Board members, money that should have been spent on the care of at-risk children.

**ADAM ENROLLS AT MHS WITH DEMONSTRATED SOCIAL NEEDS AND FOR THE NEXT EIGHT YEARS IS AN UPSTANDING HIGH PERFORMING STUDENT**

66.     Adam was considered for enrollment at the School in August 2004, at the age of nine.

67.     When he applied for admission to MHS, Adam had great social needs related to his family structure and home life.

68.     Among other things, Adam was without a father, as his passed away when Adam was six months old. Adam's mother, although present, was limited by her own struggles with depression, substance abuse and by the demands of raising seven other children besides Adam.

69.     Adam's enrollment process also included a series of tests, an interview, and several meetings between Adam, his mother and MHS administrators.

70.     Due to this extensive examination and review, Defendants were fully aware of Adam's social needs and family mental health issues when MHS admitted him as a student. Based on this family history, MHS knew or should have known that there was a high degree of risk that Adam would exhibit symptoms of depression during his time at MHS. Neither Adam nor his mother were not advised that: (a) if Adam began to exhibit such symptoms, there was a high likelihood of expulsion, regardless of him thriving at MHS prior to such time; or (b) that MHS was not able to care for children with depressive disorders.

## PRIOR TO ADAM'S EXPULSION, THE DEFENDANTS MAKE SEVERAL IMPORTANT REPRESENTATIONS TO ADAM

71.     In early 2013, the Defendants made numerous representations regarding their supposed compliance with the ADA, commitment to non-discrimination and accommodating students with disabilities, and comprehensive array of mental health services available to their students.

72.     Related to compliance, the Equal Opportunity Policy – which was drafted as result of the stipulated finding in the ADA Settlement Agreement that MHS had committed blatant acts of discrimination – was provided to Adam and his mother in or around March 2013.

73.     While Adam was enrolled at the School, Adam and his mother also received a copy of the MHS Student/Sponsor Handbook (the "Handbook"); a true and correct copy of

which is attached hereto as Exhibit "F", which also contains a copy of the Equal Opportunity Policy.

74.     Also included in the Handbook at page 70 is an additional section entitled "ADA Accommodation Procedures for Applicant and Students."  As it relates to current students, those procedures provide that MHS will develop and implement individualized plans for disabled students to ensure that MHS is able to accommodate those students at the School. Individualized plans dealing with mental health issues are to be managed by a Psychological Services Administrator. *Id.* at 46.

75.     Further, the Handbook discusses the several psychological services available to students and represents that "Psychological Services offers a comprehensive array of services, which includes individual and group therapy, psychological and psychoeducational assessments, consultation, staff training, ***crisis intervention and prevention***.  The type of psychological service provided for a student is dependent on the individual student's need." *Id.* at 46 (emphasis added.)

## ADAM WORKS IN THE ENROLLMENT OFFICE, WITHOUT PAY

76.     Students entering ninth grade at the School are required to engage in community service.  To fulfill this requirement, in his ninth grade year Adam began working in the School's Admissions Office.

77.     The work began as an hour or two per week on campus, but quickly increased in both hours and scope.  For example, the School began asking him to attend admission fairs in places like Philadelphia, Chambersburg, Reading and Scranton.  These events were generally on school night requiring Adam to leave campus around 4 p.m., arrive at the fair at 6 p.m., and return back to MHS as late as 11 p.m.  On a few occasions Adam did this twice per week.

Adam was not paid for any of this work.  The only benefit given to Adam was free non-MHS food.  As many as three other MHS students worked with Adam at the admission fairs.

78.    Weekend events for the Admissions Office were primarily on campus but would last all day.  Once or twice a month from 8 a.m. to 3 p.m., Adam would participate by riding on a bus with parents or sponsors and prospective students, and acting as a tour guide and promoter of the School as the group toured the School, the grounds and a student home.  Approximately six to seven MHS students worked with Adam for the weekend on-campus tour events.

79.    Adam also worked in the Admissions Office throughout high school.  In that capacity, he answered phone inquiries and stuffed envelopes, and did other office work that without student volunteers would have been done by paid employees.  Eventually, his hours increased to three per day.

80.    All told, between admission fairs, on-campus tours and office work, Adam averaged between 13 to 16 hours per week working with the Admissions Office over his last two years at the School, including working right up to the time of his expulsion.

81.    In addition to working for MHS, the Defendants have also used Adam's likeness without permission or compensation.  Specifically, MHS minivans are quasi billboards for the School, complete with pictures of supposedly happy MHS students.

82.    At least through 2015, two of those minivans prominently displayed a picture of Adam taken from a club photo when Adam was in the sixth grade.  A picture of one of the minivans is attached hereto as Exhibit "G."

### MHS IS AWARE THAT ADAM'S EMOTIONAL WELL-BEING BEGINS TO DETERIORATE OVER THE COURSE OF HIS JUNIOR YEAR

83.    Adam began eleventh grade at MHS in August of 2012.

84.     Over the course of that school year, Adam's emotional well-being deteriorated as he wrestled with the reality of his sexual orientation as a gay teenager, and struggled with certain peer relationships.

85.     Adam's first outward manifestation of his attraction to other people of the same sex occurred in ninth grade when he explored gay pornography on the computer located in his student home.  Adam's houseparents at the time were made aware of this usage by MHS, who tracked pages viewed on house computers.  After the houseparents had a meeting with all members of the student home to discourage such usage, Adam owned up to his mistake and admitted to being responsible.  Because the material he viewed was same-sex in nature, Adam's houseparents responded by forcing him to watch a religious-based video that was intended to "cure" him of being gay.

86.     Throughout his time at MHS, many of Adam's friends at MHS were female.  Adam had a single close male friend.  But, the two grew apart during Adam's 11th Grade year, ending in a falling out in October of 2012.

87.     One week later, Adam experienced a suicidal ideation and wrote a suicide letter to his family and loved ones, saying that he was going to choke himself with a belt.

88.     Around that same time, Adam also emailed a friend to say that he was going to kill himself while taking a walk.  That friend reported the email to Adam's houseparents. Adam was intercepted on his walk and he was sent directly to the School's Health Center.

89.     While at the Health Center, Adam saw Dr. Rose Huntzinger, a School psychologist.

90.     At Dr. Huntzinger's recommendation, Adam agreed to in-patient treatment at Philhaven, a mental and behavioral health care provider in the area.   Adam remained at Philhaven for two weeks.

91.     While Adam was there, then-President of the School, Dr. Anthony Colistra, visited Adam.   Dr. Colistra knew Adam through Adam's work with the Admissions Office. Indeed, through that work Adam had developed a friendship with Dr. Colistra and his wife, Sue.   Adam's houseparents and his speech therapist also came to visit Adam.   Further, Adam was given MHS homework assignments to complete, which he did, turning them in upon his return to the School.

92.     After his discharge from Philhaven, Adam spent one week in the Health Center before returning to his student home.

93.     The next six months were rather unremarkable, and Adam appeared mentally healthy.

94.     Then, on March 27, 2013, Adam again expressed feelings of suicidal ideation and the School required Adam to spend that night at the Health Center.

95.     Adam returned to classes the following day and was discharged from the Heath Center at 4:30 p.m. on Thursday, March 28, 2013, the first day of Easter break, just one half hour after an MHS-provided bus left for Adam's hometown of Scranton with his twin brother on board.   Adam was told that he was not permitted to visit his mother or siblings for the upcoming Easter break, and that, instead, he needed to remain at the School.   Left with no option but to stay on the MHS campus during Easter break, Adam felt completely alone (as nearly all children return to their natural families during this break), which caused the onset of

another bought of depression.  MHS provided no therapeutic counseling to Adam during this Easter break from 4:30 on Thursday p.m., March 28, 2013 to Monday morning, April 1, 2013.

96.    Adam's depression and feelings of isolation and abandonment worsened at the end of April when his mother suddenly cancelled Adam's 18th birthday party, a sit down dinner at a local restaurant scheduled for May 4, 2013, because she spent the money designated for the party.

97.    On May 1, 2013, Adam wrapped a belt around his neck, but stopped before carrying out suicide.

98.    No one saw Adam wrap the belt around his neck, but Adam took it upon himself to report the action to School's principal and ask for help.

99.    In response, the School referred Adam to the Heath Center and the Lead Psychologist.

100.    Subsequently, Adam again agreed to in-patient admission at Philhaven.  Dr. Huntzinger and another MHS doctor drove Adam to the facility, as Adam believed it was critical to his emotional and financial wellbeing to graduate from MHS.  Adam only agreed to this course of treatment after being assured that this second admission would not automatically lead to an expulsion from the School.

101.    Adam again stayed a total of two weeks at Philhaven.  In contrast to his first admission, however, Dr. Colistra did not visit.  Neither did Adam's houseparents or his speech therapist.  In fact, during this admission, Adam had no contact with anyone from MHS, absent a phone call or two.  Also in contrast to his first admission, Adam was not given any School homework assignments to complete during his second stay at Philhaven.  MHS took no further

interest in Adam's well-being or program at MHS and plotted to expel him, so that his expulsion was automatic, despite School representations to the contrary.

102.    During his hospitalizations, Philhaven nursing staff told Adam that MHS generally enforced a two-hospitalization expulsion policy, but that some exceptions were made to that policy in the past based on the nurses' experience.

103.    Although the Equal Opportunity Policy, as discussed at length above, broadly prohibits all forms of discrimination against students with "disabilities" as that term is defined by the ADA, as noted by the Philhaven nurses when dealing with students like Adam, MHS was abiding by another "policy," official or unofficial.  This other "shadow policy" robotically mandated that a student be expelled after two hospitalizations in outside mental health facilities, and with the hospitalization decisions in the first instance being recommended by MHS staff.

104.    Such a consequence is not provided for in the Equal Opportunity Policy and flies in the face of its requirements and ADA strictures requiring that students with disabilities be treated fairly with individualized assessments.  Indeed, the shadow "policy" actually has the perverse effect of *discouraging* students who are suffering from mental or emotional injuries from seeking help in the first place, for fear that doing so might lead to brief hospitalizations and a subsequent quick ticket out of MHS.

105.    This is an irrational, anti-child policy for dealing with children who are mature enough to recognize their own depression and seek help for it, but who are equally cognizant of an expulsion hanging over their heads, in the event that they might just need hospitalization.

106.    MHS applies the mechanical "two-institutionalization" rule: (a) without regard to the therapeutic results of the second hospitalization; (b) without consultation with the institution's care-providers; (c) without any further analysis of the mental health of the child

and accommodations that could be made; and (d) without any analysis of the consequences to the child of termination from MHS, the one stable and nurturing environment that many MHS children have had in their short lives.

107.    Upon information and belief, the shadow policy had other aspects to it that were so well established and accepted by MHS that they were openly discussed at MHS Board meetings.    During a Board meeting that occurred in or around 2010, there was a topic of discussion related to the decision to terminate a student because she had suicidal ideations. When one Board member questioned the decision, a senior MHS official stated words to the effect that MHS did not want the publicity of someone killing themselves at MHS.    Because the student in question expressed a desire to kill herself, she would be terminated.    Thus, a policy was institutionalized at the highest level.

108.    Adhering to its shadow policy, MHS expelled Adam from the School and evicted him from this student home.    MHS did not even have the decency to wait until after Adam had been discharged from Philhaven to do so, instead taking that step while Adam was still a patient.    Neither did MHS have the decency to speak to Adam about the situation directly. Instead, Adam had to receive the terrible news directly from his mother, who recounted to Adam that the School told her that Adam was being expelled "because you are a liability." Then she asked Adam, "are you happy now?"

109.    It is believed that a so-called "Enrollment Review" was conducted prior to Adam's expulsion and while he received treatment at Philhaven, but Plaintiff has not been able to confirm this as MHS has refused to provide any such records prior to the filing of this lawsuit.

110.   An MHS "Enrollment Review" is a misnomer.  Specifically, it never deals with enrollment, but instead, it is only used to pursue expulsions; *i.e.*, when MHS is getting ready to send a child away, the administrators circle up in a proceeding that they euphemistically call an "Enrollment Review."

111.   MHS children are not permitted to attend, speak at, or be represented at their Enrollment Reviews.  Parents and guardians are similarly excluded.  There are no means of providing evidence, arguments, or pleas on behalf of children who are subjected to these sham proceedings.  Thus, there is no due process of any kind.

112.   MHS makes no account of the proceeding to provide to students or their guardians, and there is no right of appeal whatsoever.

113.   In sum, the entire Enrollment Review proceeding, with its near-inevitable result in most cases, is itself an affront to child welfare, due process and ADA norms.

114.   Following his release from Philhaven, the "Enrollment Review" and his subsequent expulsion from the School and eviction from his student home, Adam returned to Scranton, Pennsylvania to reside with his mother and siblings.

115.   At the time, Adam's mother lived in an apartment, although soon after Adam was expelled from the School he found out that she was being evicted.  After the eviction was completed in July of 2013, Adam moved in with an older sister, who was approved for Section 8 housing in nearby Dunmore.  However, the sister's boyfriend was abusive and kicked Adam out.

116.   In October 2013, Adam spent more than a month bouncing around from place to place, both with family and friends, spending one night on the streets of Scranton.  He eventually settled at a friend's house, where he paid rent and worked at retail stores.  His ability

to survive this harrowing year is clear evidence that MHS had no reason to discriminate against him and remove him from the School and his home.

117.   Adam eventually finished his junior year at West Scranton in May and June 2013 and then graduated from the school in 2014.

118.   Before being expelled from MHS, Adam had planned to go to Millersville University or Shippensburg University with the scholarship money provided to students who successfully graduated from the School.

119.   Specifically, students enrolled at MHS are eligible to receive up to $80,000 in post-secondary scholarships, earning credits for each year successfully completed at the School, as follows: 5% for freshman year, 10% sophomore, 35% junior and 50% senior year. However, students expelled from the School prior to graduating – like Adam – are not eligible to receive any of this scholarship money.

120.   Without access to any scholarship money, Adam has had to support himself and has been unable to afford and attend college at the same time, emotionally scarred from his treatment by MHS.

121.   It is evident that after over eight years of good conduct and academic success, MHS had given up on Adam and gone into termination mode, just weeks after the onset of an emotional episode.

122.   MHS heightened Adam's alienation, loneliness, and break with the only community where he felt he belonged (MHS), and made him feel his future would be hopeless without MHS.

123.    MHS, with $12 billion of assets and a small army of mental health professionals, made no assessment of how Adam would fare in Scranton, Pennsylvania, with a destitute mother suffering with her own mental health and substance issues.

124.    While MHS's conduct toward Adam shocks the conscience, it is not an isolated incident in the mental health policies of MHS.

125.    For example, Abrielle Bartels ("Abbie") was enrolled at MHS at the age of five and was an exceptional student, with an unblemished record.

126.    But, when Abbie experienced a severe but treatable bout of depression during her eighth grade year, the School kicked her out and even barred her from her eight grade graduation and associated activities.  By expelling her, the School returned her to a traumatic living situation with her natural parents – a situation that the School knew was her chief stressor and the main reason she was depressed and suicidal in the first place.

127.    Feeling like a discarded piece of trash with no hope for the future, Abbie succumbed to her depression, taking her own life by hanging herself shortly after receiving the heartless message from MHS administrators that she was not permitted to set foot on campus for graduation.

128.    KR was an 8th grader when she too was expelled, and again, merely for facing depression.  KR's post-expulsion mistreatment was also cavalier and compounded the pain she felt.

129.    On information and belief, there are many other children who have been similarly mistreated by MHS for mental health issues, with the School and its board members allowing this unlawful discrimination to continue unabated.

## COUNT I – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

130.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

131.    Adam met all of MHS's eligibility criteria during his enrollment at the School.

132.    MHS discriminated against Adam by terminating him from MHS on the basis of his mental disability.

133.    The Defendants failed to investigate, engage in an interactive dialog with, and/or offer any reasonable accommodations to Adam for his mental disability, which reasonable accommodations would have allowed him to remain enrolled in and prosper at MHS.

134.    Instead, Defendants negligently, carelessly, intentionally, and recklessly applied a policy requiring expulsion after a student is twice admitted to an outside mental health institution, including barring the child from stepping foot on campus, and permitted Adam to be returned to a disruptive and unstable environment outside of MHS, which Defendants knew was, for Adam, a dangerous situation for his then-existing mental and emotional state.

135.    Adam did not pose a direct threat to anyone such that the Defendants' conduct was permissible under the ADA. Moreover, the Defendants have never indicated when, how, and to whom Adam posed such a direct threat, having failed to make any individualized assessment based on reasonable judgment, relying on current medical knowledge, or on the best available objective evidence.

136.    The Defendants had no medical, scientific or rational basis to exclude Adam from participating in or benefiting from the goods, services, facilities, privileges, advantages and accommodations provided by the School.

137.    Rather than relying on current medical knowledge or the best available evidence about adolescent depression or consulting with trained professionals at Philhaven or MHS, the Defendants based their decisions on unfounded assumptions, unwarranted fears, generalizations, prejudices, stereotypes and myths about mental and emotional illnesses.

138.    The Defendants denied Adam the right to participate in and benefit from the goods, services, facilities, privileges, advantages and accommodations provided by the School based on his depression, anxiety and other mental and emotional illnesses.

139.    Title III of the Americans with Disabilities Act prohibits discrimination against individuals on the basis of disability in the full and equal enjoyment of the services of any place of public accommodation.  42 U.S.C. § 12182, *et seq.*; 28 C.F.R. § 36.102, *et seq.*

140.    At all relevant times, Adam had a mental impairment (diagnosed mental and emotional illness) that substantially limited the operation of his major bodily functions, as well as substantially limited other major life activities, such that he was an individual with a disability within the meaning of the ADA.

141.    In addition, Adam's medical records all note a diagnosis of a mental impairment, such that they reflect that he was an individual with a disability within the meaning of the ADA.

142.    Finally, the Defendants regarded Adam as an individual with a disability within the meaning of the ADA.

143.    MHS is place of public accommodation within the meaning of the ADA because it is an "elementary, secondary … private school or other place of education."  42 U.S.C. § 12181(7)(J).

144.    As described above, Defendants denied Adam the full and equal enjoyment of the goods, services, facilities, privileges, advantages and/or accommodations provided by MHS on the basis of his disability in violation of 42 U.S.C. § 12182(a) and 28 C.F.R. § 36.201(a).

145.    Through its actions, Defendant also:

    (a)    Denied Adam the opportunity to "participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations" of MHS, in violation of 42 U.S.C. § 12182(b)(1)(A)(i) and 28 C.F.R. § 36.202(a);

    (b)    Utilized "standards or criteria or methods of administration that have the effect of discriminating on the basis of disability," in violation of 42 U.S.C. § 12182(b)(1)(D) and 28 C.F.R. § 36.204;

    (c)    Imposed or applied eligibility criteria that "screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying its goods, services, facilities, privileges, advantages or accommodations," in violation of 42 U.S.C. § 12182(b)(2)(A)(i); and

    (d)    Afforded Adam with an unequal benefit in regard to its offering of goods, services, facilities, privileges, advantages or accommodations on the basis of his disability, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii) and 28 C.F.R. § 36.202(b).

146.    Defendants' discrimination was a direct and factual cause that led Adam to sustain severe emotional and psychological harm.

147.    Plaintiff seeks immediate injunctive relief, which shall consist of (a) immediate qualification for the MHS Scholarship program as if he had completed his junior and senior year at MHS, and had met all criteria upon graduation, and access to whatever other assistance, rights and privileges the School provides to its graduates; (b) creation by MHS of a therapeutic student home for the seriously depressed children in its care, with 24 hour professional coverage; (c) appointment of an advocate for children to participate in all enrollment reviews; and (d) a commitment to continue care for children suffering from a mental health disability for

a duration of at least twelve (12) months from diagnosis before any decisions on termination are made.

148.    Plaintiff also seeks the recovery of attorney's fees, litigation expenses and costs consistent with 42 U.S.C. § 12205 and 28 CFR § 36.505.

## COUNT II – VIOLATION OF THE FAIR HOUSING ACT

**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

149.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

150.    Adam met all of MHS's eligibility criteria during his enrollment to reside at the School.

151.    MHS discriminated against Adam by denying him housing at MHS on the basis of his mental handicap.

152.    The Defendants failed to investigate, engage in an interactive dialog with, and/or offer any reasonable accommodations to Adam for his mental disability, which reasonable accommodations would have allowed him to remain enrolled in and prosper at MHS.

153.    Instead, Defendants negligently, carelessly, intentionally, and recklessly applied a policy requiring expulsion after a student is twice admitted to an outside mental health institution, including barring the child from stepping foot on campus, and permitted Adam to be returned to a disruptive and unstable environment outside of MHS, which Defendants knew was, for Adam, a dangerous situation for his then-existing mental and emotional state.

154.    Adam did not pose a direct threat to anyone such that the Defendants' conduct would be permissible under the FHA.  Moreover, the Defendants have never indicated when, how and to whom Adam posed such a direct threat, having failed to make any individualized

assessment based on reasonable judgment, relying on current medical knowledge, or on the best available objective evidence.

155.    Defendants negligently, carelessly, intentionally and recklessly applied a policy requiring expulsion after a student is twice admitted to an outside mental health institution, including taking away a child's housing, and barring the child from stepping foot on campus or attending graduation ceremonies open to the public. Rather than relying on current medical knowledge or the best available evidence about adolescent depression or consulting with trained professionals at Philhaven or MHS,  the Defendants based their decisions on unfounded assumptions, unwarranted fears, generalizations, prejudices, stereotypes and myths about mental and emotional illnesses.

156.    The Defendants denied Adam continued residence at the School, the right to participate in and benefit from the residential programs at the School, and the right to other goods, services, facilities, privileges, advantages and accommodations provided by the School based on his depression, anxiety and other mental and emotional illnesses.

157.    At all relevant times, Adam had a mental impairment (diagnosed mental and emotional illnesses) that substantially limited the operation of his major bodily functions, as well as substantially limited other major life activities, such that he was an individual with a handicap within the meaning of the FHA, 42 U.S.C. § 3602(h).

158.    In addition, Adam's medical records all note a diagnosis of a mental impairment, such that they reflect that he was an individual with a handicap within the meaning of the FHA.

159.    Finally, the Defendants regarded Adam as an individual with a handicap within the meaning of the FHA.

160.    Adam is an aggrieved person as defined by the FHA, 42 U.S.C. § 3602(i)(1), and has suffered damages as a result of the Defendants' discriminatory conduct as described above.

161.    Defendants' discrimination was a direct and factual cause that led Adam to sustain severe emotional and psychological harm and humiliation, as well as monetary damages in securing alternative housing and paying his own living expenses.

162.    Adam's student home at MHS is a dwelling, as set forth in the FHA, 42 U.S.C. § 3602(b).

163.    Adam, like all students enrolled at MHS and living in the student homes on campus, were given chores and other tasks to do by their houseparents.  Theses chores and tasks were required, and constitute consideration for Adam's residence in the student home.

164.    Additional consideration for Adam's residence in the student home was provided to the School by The Milton Hershey School Trust, which contributed money, funding and other tangible consideration.

165.    As described above, Defendants have:

(a)     Discriminated against Adam in the sale or rental, or otherwise making unavailable or denying a dwelling to Adam because of his disability, in violation of the FHA, 42 U.S.C. § 3604(f)(1);

(b)     Discriminated against Adam in the terms, conditions, or privileges of rental of a dwelling or in the provision of services or facilities in connection with a dwelling, because of his disabilities, in violation of the FHA, 42 U.S.C. § 3604(f)(2); and

(c)     Refused to make reasonable accommodations in their rules, policies, practices or services, when such accommodations were necessary to afford Adam equal opportunity to use and enjoy his dwelling, in violation of the FHA, 42 U.S.C. § 3604(f)(3).

(d)     Afforded Adam with an unequal benefit in regard to its offering of goods, services, facilities, privileges, advantages or accommodations on the basis of his disability, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii) and 28 C.F.R. § 36.202(b).

166.    Plaintiff seeks immediate injunctive relief which shall consist of, *inter alia*, (a) immediate qualification for the MHS Scholarship program as if he had completed his junior and senior year at MHS, and had met all criteria upon graduation, and access to whatever other assistance, rights and privileges the School provides to its graduates; (b) creation by MHS of a therapeutic student home for the seriously depressed children in its care, with 24 hour professional coverage; (c) appointment of an advocate for children to participate in all enrollment reviews; and (d) a commitment to continue care for children suffering from a mental health disability for a duration of at least twelve (12) months from diagnosis before any decisions on termination are made

167.    Plaintiff also seeks the recovery of money damages, attorney's fees, litigation expenses and costs consistent with the FHA.

168.    The discriminatory actions of the Defendants were intentional, willful, and taken in disregard of Adam's federally protected rights.

## COUNT III – VIOLATION OF THE FAIR LABOR STANDARDS ACT

**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

169.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

170.    Defendants have engaged in a pattern, policy and practice of violating the FLSA as detailed herein.

171.    The minimum wage provisions set forth in the FLSA, 29 U.S.C. §§ 201 *et seq.*, and the supporting federal regulations, apply to the Defendants and protect Plaintiff.

172.    At all relevant times, Plaintiff was employed by an entity engaged in commerce and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§

203(e), (m) and 206(a), and/or they were engaged in commerce and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(e), (r) and (s).

173.    The Defendants took advantage of a vulnerable child's desire to please the School administration by constantly requesting his presence at fairs and tours and in the office with Plaintiff expecting at the very least the benefits of the School available to its students, including a continued education, housing through graduation, college scholarship assistance, and help in achieving those objectives as his recompense.

174.    At all relevant times, Plaintiff was an employee of Defendants within the meaning of 29 U.S.C. § 203(e), and not mere volunteer, subject to the direction and control of the School's Admission Office, which assigned him tasks otherwise to be performed by paid employees of the School for necessary School functions that directly benefited the School, but not Adam.

175.    At all relevant times, Defendants have been engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 203(e), (r) and (s).

176.    At all relevant times, Defendants employed Plaintiff within the meaning of 29 U.S.C. § 203(g).

177.    Defendants engaged in a policy and/or practice of failing to pay Plaintiff the applicable minimum wage for all hours it suffered or permitted Plaintiff to work.

178.    As a result of these minimum wage violations, Plaintiff has suffered damages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

179.     Defendants' unlawful conduct, as described at length herein, has been willful and intentional.  Defendants were aware or should have been aware that the practices described herein are unlawful, and that it would not assign him work often between 13 and 20 hours per week for the School Admission's Office without compensation.  Defendants have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiff.

180.     Not even the School's Board of Managers, who worked far less hours than Plaintiff, and are all men and women of substantial wealth, volunteer their services to the School without substantial compensation.

181.     Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

182.     On information and belief, Defendants have failed to make, keep and preserve accurate records with respect to Plaintiff including hours worked each workday and total hours worked each work week, as required by the FLSA, 29 U.S.C. § 211(c) and supporting federal regulations.

183.     Plaintiff also seeks the recovery of attorney's fees, litigation expenses and costs.

## COUNT IV – BREACH OF CONTRACT

**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

184.     Plaintiff incorporates by references all of the preceding paragraphs of the Complaint as if each was individually set forth at length within this Count.

185.     Adam and the other children enrolled in MHS were intended third party beneficiaries of the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook, and as to provisions applicable to enrolled students, were the only intended beneficiaries.

186.   The Defendants specific intent was to make children enrolled at MHS intended beneficiaries of the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook.  Such children were within the contemplation of those documents at the time they were entered into and/or distributed to children, parents and/or sponsors.

187.   The ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook each created a contractual duty of increasing tolerance for and eliminating discrimination of disabled children enrolled at MHS.

188.   The child beneficiaries of the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook, including Adam, have a right to performance to effectuate the intention of the parties because the circumstances indicate that the promisee, the United States of America, intended to give enrolled children at MHS the benefit of the promised performance.  The promisor, MHS, had a similar intent, and the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook, along with the circumstances, reflect that intent.

189.   Alternatively, the circumstances of tolerance and anti-discrimination are so compelling that recognition of an enrolled child's right to acceptance is appropriate to effectuate the intention of the parties, and indicate that the United States of America intended to give enrolled children the benefit of the promised performance.

190.   The Defendants breached their promise in the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook to correct then-existing discriminatory practices against disabled students, and Adam was directly harmed thereby.

191.   The above-described conduct directly caused Adam significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional

distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

### COUNT V – NEGLIGENCE - BREACH OF DUTY OF CARE
**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

192.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

193.    An affirmative duty on the Defendants' part to care for Adam and protect him from harm arose from the special relationship that existed between Defendants and Adam.

194.    Specifically, and as described at length above, through its "unique, home-like environment," the Defendants, by and through their agents, servants and employees, exercised custody and control over its enrolled students, such as Adam.  At all relevant times, MHS functioned as Adam's primary caregiver, providing education, housing, food, clothing and medical, dental and psychological care.  In these and other ways, Adam was dependent on the Defendants to meet his basic needs of sustenance, care and protection.  Moreover, the Defendants had imposed limitations on Adam's freedom to act on his own behalf and had deprived Adam of his normal opportunities for protection.

195.    In addition to the above, the Defendants, by and through their agents, servants and employees, further exercised custody and control over Adam by requiring him to submit to in-patient admissions at Philhaven.

196.    For all of these reasons, the Defendants owed Adam a special and higher duty of care, in addition to a duty of ordinary care, to protect him from harm.

197.    The Defendants, by and through their agents, servants and employees, breached the duty arising by virtue of their special relationship with Adam in ways which include, but are not limited to, the following:

(1)    By requiring that Adam be admitted to two mental institutions so that MHS could effectuate its two institution expulsion policy and also terminate the medical care being provided by MHS staff;

(2)    By permitting Adam to be discharged from Philhaven directly to his mother rather than maintaining custody over Adam at MHS.  For example, MHS could have, but did not, offer any options that would permit Adam to remain on the MHS campus for observation and/or further treatment immediately following his discharge from Philhaven;

(3)    By failing to develop a care plan for Adam before he was discharged to his mother;

(4)    By failing to provide adequate care to Adam prior to his discharge from Philhaven, when MHS doctors and administrators took no role in Adam's education or treatment due to the expulsion policy and related determination that Adam would not be permitted to return to MHS; and

(5)    By holding out the threat of expulsion and/or a forced leave of absence.

198.    Defendants had a further duty to protect Adam because they created or exacerbated a dangerous situation as described in the preceding paragraph, including by first caring for him in a supportive environment for over eight years, confusing him with "conversion therapy," and then deserting him when he needed MHS the most.

199.    Defendants had a further duty to protect Adam because MHS withdrew critical, life-saving support after partially performing, and after Adam had relied upon MHS's care and assistance to the exclusion of other alternative assistance.

200.    Defendants had a further duty to protect Adam because MHS took charge of Adam, who was helpless to adequately aid or protect himself, but then discontinued its aid and protection, thereby leaving Adam in a worse position than when MHS took charge of Adam in the first place.

201.    Adam was significantly damaged by all of these breaches by the Defendants, mentally, emotionally, physically and monetarily.

202.    As a result of the above-described conduct, Adam suffered significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life as well as conscious pain and suffering; and/or Adam has been denied at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits, and incurred housing and living expenses fending for himself during this time.

203.    All of these damages were foreseeable to the Defendants because at the time of each breach described above, the Defendants knew or should have known that remaining in the supportive environment of MHS was essential for Adam's well-being given his then-existing fragile mental state.   Moreover, the Defendants knew or should have known of Adam's mother's lack of financial resources and that she was otherwise unable to provide him with the type of psychological care or home that he needed at the time of his discharge from Philhaven and expulsion from the School.

204.    The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

### COUNT VI – INTENTIONAL CREATION OF DANGER
**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

205.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

206.    MHS intentionally created and/or exacerbated a known dangerous situation by engaging in the specific affirmative conduct described herein.

207.    MHS further deliberately and recklessly established and maintained a custom, practice or policy that caused Adam harm.   That custom, practice or policy was to expel students suffering with mental impairments once they have been twice institutionalized, and to bar those same students from the MHS campus.

208.    These intentional, deliberate and reckless acts of MHS directly caused Adam significant mental, emotional, physical and monetary harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life as well as conscious pain and suffering, and further have denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

209.    The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

## COUNT VII - NEGLIGENT MISREPRESENTATION
**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

210.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

211.    Defendants, through their employees and agents, represented to Plaintiff and his mother the following things:

(1)    MHS does not discriminate against applicants or students on the basis of any disability;

(2)    students with any sort of disabilities have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, and accommodations provided by the School;

(3)    students cannot have their enrollment discontinued solely on the basis of their disability;

(4)    MHS does not exclude persons with disabilities from participation in, or deny them the benefits of, the full and equal enjoyment of its goods, services, facilities, privileges, advantages or accommodations on the basis of their disability;

(5)    MHS makes reasonable modifications to its policies, practices and procedures when the modification are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with any sort of disabilities;

(6)    MHS develops and implements individualized plans for disabled students to ensure that MHS is able to accommodate those students at the School; and

(7)    MHS has developed and provided mandatory and comprehensive training on the ADA, and specifically on Title III of the ADA, to all staff and administrators.

212.    Defendants, through their employees and agents, also represented to Plaintiff and his family that MHS provided a "comprehensive array" of psychological services to students, including "individual and group therapy, psychological and psychoeducational assessments, consultation, staff training, crisis intervention and prevention," and that the "type of psychological service provided for a student is dependent on the individual student's need."

213.    Each of these representations was material and false as to Adam and others.

214.    In addition to the representations being made directly to Adam, Defendants, through their officials, made these representations to Adam's mother with knowledge and intent that they would be communicated to and relied upon by Adam through words and actions.

215.    Defendants' representations to Adam and his family began in 2005 and continued until May of 2013.

216.    Defendants should have known that their representations were false when made.

217.   Defendants reasonably should have foreseen that these representations would subject Adam to an unreasonable risk of harm.

218.   Adam and his mother believed and justifiably relied upon Defendants' representations, which caused him suffer the vast array of damages described herein.

219.   Adam's injuries were proximately caused by his reliance on the representations.

220.   The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

221.   The above-described conduct directly caused Adam significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

## COUNT VIII - INTENTIONAL MISREPRESENTATION
**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

222.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

223.   Defendants knew that the material representations set forth in Count IV above made by Defendants, through their employees and agents, to Plaintiff and his mother were false when made or, alternatively, acted with reckless disregard as to the truth or falsity of such representations.

224.   Plaintiff believed and justifiably relied upon Defendants' representations, which caused him to suffer the other damages as more particularly described herein.

225.    Upon information and belief, Defendants made the misrepresentations with the intent to deceive Plaintiff and to induce him and his mother to act on the misrepresentations to their detriment and harm.

226.    Adam's damages and injuries were proximately caused by his reliance on the representations such that Defendants actions caused Adam to suffer the vast array of damages described herein.

227.    The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

228.    The above-described conduct directly caused Adam significant mental, emotional, physical and economic harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

## COUNT IX - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

229.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

230.    By acting in conscious disregard of the findings of the Department of Justice as set forth in the ADA Settlement Agreement and in conscious disregard of the anti-discrimination requirements set forth in both the Equal Opportunity Policy and the ADA, Defendants did by extreme and outrageous conduct intentionally or recklessly cause severe emotional distress and bodily harm to Adam.

231.   Defendants' conduct in holding out its premises as a safe environment for young children with mental impairments when it had reason to know the School could be a dangerous place for children such as Adam due to the School's discriminatory treatment of students with disabilities, constitute extreme and outrageous conduct that was atrocious and went beyond all bounds of decency such that it is conduct utterly intolerable in a civilized society.

232.   Defendants acted extremely and outrageously in threatening to expel Adam on the basis of his mental impairments at the very time when he was the most fragile, despite the fact that Defendants purportedly provided a vast array of psychological and psychiatric services, including, but not limited to, crisis intervention.

233.   Defendants' conduct intentionally and/or recklessly caused Adam severe physical and emotional distress, including severe mental anguish and horror, because the natural and probable consequences of Adam's proposed expulsion from the School was Adam's emotional distress.

## COUNT X - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

234.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

235.   Defendants, by and through their agents, servants and employees, knew or reasonably should have known of the dangerous conditions that existed by virtue of the School's discriminatory treatment of students with disabilities and their exclusion from campus events such as graduation ceremonies and celebrations.

236.   Defendants, by and through their agents, servants and employees, knew or reasonably should have known that Adam was being discriminated against by virtue of the

School's custom, practice or policy requiring the expulsion of students suffering with mental impairments.

237.   Defendants breached the duty of care owed to Adam by failing to protect him from foreseeable pain and suffering related to his expulsion from MHS.

238.   Defendants' conduct resulted in Adam suffering severe physical and emotional distress, including severe mental anguish and horror.

## COUNT XI - CIVIL CONSPIRACY TO ENDANGER CHILDREN

**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

239.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

240.   Defendant The Milton Hershey School, The Milton Hershey School Trust, Board of Managers of the Milton Hershey School and The Hershey Trust Company, along with individual members of the Board of Managers not presently named as defendants and senior MHS administrators, acted with a common purpose, and conspired to endanger the welfare of children, including Adam, in violation of Pennsylvania law by continuing dangerous discriminatory policies unbeknownst to the public and contrary to their public pronouncements.

241.   In Pennsylvania, there is an implied civil cause of action for endangering the welfare of children by a child whose welfare was endangered.

242.   Also in Pennsylvania, there is a civil cause of action for negligence *per se* for violation of the statute against endangering the welfare of children.

243.   Adam has standing to bring this claim because he was one of the children who were discriminated against as a result of this conspiracy to endanger the welfare of children.

244.    Members of the Trust/MHS boards and senior leadership at the School had or should have had information that discriminatory customs, practices and policies were still in place and/or that the anti-discrimination requirements set forth in the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook had not been enacted, enforced or abided by, and that MHS mental health policies, procedures and practices were dangerous.

245.    The decision to continue discriminatory customs, practices and policies and the collective silence of various individuals at MHS in addition to Defendants were overt acts committed in pursuance of the common purpose to endanger the welfare of children, and concealed from Adam the unsafe living environment.

246.    These decisions and their concealment directly injured Adam because it caused Adam and his mother to keep Adam enrolled at the School to endure further discrimination.

247.    The above-described conduct directly caused Adam significant mental, emotional, physical and monetary harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

## COUNT XII – BREACH OF THE FIDUCIARY DUTIES OF CARE AND GOOD FAITH

### Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee

248.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

249.    The Board of Managers and the Trustee owed Adam fiduciary duties of care and good faith to provide a safe environment for all children in their care, requiring them to exercise

the kind of reasonable inquiry, skill and diligence that a person of ordinary prudence would use in overseeing the care of young at-risk children and protecting them from known dangers.

250.    The Board of Managers and the Trustee, officers and key employees of the School and the School Trust also have a fiduciary relationship with the School and School Trust which requires that they act in good faith with regard to the School and School Trust's best interests, and also requires that they apply the highest moral, legal, and ethical standards in their conduct.

251.    The Board of Managers and the Trustee breached their duties by: (1) failing to appoint residential childcare and mental health experts to their boards; (2) failing to hire qualified senior MHS administrators; (3) failing to implement policies or institutional controls that would prevent incidents of discrimination against disabled students and allow identification of such abuse once it had occurred; (4) not following through on the ADA Settlement Agreement, the Equal Opportunity Policy or the Handbook by, among other things, failing to properly train staff and administrators on the requirements of Title III of the ADA; and (5) failing to monitor and comply with the ADA Settlement Agreement, the Equal Opportunity Policy, the Handbook and/or Title III of the ADA.

252.    The Trustee and Board of Managers, by and through their agents, servants and employees, as signatories to the ADA Settlement Agreement, and authors of the Equal Opportunity Policy and the Handbook, knew or reasonably should have known of the dangerous conditions that existed on campus by virtue of the active discrimination against disabled children.

253.    Defendants all knew of the numerous prior instances of discrimination against disabled students, and yet, indefensibly given this history, intentionally subjected Adam to the

discriminatory custom, practice and/or policy requiring the expulsion of students suffering with mental impairments.

254.   Based on the explicit findings of the ADA Settlement Agreement, Adam's documented history of mental impairment and literature in the field of depression, it was reasonably foreseeable and, indeed, completely predictable, that if the Trustee and Board of Managers did not adequately exercise or provide the duty of care owed to young children suffering with mental impairments in their care, including but not limited to Adam, those children would be vulnerable to emotional, mental and physical harm.

255.   The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious, and as to the Trustee, constituted a breach of trust, such that punitive damages are further warranted.

256.   The above-described conduct directly caused Adam significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

## COUNT XIII – NEGLIGENCE *PER SE*

**Plaintiff v. Defendants, The Milton Hershey School and School Trust, The Milton Hershey School Trust, The Board of Managers of the Milton Hershey School, and The Hershey Trust Company, as Trustee**

257.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

258.    Defendants have violated at least four statutes, (1) the ADA, (2) the FHA, (3) the FLSA, all as described above, and also a related statute, (4) the Pennsylvania Human Relations Act.

259.    The purpose of these statutes, at least in part, is to protect the interest of the Plaintiff individually, as he is an intended beneficiary of both statutes.

260.    The aforementioned statutes clearly apply to the conduct of the Defendants in this case.

261.    As described above, the Defendants have violated these statutes, which is negligence *per se*.

262.    The violation of these statutes has proximately cause Adam's injuries. Specifically, the above-described conduct directly caused Adam significant mental, emotional, physical and monetary harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests the following relief:

(a)    A permanent injunction, or in the alternative an order, requiring that Defendants, their agents and employees abide by and comply in all respects with the terms of the FHA, the ADA and the ADA Settlement Agreement;

(b)    A permanent injunction, or in the alternative an order, requiring that Defendants, their agents and employees develop and implement a written anti-discrimination policy insuring that no student will be expelled or otherwise discriminated against because of his or her mental impairment in the future;

(c)     A permanent injunction, or in the alternative an order, requiring that Defendants, their agents and employees conduct mandatory School-wide sensitivity training for all staff regarding depression and other mental impairments;

(d)     A permanent injunction, or in the alternative an order, requiring that Defendants create a therapeutic student home for the seriously depressed children in its care, with 24 hour professional coverage;

(e)     A permanent injunction, or in the alternative an order, requiring that Defendants appoint an advocate for children to participate in all enrollment reviews;

(f)     A permanent injunction, or in the alternative an order, requiring that Defendants provide a commitment and assurance to continue care for children suffering from a mental health disability for a duration of at least twelve (12) months from diagnosis before any decisions on termination or enrollment are made;

(g)     Actual and punitive damages, attorney's fees, litigation expenses and costs consistent with 42 U.S.C. § 12205 and 28 CFR § 36.505, as well as 42 U.S.C. § 3613;

(h)     Unpaid minimum wages and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

(i)     Compensatory and actual damages in an amount to be determined at trial;

(j)     Punitive damages in an amount to be determined at trial;

(k)     Cost and reasonable attorneys' fees; and

(l)     Such other and further relief as this Court deems just and proper.

Respectfully submitted:

Gregory F. Cirillo, Esquire
Matthew Faranda-Diedrich, Esquire
Alexander J. Nassar, Esquire
**DILWORTH PAXSON LLP**
1500 Market Street, Suite 3500E
Philadelphia, PA 19102
215-575-7000
Emails:  gcirillo@dilworthlaw.com
         mfd@dilworthlaw.com
         anassar@dilworthlaw.com
*Attorneys for Plaintiffs*

Dated:  June 30, 2016