## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| ADAM DOBSON<br><br>                    Plaintiff,<br><br>         v.<br><br>THE MILTON HERSHEY SCHOOL,<br><br>and<br><br>THE HERSHEY TRUST COMPANY, AS TRUSTEE OF THE MILTON HERSHEY SCHOOL TRUST,<br><br>                  Defendants. | C.A. NO.:<br><br>2016-cv-1958-YK<br><br>**JURY TRIAL DEMANDED** |

### AMENDED COMPLAINT

Plaintiff Adam Dobson ("Adam"), by and through his attorneys Dilworth Paxson LLP, brings this Complaint and avers as follows:

This case involves a school – entrusted with children of limited means and troubled backgrounds – who callously and tragically discarded one of its students, after he resided there for almost nine years, a youth struggling with the disability of significant, but treatable, depression and related mental health issues. Because the school is set up to a be a surrogate family for students, complete with group "homes" for living and "house parents," Adam's sudden separation from his familial unit on account of the school's wrong-headed decision to expel him because of his disability led to wide-ranging and significant emotional and economic damages, as well as the loss of scholarship opportunities.

Adam was a poster-child for MHS, his happy face appearing on MHS marketing material. Adam cheerfully toiled for hours in the MHS Admissions Office for no pay, and was

invited to numerous enrollment fairs throughout the northeast to encourage families to send their children to MHS. But after seeking professional help with adolescent depression, he was ignored and terminated, as a "liability" to MHS.  MHS's actions failed miserably to meet the standards of care required of a residential school of its nature.  MHS even exacerbated Adam's depression by attempting "conversion therapy" to change his sexual preference.  It then applied its informal two-hospitalization rule to terminate Adam after he needed a second short term stay at a mental health facility. Despite being one of the children at MHS with the highest social need, Adam was terminated by MHS and released back to a poor, unstable and at-risk environment, contrary to any reasonable treatment of his depression, which needed supervised and controlled – treatment available at the MHS, where he was safe.

MHS's conduct is made all the more egregious because the shameful way MHS handled this young man's disability is not an isolated incident; rather, it is one of many violations of the Americans with Disabilities Act perpetrated by the school over the past several years, with one such occurrence leading to a settlement agreement with the United States of America explicitly prohibiting the school from engaging in such conduct.  In this case, MHS coldly embarked on a strategy to terminate Adam's enrollment, in direct violation of a settlement agreement the school previously signed with the United States of America that prohibited the exact kind of discrimination that the school perpetrated against Adam, a vulnerable child with a diagnosed disability under federal law.  The school's failure to strictly comply with federal law leaves childrens' lives hanging in the balance.

## PARTIES

1.      Adam Dobson is an adult male individual and is a citizen of the State of New York, currently residing at 15 Ann Street, Apartment 2, New York, New York 10038.

2.      Defendants The Milton Hershey School and The Hershey Trust Company refer to themselves collectively as the "Milton Hershey School and School Trust," which they describe as being an integrated tax-exempt organization composed of a not-for-profit corporation, acting as Manager under the Deed of Trust, and the Trust itself, filing one Federal Form 990 (hereinafter referred to as "MHS" or the "School" or the "School Trust" as the context implies) with its principal address at 711 Crest Lane, Hershey, Pennsylvania 17033. MHS is organized, exists and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania.   MHS operates its residential school in Dauphin County, Pennsylvania, soliciting students for admission throughout the Commonwealth, including in Philadelphia County.  With approximately $12 billion in assets, MHS is the world's wealthiest residential school, and serves children in grades K through 12.  Its stated mission is to nurture and educate children in social and financial need to lead fulfilling and productive lives.  The School Trust was and continues to be a charitable trust qualified under Section 501(c)(3) of the Internal Revenue Code of 1986 with its principal address at Hershey Trust Company, 100 Mansion East Road, P. O. Box 445, Hershey, Pennsylvania  17033.  The School Trust is organized, exists and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania and engages in activity throughout Pennsylvania, including in Philadelphia County.  The School Trust's purpose is to maintain "a permanent institution for the residence and accommodation of poor children . . . and the maintenance, support, and education . . . of such children."   The School Trust funds the School, owns a controlling interest in The Hershey Company, a publicly-traded corporation, and wholly owns The Hershey Trust Company, its trustee, and the Hershey Entertainment and Resorts Company ("HERCO"), which oversees resort properties along with an amusement park called Hersheypark.

3.      Defendant The Hershey Trust Company (hereinafter the "Trustee") was and continues to be a Pennsylvania for-profit corporation, with its principal place of business located at 100 Mansion Road East, in Derry Township, Hershey, Pennsylvania 17033-0445. The Hershey Trust Company is organized, exists, and operates pursuant to and by virtue of the laws of the Commonwealth of Pennsylvania and engages in activity throughout the Commonwealth, including in Philadelphia County.  The Trustee was organized for the purpose of serving as trustee of the School Trust and continues to serve in this role.  The Trustee is wholly owned by the Milton Hershey School.

4.      The School and the Trustee share a self-perpetuating, interlocking and integrated governance structure.  The members of the School's Board of Managers are the same persons as the members of the board of directors of the Trustee.  The School's Board of Managers and the board of directors of the Trustee will be collectively referred to herein as the "Trust/School Boards."  These board members pay themselves extraordinary sums of compensation, from charitable assets, but have failed in their oversight of MHS policies and have failed to include within their membership a single residential childcare expert, or any member with the requisite experience in working with at-risk children.

5.      The Trust/School Boards have been put on notice that MHS teenagers were being expelled for depression and took no action to correct this illegal activity.

6.      All named defendants will be collectively referred to herein as "Defendants."

7.      At all times relevant hereto, Defendants acted by and through their agents, servants and employees, each of whom acted within the scope of his or her job duties.

## JURISDICTION AND VENUE

8.      Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this matter because the parties are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      Additionally, pursuant to 28 U.S.C. § 1331, this Court has federal question jurisdiction over the subject matter of Plaintiffs' claims under the Americans with Disabilities Act ("ADA"), the Fair Housing Act ("FHA") and the Fair Labors Standards Act (the "FLSA").

10.     Under federal question jurisdiction, this Court would have supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

11.     This action is authorized by 42 U.S.C. § 12188 and 42 U.S.C. § 3613.

12.     Venue is proper in the Middle District of Pennsylvania by virtue of 28 U.S.C. §1391(b)(1) because The School and the Trustee are entities that reside in this judicial district, pursuant to 28 U.S.C. §1391(c).

13.     According to the MHS website, the School provides a "cost-free, private, coeducational home and school for children from families of low income, limited resources, and social need. The School is funded by a trust established by Milton S. Hershey and his wife Catherine. Milton Hershey School offers a positive, structured home life year-round and an excellent pre-kindergarten through 12th grade education."

14.     MHS regularly conducts business in this judicial district in a variety of ways.

15.     The School's Deed of Trust requires preferential admission to students born in this judicial district.  A true and correct copy of the Deed of Trust is attached hereto as Exhibit "A."

16.     The Trustee and the Trust/School Boards, by virtue of their self-described status as organizations "integrated" and "interlocking" with the School, also regularly engage in the same kind of business in this judicial district.

## FACTS

### ADAM DOBSON, A SWEET AND TENDER CHILD

17.     Adam was born on May 4, 1995.  He was admitted to MHS on or about August 2004, having recently turned nine years old (third grade).  Adam's father passed away when Adam was six months old.  During his time at MHS, Adam's mother struggled with emotional and financial difficulties.  Adam attended, excelled, and thrived at MHS for more than eight years.

18.     Adam was by all accounts a model student during his eight years at MHS. Indeed, it is believed that school records will demonstrate that Adam was a high-achiever and an outgoing and sensitive child.  He also consistently maintained the highest levels of conduct, designated as "Spartan" or "Gold" by the School.  In ninth grade, Adam achieved "All Spartan" status on account of his academic excellence.   He thrived at the School and had a promising future.  He worked endless hours promoting the School in its admissions office after classes, during nights and on weekends.

19.     But merely because Adam suffered from treatable teenage depression, MHS officials would expel him from the school at the very end of his junior year, completely disregard Adam's high-achieving student standing, rupture all his existing social bonds with friends, houseparents, teachers, coaches, counselors, and other staff, destroy the home he had found at MHS, take away his entire support structure, banish him from MHS, stigmatize and marginalize him, and send Adam back to the very environment from which he had been rescued at the age of nine, in total disregard of his well-being and with completely predictable results.

**THE SPECIAL, CUSTODIAL RELATIONSHIP EXISTING BETWEEN THE
DEFENDANTS AND STUDENTS ENROLLED AT THE SCHOOL**

20.     MHS is a private residential school for children in financial and social need from

pre-kindergarten through 12th grade.  It was tailor-made for young Adam, who faced severe

financial and social needs upon presenting for enrollment.

21.     MHS currently enrolls approximately 2,000 students and solicits applications for

admission from children between the ages of 4 and 15.

22.     The School spends approximately $100,000 per year per enrolled student.  MHS

also provides for up to approximately $80,000 in higher education benefits to each qualifying

graduate.

23.     According to the School, its students live "in large, comfortable homes with 10

to 14 students in their own age group.  A pair of married houseparents oversee each home,

providing the structure that children need and taking an active interest in their development."

24.     The School also advertises to prospective students and their parents or guardians

that MHS "aims to create a family-like atmosphere for students" with houseparents and other

students becoming a student's "extended family."

25.     MHS promotional materials represent that, "[o]ur students live at the School and

our program is *year-round*.  So the Student home and houseparents are at the core of each

child's stability and safety while they are here" (emphasis added).

26.     Indeed, MHS openly describes itself as "a private residential school with

surrogate parenting responsibilities."

27.     In court documents recently filed by MHS in the Eastern District of

Pennsylvania (*Mother Smith v. MHS*), MHS further described the special type of custodial

relationship between the School and its students as follows:

> The Milton Hershey School educates children in a unique, home-like environment. ... the School is designed and operated to raise and care for children, and to fulfill a parental role for most of the year.
>
>                                 \* \* \*
>
> [T]he School operates a home-like residential setting in conjunction with its educational program that is a fundamental part of its program.  Students reside at the school 24 hours a day, 7 days a week, for most of the year, living in family style residences. ... students often also reside at the School for most of the year, not just during the school year.

*See* p. 2 and 6-7 of Milton Hershey School's Answer with Affirmative Defenses to Amended Complaint and Counter-Claim for Declaratory Judgment in *Mother Smith* (E.D. Pa. 11-cv-07391 at Dkt. #10), a true and correct copy of which is attached hereto as Exhibit "B."

28.      Elsewhere in the same filing, MHS explained the broad scope of primary and physical custodial control it exercises over its enrolled students by virtue of its status as the students' primary caregiver, as follows:

> [T]he School provides a unique all-encompassing program for these children, including an education, housing in a family setting, food, clothing, medical, dental and psychological care, and recreational opportunities, with no financial obligation to the family.

*Id*. at 17.

29.      Also in those documents, MHS refers to the "comprehensive nature of the care provided by the School" to students and touts "the unique 24/7 residential nature of its programs and services" as well as its "unique residential private school setting" that includes "a very closely-knit community" with an "extended [school] year."  *Id*. at 3, 21 and 23.

30.      In connection with a settlement reached in the above-noted proceeding, MHS confirmed that "it stands '***in loco parentis***' to all children attending the School" *See* ¶ 19 of the ADA Settlement Agreement discussed in more detail below (emphasis added).

31.     The breadth of MHS's custody over students extends to controlling both parental visitation schedules at the School and so-called "overnight" visits taken by students, which are often visits between the students and their natural parents and/or guardians.

32.     Indeed, MHS's desire to affirmatively undertake its surrogate family role is so pronounced that it prohibits parent-child interaction during the first month that a child is enrolled in MHS, even for children as young as four, working to create a new dynamic.

33.     The School monitors and regulates every aspect of children's lives, creating a virtual surrogate institutional family.  MHS even regulates the love lives of its students, and requires, among other things, that "Students must be at least 15 years of age and in Senior Division to begin dating," and that "[d]ating arrangement must be set up with and approved by houseparents."

34.     These and other  MHS practices illustrate that MHS is deliberate in its effort to substitute its student home/MHS "school family" for the biological families of enrolled students, thereby heightening its own duties to these children, in good times and bad.

35.     Any subsequent removal from MHS is the equivalent of removal from a child's natural family, with traumatic consequences greater even in many cases than the original traumatization of entering MHS.

**THE UNITED STATES DEPARTMENT OF JUSTICE RECENTLY FOUND THAT THE DEFENDANTS HAVE DISCRIMINATED AGAINST STUDENTS WITH DISABILITIES AND OTHERWISE FAILED TO ABIDE BY THE AMERICANS WITH DISABILITIES ACT**

36.     In or around April of 2011, a 13 year old boy, going by the pseudonym "Abraham Smith," sought admission for fall enrollment at the School.

37.     At the time he sought admission, Abraham Smith was HIV positive.

38.     The School subsequently denied Abraham Smith enrollment based on the claim that his "documented needs are beyond the scope of the Milton Hershey School programs," which, as will be described at length below, is very similar to the reason given for denying Adam continued residence at the School beyond 11th grade.

39.     In November of 2011, Abraham's mother, identified as "Mother Smith," filed a complaint captioned *Mother Smith, on behalf of herself as parent and natural guardian on behalf of Abraham Smith v. Milton Hershey School*, C.A. No. 11-CV-07391-CDJ (E.D. Pa.) (the "HIV Case").

40.     In the HIV Case, Mother Smith alleged that the School violated Title III of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12181, *et seq.*, and its implementing regulation, 28 C.F.R. Part 36, as well as committed common law torts, by refusing to consider Abraham Smith for enrollment in the School due to the fact that he is HIV positive.

41.     Subsequently, the United States, through the Department of Justice ("DOJ"), initiated an investigation, at DJ #202-63-162, of the School's actions regarding Abraham Smith, ultimately resulting in a Settlement Agreement between The United States of America, The Milton Hershey School, and Mother Smith (on behalf of herself and Abraham Smith) dated September 12, 2012 (the "ADA Settlement Agreement").  A true and correct copy of the ADA Settlement Agreement is attached hereto at Exhibit "C."

42.     As a result of the investigation by the Department of Justice, and as reflected in the terms of the ADA Settlement Agreement, the United States made the following key findings:

    (1)     the School is a covered entity under the ADA, as it operates a place of public accommodation within the meaning of 42 U.S.C. § 12182(a); is a private entity within the meaning of 42 U.S.C. § 12181(6); and is

considered a place of public accommodation because it affects commerce and is a place of education within the meaning of 42 U.S.C. § 12181(7);

(2)     the School violated the ADA by rejecting Abraham Smith's application for admission to the School based on the fact that he has HIV, hereby denying him the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of the School, in violation of 42 U.S.C. § 12182 and 28 C.F.R. §§ 36.201 and 36.301; and

(3)     the School discriminated against Mother Smith by denying Abraham Smith's application for admission to the School based on the fact that he has HIV, hereby denying Mother Smith, among other things, privileges, advantages, accommodations or other opportunities because of Abraham Smith's known disability, in violation of 42 U.S.C. § 12182(b)(1)(E) and 28 C.F.R. §36.205.

*Id.* at ¶¶ 6-22.

43.     The ADA Settlement Agreement went on to impose several continuing obligations on MHS, including the enactment and enforcement of a non-disclosure and equal opportunity policy applicable to its programs and services for all students.  This policy was required to expressly provide, among other things that,

(1)     the School does not discriminate against applicants or students on the basis of any disability (including but not limited to HIV);

(2)     applicants and students with any sort of disabilities have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, and accommodations provided by the School; and

(3)     the School shall make reasonable modifications to its policies, practices and procedures when the modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with any sort of disabilities.

*Id.* at ¶¶ 23-35.

44.     The ADA Settlement Agreement at paragraph 26 further required the School to "develop and provide training on title III of the ADA" (a) to all persons with responsibilities for educating students and/or for providing medical, dental psychological, behavioral, or social

work-related care to students; (b) to all persons involved in the admissions process; and (c) to all School administrators and officers. *Id.* at ¶ 26.

45.    Finally, the ADA Settlement Agreement at paragraph 43 provided the United States with the continuing opportunity to review the School's compliance with the ADA Settlement Agreement and/or Title III of the ADA. Should the School fail to comply, the United States retained the right to initiate an enforcement action to enforce the ADA Settlement Agreement or Title III of the ADA. *Id.* at ¶ 43.

46.    As required by the ADA Settlement Agreement, MHS has developed a non-discrimination and equal opportunity policy entitled "Milton Hershey School (MHS) Student, Applicant and General Public Non-Discrimination and Equal Opportunity Policy," Policy No. 2.05.1, effective date December 4, 2012 (the "Equal Opportunity Policy"). A true and correct copy of the Equal Opportunity Policy is attached hereto as Exhibit "D."

47.    The Equal Opportunity Policy includes the following "Policy Statement":

> Milton Hershey School ("MHS" or the "School") will not tolerate any form of harassment or discrimination on the basis of race, color, religion, sex, disability or need for accommodation, association with or relationship to person with a disability, or any other class or status protected under federal, Pennsylvania, or local law (collectively "Protected Characteristics"), against any applicant for admission, enrolled student, or any other individual(s) who participate(s) in the programs, services, and activities of the School. ... Individuals protected by this policy, other than applicants and students, would include parent/sponsors and visitors touring the School or attending public events.

> * * *

> This Equal Opportunity Policy ("EO Policy" or "Policy") prohibits all forms of discrimination in all programs, services and activities of the School, including, but not limited to, admissions, academic and educational programs, other terms, conditions or privileges of education or enrollment at the School, and all activities open to the general public.

*Id.* at 1.

48.     The Equal Opportunity Policy goes on, in a section entitled "Disability

Discrimination is Prohibited," to mandate the following protections for students enrolled at the

School:

> The School is committed to preventing discrimination against persons with disabilities, and complying with the federal Americans with Disabilities Act ("ADA") and all similar Pennsylvania and local laws ... . All applicants for admission and currently enrolled students with disabilities ... will have an equal opportunity to participate in and benefit from all goods, services, facilities, privileges, advantages, accommodations, or programs provided by or at MHS.
>
> * * *
>
> The School will not exclude persons with disabilities ... from participation in, or deny them the benefits of, the full and equal enjoyment of its goods, services, facilities, privileges, advantages or accommodations on the basis of their disability.
>
> * * *
>
> ***Applicants who are otherwise qualified for admission to the School will not*** be denied enrollment or ***have their enrollment discontinued solely on the basis of their disability***.
>
> * * *
>
> Applicants and students with disabilities ... have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, and accommodations provided by the School.
>
> * * *
>
> The School will make reasonable modifications to its policies, practices, and procedures when the modifications are necessary to afford goods, services, programs, facilities, privileges, advantages, or accommodations to all individuals with disabilities.

*Id.* at 2-3 (emphasis added.)

49.     Pursuant to the ADA, the term "disability" means: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(a).

50.     The ADA defines "mental impairment" to include "[a]ny mental or psychological disorder, such as … emotional or mental illness." 28 C.F.R. § 36.104.

51.     Further, it is well-established that emotional conditions such as anxiety and depression are disabilities included within the meaning of "disability" under the ADA.

52.     Thus, one of the things that the Defendants promised (through the ADA Settlement Agreement and the Equal Opportunity Policy) to root out and eliminate from the School was discrimination based on emotional or mental illnesses, including anxiety and depression.  Adam's treatment at the hands of MHS will demonstrate that illegal discrimination at MHS continues in the mental health arena.

53.     However, despite (a) the prior finding of discrimination by MHS against a disabled student; (b) the repeated promises made by MHS to the United States in the ADA Settlement Agreement; and (c) the clear requirements of MHS's own Equal Opportunity Policy designed to prevent future instances of discrimination, upon information and belief, Defendants refused to implement or inadequately implemented, among things, (1) safeguards to prevent discrimination against students suffering from emotional or mental illnesses, including anxiety and depression; or (2) any type of reasonable modifications to afford goods, services, programs, facilities, privileges, advantages, or accommodations to students suffering from emotional or mental illnesses, including anxiety and depression.

54.     Despite the promises made and stated intentions of the School in the ADA Settlement Agreement and the Equal Opportunity Policy, the Defendants have failed to follow their own directives when caring for Adam, who MHS knew suffered from a serious but treatable form of depression, resulting in acts of discrimination against Adam on account of his disability.

55.     Indeed, and notwithstanding the DOJ's prior investigation, the ADA Settlement Agreement and the Equal Opportunity Policy, the DOJ is currently pursuing *another* investigation into whether the School is compliant with the ADA and the Fair Housing Act, which has been ongoing for more than a year – the second such investigation in four years.

**ADAM ENROLLS AT MHS WITH DEMONSTRATED SOCIAL NEEDS AND FOR THE NEXT EIGHT YEARS IS AN UPSTANDING HIGH PERFORMING STUDENT**

56.     Adam was considered for enrollment at the School in August 2004, at the age of nine.

57.     When he applied for admission to MHS, Adam had great social needs related to his family structure and home life.

58.     Among other things, Adam was without a father, as his passed away when Adam was six months old.  Adam's mother, although present, was limited by her own struggles with depression, substance abuse and by the demands of raising seven other children besides Adam.

59.     Adam's enrollment process also included a series of tests, an interview, and several meetings between Adam, his mother and MHS administrators.

60.     Due to this extensive examination and review, Defendants were fully aware of Adam's social needs and family mental health issues when MHS admitted him as a student. Based on this family history, MHS knew or should have known that there was a high degree of risk that Adam would exhibit symptoms of depression during his time at MHS.  Neither Adam

nor his mother were not advised that: (a) if Adam began to exhibit such symptoms, there was a high likelihood of expulsion, regardless of him thriving at MHS prior to such time; or (b) that MHS was not able to care for children with depressive disorders.

### PRIOR TO ADAM'S EXPULSION, THE DEFENDANTS MAKE SEVERAL IMPORTANT REPRESENTATIONS TO ADAM

61.     In early 2013, the Defendants made numerous representations regarding their supposed compliance with the ADA, commitment to non-discrimination and accommodating students with disabilities, and comprehensive array of mental health services available to their students.

62.     Related to compliance, the Equal Opportunity Policy – which was drafted as result of the stipulated finding in the ADA Settlement Agreement that MHS had committed blatant acts of discrimination – was provided to Adam and his mother in or around March 2013.

63.     While Adam was enrolled at the School, Adam and his mother also received a copy of the MHS Student/Sponsor Handbook (the "Handbook"); a true and correct copy of which is attached hereto as Exhibit "E", which also contains a copy of the Equal Opportunity Policy.

64.     Also included in the Handbook at page 70 is an additional section entitled "ADA Accommodation Procedures for Applicant and Students." As it relates to current students, those procedures provide that MHS will develop and implement individualized plans for disabled students to ensure that MHS is able to accommodate those students at the School. Individualized plans dealing with mental health issues are to be managed by a Psychological Services Administrator. *Id.* at 46.

65.     Further, the Handbook discusses the several psychological services available to students and represents that "Psychological Services offers a comprehensive array of services,

which includes individual and group therapy, psychological and psychoeducational assessments, consultation, staff training, ***crisis intervention and prevention***. The type of psychological service provided for a student is dependent on the individual student's need." *Id.* at 46 (emphasis added.)

## ADAM WORKS IN THE ENROLLMENT OFFICE, WITHOUT PAY

66.     Students entering ninth grade at the School are required to engage in community service. To fulfill this requirement, in his ninth grade year Adam began working in the School's Admissions Office.

67.     The work began as an hour or two per week on campus, but quickly increased in both hours and scope. For example, the School began asking him to attend admission fairs in places like Philadelphia, Chambersburg, Reading and Scranton. These events were generally on school night requiring Adam to leave campus around 4 p.m., arrive at the fair at 6 p.m., and return back to MHS as late as 11 p.m. On a few occasions Adam did this twice per week. Adam was not paid for any of this work. The only benefit given to Adam was free non-MHS food. As many as three other MHS students worked with Adam at the admission fairs.

68.     Weekend events for the Admissions Office were primarily on campus but would last all day. Once or twice a month from 8 a.m. to 3 p.m., Adam would participate by riding on a bus with parents or sponsors and prospective students, and acting as a tour guide and promoter of the School as the group toured the School, the grounds and a student home. Approximately six to seven MHS students worked with Adam for the weekend on-campus tour events.

69.     Adam also worked in the Admissions Office throughout high school. In that capacity, he answered phone inquiries and stuffed envelopes, and did other office work that

without student volunteers would have been done by paid employees. Eventually, his hours increased to three per day.

70. All told, between admission fairs, on-campus tours and office work, Adam averaged between 13 to 16 hours per week working with the Admissions Office over his last two years at the School, including working right up to the time of his expulsion.

71. In addition to working for MHS, the Defendants have also used Adam's likeness without permission or compensation. Specifically, MHS minivans are quasi billboards for the School, complete with pictures of supposedly happy MHS students.

72. At least through 2015, two of those minivans prominently displayed a picture of Adam taken from a club photo when Adam was in the sixth grade. A picture of one of the minivans is attached hereto as Exhibit "F."

### MHS IS AWARE THAT ADAM'S EMOTIONAL WELL-BEING BEGINS TO DETERIORATE OVER THE COURSE OF HIS JUNIOR YEAR

73. Adam began eleventh grade at MHS in August of 2012.

74. Over the course of that school year, Adam's emotional well-being deteriorated as he wrestled with the reality of his sexual orientation as a gay teenager, and struggled with certain peer relationships.

75. Adam's first outward manifestation of his attraction to other people of the same sex occurred in ninth grade when he explored gay pornography on the computer located in his student home. Adam's houseparents at the time were made aware of this usage by MHS, who tracked pages viewed on house computers. After the houseparents had a meeting with all members of the student home to discourage such usage, Adam owned up to his mistake and admitted to being responsible. Because the material he viewed was same-sex in nature, Adam's

houseparents responded by forcing him to watch a religious-based video that was intended to "cure" him of being gay.

76.     Throughout his time at MHS, many of Adam's friends at MHS were female. Adam had a single close male friend. But, the two grew apart during Adam's 11th Grade year, ending in a falling out in October of 2012.

77.     One week later, Adam experienced a suicidal ideation and wrote a suicide letter to his family and loved ones, saying that he was going to choke himself with a belt.

78.     Around that same time, Adam also emailed a friend to say that he was going to kill himself while taking a walk. That friend reported the email to Adam's houseparents. Adam was intercepted on his walk and he was sent directly to the School's Health Center.

79.     While at the Health Center, Adam saw Dr. Rose Huntzinger, a School psychologist.

80.     At Dr. Huntzinger's recommendation, Adam agreed to in-patient treatment at Philhaven, a mental and behavioral health care provider in the area. Adam remained at Philhaven for two weeks.

81.     While Adam was there, then-President of the School, Dr. Anthony Colistra, visited Adam. Dr. Colistra knew Adam through Adam's work with the Admissions Office. Indeed, through that work Adam had developed a friendship with Dr. Colistra and his wife, Sue. Adam's houseparents and his speech therapist also came to visit Adam. Further, Adam was given MHS homework assignments to complete, which he did, turning them in upon his return to the School.

82.     After his discharge from Philhaven, Adam spent one week in the Health Center before returning to his student home.

83.    The next six months were rather unremarkable, and Adam appeared mentally healthy.

84.    Then, on March 27, 2013, Adam again expressed feelings of suicidal ideation and the School required Adam to spend that night at the Health Center.

85.    Adam returned to classes the following day and was discharged from the Heath Center at 4:30 p.m. on Thursday, March 28, 2013, the first day of Easter break, just one half hour after an MHS-provided bus left for Adam's hometown of Scranton with his twin brother on board.  Adam was told that he was not permitted to visit his mother or siblings for the upcoming Easter break, and that, instead, he needed to remain at the School.  Left with no option but to stay on the MHS campus during Easter break, Adam felt completely alone (as nearly all children return to their natural families during this break), which caused the onset of another bought of depression.  MHS provided no therapeutic counseling to Adam during this Easter break from 4:30 on Thursday p.m., March 28, 2013 to Monday morning, April 1, 2013.

86.    Adam's depression and feelings of isolation and abandonment worsened at the end of April when his mother suddenly cancelled Adam's 18th birthday party, a sit down dinner at a local restaurant scheduled for May 4, 2013, because she spent the money designated for the party.

87.    On May 1, 2013, Adam wrapped a belt around his neck, but stopped before carrying out suicide.

88.    No one saw Adam wrap the belt around his neck, but Adam took it upon himself to report the action to School's principal and ask for help.

89.    In response, the School referred Adam to the Heath Center and the Lead Psychologist.

90.     Subsequently, Adam again agreed to in-patient admission at Philhaven.  Dr. Huntzinger and another MHS doctor drove Adam to the facility, as Adam believed it was critical to his emotional and financial wellbeing to graduate from MHS.  Adam only agreed to this course of treatment after being assured that this second admission would not automatically lead to an expulsion from the School.

91.     Adam again stayed a total of two weeks at Philhaven.  In contrast to his first admission, however, Dr. Colistra did not visit.  Neither did Adam's houseparents or his speech therapist.  In fact, during this admission, Adam had no contact with anyone from MHS, absent a phone call or two.  Also in contrast to his first admission, Adam was not given any School homework assignments to complete during his second stay at Philhaven.  MHS took no further interest in Adam's well-being or program at MHS and plotted to expel him, so that his expulsion was automatic, despite School representations to the contrary.

92.     During his hospitalizations, Philhaven nursing staff told Adam that MHS generally enforced a two-hospitalization expulsion policy, but that some exceptions were made to that policy in the past based on the nurses' experience.

93.     Although the Equal Opportunity Policy, as discussed at length above, broadly prohibits all forms of discrimination against students with "disabilities" as that term is defined by the ADA, as noted by the Philhaven nurses when dealing with students like Adam, MHS was abiding by another "policy," official or unofficial.  This other "shadow policy" robotically mandated that a student be expelled after two hospitalizations in outside mental health facilities, and with the hospitalization decisions in the first instance being recommended by MHS staff.

94.     Such a consequence is not provided for in the Equal Opportunity Policy and flies in the face of its requirements and ADA strictures requiring that students with disabilities be

treated fairly with individualized assessments. Indeed, the shadow "policy" actually has the perverse effect of *discouraging* students who are suffering from mental or emotional injuries from seeking help in the first place, for fear that doing so might lead to brief hospitalizations and a subsequent quick ticket out of MHS.

95.     This is an irrational, anti-child policy for dealing with children who are mature enough to recognize their own depression and seek help for it, but who are equally cognizant of an expulsion hanging over their heads, in the event that they might just need hospitalization.

96.     MHS applies the mechanical "two-institutionalization" rule: (a) without regard to the therapeutic results of the second hospitalization; (b) without consultation with the institution's care-providers; (c) without any further analysis of the mental health of the child and accommodations that could be made; and (d) without any analysis of the consequences to the child of termination from MHS, the one stable and nurturing environment that many MHS children have had in their short lives.

97.     Upon information and belief, the shadow policy had other aspects to it that were so well established and accepted by MHS that they were openly discussed at MHS Board meetings. During a Board meeting that occurred in or around 2010, there was a topic of discussion related to the decision to terminate a student because she had suicidal ideations. When one Board member questioned the decision, a senior MHS official stated words to the effect that MHS did not want the publicity of someone killing themselves at MHS. Because the student in question expressed a desire to kill herself, she would be terminated. Thus, a policy was institutionalized at the highest level.

98.     Adhering to its shadow policy, MHS expelled Adam from the School and evicted him from this student home. MHS did not even have the decency to wait until after

Adam had been discharged from Philhaven to do so, instead taking that step while Adam was still a patient. Neither did MHS have the decency to speak to Adam about the situation directly. Instead, Adam had to receive the terrible news directly from his mother, who recounted to Adam that the School told her that Adam was being expelled "because you are a liability." Then she asked Adam, "are you happy now?"

99.   It is believed that a so-called "Enrollment Review" was conducted prior to Adam's expulsion and while he received treatment at Philhaven, but Plaintiff has not been able to confirm this as MHS has refused to provide any such records prior to the filing of this lawsuit.

100.   An MHS "Enrollment Review" is a misnomer. Specifically, it never deals with enrollment, but instead, it is only used to pursue expulsions; *i.e.*, when MHS is getting ready to send a child away, the administrators circle up in a proceeding that they euphemistically call an "Enrollment Review."

101.   MHS children are not permitted to attend, speak at, or be represented at their Enrollment Reviews. Parents and guardians are similarly excluded. There are no means of providing evidence, arguments, or pleas on behalf of children who are subjected to these sham proceedings. Thus, there is no due process of any kind.

102.   MHS makes no account of the proceeding to provide to students or their guardians, and there is no right of appeal whatsoever.

103.   In sum, the entire Enrollment Review proceeding, with its near-inevitable result in most cases, is itself an affront to child welfare, due process and ADA norms.

104.    Following his release from Philhaven, the "Enrollment Review" and his subsequent expulsion from the School and eviction from his student home, Adam returned to Scranton, Pennsylvania to reside with his mother and siblings.

105.    At the time, Adam's mother lived in an apartment, although soon after Adam was expelled from the School he found out that she was being evicted.  After the eviction was completed in July of 2013, Adam moved in with an older sister, who was approved for Section 8 housing in nearby Dunmore.  However, the sister's boyfriend was abusive and kicked Adam out.

106.    In October 2013, Adam spent more than a month bouncing around from place to place, both with family and friends, spending one night on the streets of Scranton.   He eventually settled at a friend's house, where he paid rent and worked at retail stores.  His ability to survive this harrowing year is clear evidence that MHS had no reason to discriminate against him and remove him from the School and his home.

107.    Adam eventually finished his junior year at West Scranton in May and June 2013 and then graduated from the school in 2014.

108.    Before being expelled from MHS, Adam had planned to go to Millersville University or Shippensburg University with the scholarship money provided to students who successfully graduated from the School.

109.    Specifically, students enrolled at MHS are eligible to receive up to $80,000 in post-secondary scholarships, earning credits for each year successfully completed at the School, as follows: 5% for freshman year, 10% sophomore, 35% junior and 50% senior year.  However, students expelled from the School prior to graduating – like Adam – are not eligible to receive any of this scholarship money.

110.     Without access to any scholarship money, Adam has had to support himself and has been unable to afford and attend college at the same time, emotionally scarred from his treatment by MHS.

111.     It is evident that after over eight years of good conduct and academic success, MHS had given up on Adam and gone into termination mode, just weeks after the onset of an emotional episode.

112.     MHS heightened Adam's alienation, loneliness, and break with the only community where he felt he belonged (MHS), and made him feel his future would be hopeless without MHS.

113.     MHS, with $12 billion of assets and a small army of mental health professionals, made no assessment of how Adam would fare in Scranton, Pennsylvania, with a destitute mother suffering with her own mental health and substance issues.

114.     While MHS's conduct toward Adam shocks the conscience, it is not an isolated incident in the mental health policies of MHS.

115.     For example, Abrielle Bartels ("Abbie") was enrolled at MHS at the age of five and was an exceptional student, with an unblemished record.

116.     But, when Abbie experienced a severe but treatable bout of depression during her eighth grade year, the School kicked her out and even barred her from her eight grade graduation and associated activities.  By expelling her, the School returned her to a traumatic living situation with her natural parents – a situation that the School knew was her chief stressor and the main reason she was depressed and suicidal in the first place.

117.     Feeling like a discarded piece of trash with no hope for the future, Abbie succumbed to her depression, taking her own life by hanging herself shortly after receiving the

heartless message from MHS administrators that she was not permitted to set foot on campus for graduation.

118.   KR was an 8th grader when she too was expelled, and again, merely for facing depression.  KR's post-expulsion mistreatment was also cavalier and compounded the pain she felt.

119.   On information and belief, there are many other children who have been similarly mistreated by MHS for mental health issues, with the School and its board members allowing this unlawful discrimination to continue unabated.

## COUNT I – VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

**Plaintiff v. Defendants, The Milton Hershey School and The Hershey Trust Company, as Trustee of the Milton Hershey School Trust**

120.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

121.    Adam met all of MHS's eligibility criteria during his enrollment at the School.

122.    MHS discriminated against Adam by terminating him from MHS on the basis of his mental disability.

123.    The Defendants failed to investigate, engage in an interactive dialog with, and/or offer any reasonable accommodations to Adam for his mental disability, which reasonable accommodations would have allowed him to remain enrolled in and prosper at MHS.

124.    Instead, Defendants negligently, carelessly, intentionally, and recklessly applied a policy requiring expulsion after a student is twice admitted to an outside mental health institution, including barring the child from stepping foot on campus, and permitted Adam to be returned to a disruptive and unstable environment outside of MHS, which Defendants knew was, for Adam, a dangerous situation for his then-existing mental and emotional state.

125.    Adam did not pose a direct threat to anyone such that the Defendants' conduct was permissible under the ADA. Moreover, the Defendants have never indicated when, how, and to whom Adam posed such a direct threat, having failed to make any individualized assessment based on reasonable judgment, relying on current medical knowledge, or on the best available objective evidence.

126.    The Defendants had no medical, scientific or rational basis to exclude Adam from participating in or benefiting from the goods, services, facilities, privileges, advantages and accommodations provided by the School.

127.     Rather than relying on current medical knowledge or the best available evidence about adolescent depression or consulting with trained professionals at Philhaven or MHS, the Defendants based their decisions on unfounded assumptions, unwarranted fears, generalizations, prejudices, stereotypes and myths about mental and emotional illnesses.

128.     The Defendants denied Adam the right to participate in and benefit from the goods, services, facilities, privileges, advantages and accommodations provided by the School based on his depression, anxiety and other mental and emotional illnesses.

129.     Title III of the Americans with Disabilities Act prohibits discrimination against individuals on the basis of disability in the full and equal enjoyment of the services of any place of public accommodation.  42 U.S.C. § 12182, *et seq.*; 28 C.F.R. § 36.102, *et seq.*

130.     At all relevant times, Adam had a mental impairment (diagnosed mental and emotional illness) that substantially limited the operation of his major bodily functions, as well as substantially limited other major life activities, such that he was an individual with a disability within the meaning of the ADA.

131.     In addition, Adam's medical records all note a diagnosis of a mental impairment, such that they reflect that he was an individual with a disability within the meaning of the ADA.

132.     Finally, the Defendants regarded Adam as an individual with a disability within the meaning of the ADA.

133.     MHS is place of public accommodation within the meaning of the ADA because it is an "elementary, secondary … private school or other place of education."  42 U.S.C. § 12181(7)(J).

134.    As described above, Defendants denied Adam the full and equal enjoyment of

the goods, services, facilities, privileges, advantages and/or accommodations provided by MHS

on the basis of his disability in violation of 42 U.S.C. § 12182(a) and 28 C.F.R. § 36.201(a).

135.    Through its actions, Defendant also:

(a)     Denied Adam the opportunity to "participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations" of MHS, in violation of 42 U.S.C. § 12182(b)(1)(A)(i) and 28 C.F.R. § 36.202(a);

(b)     Utilized "standards or criteria or methods of administration that have the effect of discriminating on the basis of disability," in violation of 42 U.S.C. § 12182(b)(1)(D) and 28 C.F.R. § 36.204;

(c)     Imposed or applied eligibility criteria that "screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying its goods, services, facilities, privileges, advantages or accommodations," in violation of 42 U.S.C. § 12182(b)(2)(A)(i); and

(d)     Afforded Adam with an unequal benefit in regard to its offering of goods, services, facilities, privileges, advantages or accommodations on the basis of his disability, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii) and 28 C.F.R. § 36.202(b).

136.    Defendants' discrimination was a direct and factual cause that led Adam to

sustain severe emotional and psychological harm.

137.    Plaintiff seeks immediate injunctive relief, which shall consist of (a) immediate

qualification for the MHS Scholarship program as if he had completed his junior and senior

year at MHS, and had met all criteria upon graduation, and access to whatever other assistance,

rights and privileges the School provides to its graduates; (b) creation by MHS of a therapeutic

student home for the seriously depressed children in its care, with 24 hour professional

coverage; (c) appointment of an advocate for children to participate in all enrollment reviews;

and (d) a commitment to continue care for children suffering from a mental health disability for

a duration of at least twelve (12) months from diagnosis before any decisions on termination are made.

138.    Plaintiff also seeks the recovery of attorney's fees, litigation expenses and costs consistent with 42 U.S.C. § 12205 and 28 CFR § 36.505.

## COUNT II – VIOLATION OF THE FAIR HOUSING ACT

**Plaintiff v. Defendants, The Milton Hershey School and The Hershey Trust Company, as Trustee of the Milton Hershey School Trust**

139.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

140.    Adam met all of MHS's eligibility criteria during his enrollment to reside at the School.

141.    MHS discriminated against Adam by denying him housing at MHS on the basis of his mental handicap.

142.    The Defendants failed to investigate, engage in an interactive dialog with, and/or offer any reasonable accommodations to Adam for his mental disability, which reasonable accommodations would have allowed him to remain enrolled in and prosper at MHS.

143.    Instead, Defendants negligently, carelessly, intentionally, and recklessly applied a policy requiring expulsion after a student is twice admitted to an outside mental health institution, including barring the child from stepping foot on campus, and permitted Adam to be returned to a disruptive and unstable environment outside of MHS, which Defendants knew was, for Adam, a dangerous situation for his then-existing mental and emotional state.

144.    Adam did not pose a direct threat to anyone such that the Defendants' conduct would be permissible under the FHA.  Moreover, the Defendants have never indicated when, how and to whom Adam posed such a direct threat, having failed to make any individualized

assessment based on reasonable judgment, relying on current medical knowledge, or on the best available objective evidence.

145.     Defendants negligently, carelessly, intentionally and recklessly applied a policy requiring expulsion after a student is twice admitted to an outside mental health institution, including taking away a child's housing, and barring the child from stepping foot on campus or attending graduation ceremonies open to the public. Rather than relying on current medical knowledge or the best available evidence about adolescent depression or consulting with trained professionals at Philhaven or MHS,  the Defendants based their decisions on unfounded assumptions, unwarranted fears, generalizations, prejudices, stereotypes and myths about mental and emotional illnesses.

146.     The Defendants denied Adam continued residence at the School, the right to participate in and benefit from the residential programs at the School, and the right to other goods, services, facilities, privileges, advantages and accommodations provided by the School based on his depression, anxiety and other mental and emotional illnesses.

147.     At all relevant times, Adam had a mental impairment (diagnosed mental and emotional illnesses) that substantially limited the operation of his major bodily functions, as well as substantially limited other major life activities, such that he was an individual with a handicap within the meaning of the FHA, 42 U.S.C. § 3602(h).

148.     In addition, Adam's medical records all note a diagnosis of a mental impairment, such that they reflect that he was an individual with a handicap within the meaning of the FHA.

149.     Finally, the Defendants regarded Adam as an individual with a handicap within the meaning of the FHA.

150.    Adam is an aggrieved person as defined by the FHA, 42 U.S.C. § 3602(i)(1), and has suffered damages as a result of the Defendants' discriminatory conduct as described above.

151.    Defendants' discrimination was a direct and factual cause that led Adam to sustain severe emotional and psychological harm and humiliation, as well as monetary damages in securing alternative housing and paying his own living expenses.

152.    Adam's student home at MHS is a dwelling, as set forth in the FHA, 42 U.S.C. § 3602(b).

153.    Adam, like all students enrolled at MHS and living in the student homes on campus, were given chores and other tasks to do by their houseparents.  Theses chores and tasks were required, and constitute consideration for Adam's residence in the student home.

154.    Additional consideration for Adam's residence in the student home was provided to the School by The Milton Hershey School Trust, which contributed money, funding and other tangible consideration.

155.    As described above, Defendants have:

(a)    Discriminated against Adam in the sale or rental, or otherwise making unavailable or denying a dwelling to Adam because of his disability, in violation of the FHA, 42 U.S.C. § 3604(f)(1);

(b)    Discriminated against Adam in the terms, conditions, or privileges of rental of a dwelling or in the provision of services or facilities in connection with a dwelling, because of his disabilities, in violation of the FHA, 42 U.S.C. § 3604(f)(2); and

(c)    Refused to make reasonable accommodations in their rules, policies, practices or services, when such accommodations were necessary to afford Adam equal opportunity to use and enjoy his dwelling, in violation of the FHA, 42 U.S.C. § 3604(f)(3).

(d)    Afforded Adam with an unequal benefit in regard to its offering of goods, services, facilities, privileges, advantages or accommodations on the basis of his disability, in violation of 42 U.S.C. § 12182(b)(1)(A)(ii) and 28 C.F.R. § 36.202(b).

156.    Plaintiff seeks immediate injunctive relief which shall consist of, *inter alia*, (a) immediate qualification for the MHS Scholarship program as if he had completed his junior and senior year at MHS, and had met all criteria upon graduation, and access to whatever other assistance, rights and privileges the School provides to its graduates; (b) creation by MHS of a therapeutic student home for the seriously depressed children in its care, with 24 hour professional coverage; (c) appointment of an advocate for children to participate in all enrollment reviews; and (d) a commitment to continue care for children suffering from a mental health disability for a duration of at least twelve (12) months from diagnosis before any decisions on termination are made

157.    Plaintiff also seeks the recovery of money damages, attorney's fees, litigation expenses and costs consistent with the FHA.

158.    The discriminatory actions of the Defendants were intentional, willful, and taken in disregard of Adam's federally protected rights.

### COUNT III – VIOLATION OF THE FAIR LABOR STANDARDS ACT

**Plaintiff v. Defendants, The Milton Hershey School and The Hershey Trust Company, as Trustee of the Milton Hershey School Trust**

159.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

160.    Defendants have engaged in a pattern, policy and practice of violating the FLSA as detailed herein.

161.    The minimum wage provisions set forth in the FLSA, 29 U.S.C. §§ 201 *et seq.*, and the supporting federal regulations, apply to the Defendants and protect Plaintiff.

162.    At all relevant times, Plaintiff was employed by an entity engaged in commerce and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§

203(e), (m) and 206(a), and/or they were engaged in commerce and/or the production or sale of goods for commerce within the meaning of 29 U.S.C. §§ 203(e), (r) and (s).

163.   The Defendants took advantage of a vulnerable child's desire to please the School administration by constantly requesting his presence at fairs and tours and in the office with Plaintiff expecting at the very least the benefits of the School available to its students, including a continued education, housing through graduation, college scholarship assistance, and help in achieving those objectives as his recompense.

164.   At all relevant times, Plaintiff was an employee of Defendants within the meaning of 29 U.S.C. § 203(e), and not mere volunteer, subject to the direction and control of the School's Admission Office, which assigned him tasks otherwise to be performed by paid employees of the School for necessary School functions that directly benefited the School, but not Adam.

165.   At all relevant times, Defendants have been engaged in commerce and/or the production of goods for commerce within the meaning of 29 U.S.C. §§ 203(e), (r) and (s).

166.   At all relevant times, Defendants employed Plaintiff within the meaning of 29 U.S.C. § 203(g).

167.   Defendants engaged in a policy and/or practice of failing to pay Plaintiff the applicable minimum wage for all hours it suffered or permitted Plaintiff to work.

168.   As a result of these minimum wage violations, Plaintiff has suffered damages in amounts to be determined at trial, and are entitled to recovery of such amounts, liquidated damages, prejudgment interest, attorneys' fees, costs and other compensation pursuant to 29 U.S.C. § 216(b).

169.   Defendants' unlawful conduct, as described at length herein, has been willful and intentional.  Defendants were aware or should have been aware that the practices described herein are unlawful, and that it would not assign him work often between 13 and 20 hours per week for the School Admission's Office without compensation.  Defendants have not made a good faith effort to comply with the FLSA with respect to the compensation of Plaintiff.

170.   Not even the School's Board of Managers, who worked far less hours than Plaintiff, and are all men and women of substantial wealth, volunteer their services to the School without substantial compensation.

171.   Because Defendants' violations of the FLSA have been willful, a three-year statute of limitations applies, pursuant to 29 U.S.C. § 255.

172.   On information and belief, Defendants have failed to make, keep and preserve accurate records with respect to Plaintiff including hours worked each workday and total hours worked each work week, as required by the FLSA, 29 U.S.C. § 211(c) and supporting federal regulations.

173.   Plaintiff also seeks the recovery of attorney's fees, litigation expenses and costs.

### COUNT V – NEGLIGENCE - BREACH OF DUTY OF CARE
**Plaintiff v. Defendants, The Milton Hershey School and The Hershey Trust Company, as Trustee of the Milton Hershey School Trust**

174.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

175.   An affirmative duty on the Defendants' part to care for Adam and protect him from harm arose from the special relationship that existed between Defendants and Adam.

176.   Specifically, and as described at length above, through its "unique, home-like environment," the Defendants, by and through their agents, servants and employees, exercised custody and control over its enrolled students, such as Adam.  At all relevant times, MHS

functioned as Adam's primary caregiver, providing education, housing, food, clothing and medical, dental and psychological care. In these and other ways, Adam was dependent on the Defendants to meet his basic needs of sustenance, care and protection. Moreover, the Defendants had imposed limitations on Adam's freedom to act on his own behalf and had deprived Adam of his normal opportunities for protection.

177.   In addition to the above, the Defendants, by and through their agents, servants and employees, further exercised custody and control over Adam by requiring him to submit to in-patient admissions at Philhaven.

178.   For all of these reasons, the Defendants owed Adam a special and higher duty of care, in addition to a duty of ordinary care, to protect him from harm.

179.   The Defendants, by and through their agents, servants and employees, breached the duty arising by virtue of their special relationship with Adam in ways which include, but are not limited to, the following:

(1)   By requiring that Adam be admitted to two mental institutions so that MHS could effectuate its two institution expulsion policy and also terminate the medical care being provided by MHS staff;

(2)   By permitting Adam to be discharged from Philhaven directly to his mother rather than maintaining custody over Adam at MHS. For example, MHS could have, but did not, offer any options that would permit Adam to remain on the MHS campus for observation and/or further treatment immediately following his discharge from Philhaven;

(3)   By failing to develop a care plan for Adam before he was discharged to his mother;

(4)   By failing to provide adequate care to Adam prior to his discharge from Philhaven, when MHS doctors and administrators took no role in Adam's education or treatment due to the expulsion policy and related determination that Adam would not be permitted to return to MHS; and

(5)   By holding out the threat of expulsion and/or a forced leave of absence.

180.    Defendants had a further duty to protect Adam because they created or exacerbated a dangerous situation as described in the preceding paragraph, including by first caring for him in a supportive environment for over eight years, confusing him with "conversion therapy," and then deserting him when he needed MHS the most.

181.    Defendants had a further duty to protect Adam because MHS withdrew critical, life-saving support after partially performing, and after Adam had relied upon MHS's care and assistance to the exclusion of other alternative assistance.

182.    Defendants had a further duty to protect Adam because MHS took charge of Adam, who was helpless to adequately aid or protect himself, but then discontinued its aid and protection, thereby leaving Adam in a worse position than when MHS took charge of Adam in the first place.

183.    Adam was significantly damaged by all of these breaches by the Defendants, mentally, emotionally, physically and monetarily.

184.    As a result of the above-described conduct, Adam suffered significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life as well as conscious pain and suffering; and/or Adam has been denied at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits, and incurred housing and living expenses fending for himself during this time.

185.    All of these damages were foreseeable to the Defendants because at the time of each breach described above, the Defendants knew or should have known that remaining in the supportive environment of MHS was essential for Adam's well-being given his then-existing

fragile mental state.   Moreover, the Defendants knew or should have known of Adam's mother's lack of financial resources and that she was otherwise unable to provide him with the type of psychological care or home that he needed at the time of his discharge from Philhaven and expulsion from the School.

186.   The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

## COUNT VII - NEGLIGENT MISREPRESENTATION
### Plaintiff v. Defendants, The Milton Hershey School and The Hershey Trust Company, as Trustee of the Milton Hershey School Trust

187.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

188.   Defendants, through their employees and agents, represented to Plaintiff and his mother the following things:

(1)   MHS does not discriminate against applicants or students on the basis of any disability;

(2)   students with any sort of disabilities have an equal opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages, and accommodations provided by the School;

(3)   students cannot have their enrollment discontinued solely on the basis of their disability;

(4)   MHS does not exclude persons with disabilities from participation in, or deny them the benefits of, the full and equal enjoyment of its goods, services, facilities, privileges, advantages or accommodations on the basis of their disability;

(5)   MHS makes reasonable modifications to its policies, practices and procedures when the modification are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with any sort of disabilities;

(6)   MHS develops and implements individualized plans for disabled students to ensure that MHS is able to accommodate those students at the School; and

(7)   MHS has developed and provided mandatory and comprehensive training on the ADA, and specifically on Title III of the ADA, to all staff and administrators.

189.   Defendants, through their employees and agents, also represented to Plaintiff and his family that MHS provided a "comprehensive array" of psychological services to students, including "individual and group therapy, psychological and psychoeducational assessments, consultation, staff training, crisis intervention and prevention," and that the "type of psychological service provided for a student is dependent on the individual student's need."

190.   Each of these representations was material and false as to Adam and others.

191.   In addition to the representations being made directly to Adam, Defendants, through their officials, made these representations to Adam's mother with knowledge and intent that they would be communicated to and relied upon by Adam through words and actions.

192.   Defendants' representations to Adam and his family began in 2005 and continued until May of 2013.

193.   Defendants should have known that their representations were false when made.

194.   Defendants reasonably should have foreseen that these representations would subject Adam to an unreasonable risk of harm.

195.   Adam and his mother believed and justifiably relied upon Defendants' representations, which caused him suffer the vast array of damages described herein.

196.   Adam's injuries were proximately caused by his reliance on the representations.

197.   The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

198.   The above-described conduct directly caused Adam significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem,

disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has

denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary

education benefits.

### COUNT VIII - INTENTIONAL MISREPRESENTATION
**Plaintiff v. Defendants, The Milton Hershey School and The Hershey Trust Company, as Trustee of the Milton Hershey School Trust**

199.   Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

200.   Defendants knew that the material representations set forth in Count IV above made by Defendants, through their employees and agents, to Plaintiff and his mother were false when made or, alternatively, acted with reckless disregard as to the truth or falsity of such representations.

201.   Plaintiff believed and justifiably relied upon Defendants' representations, which caused him to suffer the other damages as more particularly described herein.

202.   Upon information and belief, Defendants made the misrepresentations with the intent to deceive Plaintiff and to induce him and his mother to act on the misrepresentations to their detriment and harm.

203.   Adam's damages and injuries were proximately caused by his reliance on the representations such that Defendants actions caused Adam to suffer the vast array of damages described herein.

204.   The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious such that punitive damages are further warranted.

205.   The above-described conduct directly caused Adam significant mental, emotional, physical and economic harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-

esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

## COUNT IX - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Plaintiff v. Defendants, The Milton Hershey School and The Hershey Trust Company, as Trustee of the Milton Hershey School Trust

206.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

207.    By acting in conscious disregard of the findings of the Department of Justice as set forth in the ADA Settlement Agreement and in conscious disregard of the anti-discrimination requirements set forth in both the Equal Opportunity Policy and the ADA, Defendants did by extreme and outrageous conduct intentionally or recklessly cause severe emotional distress and bodily harm to Adam.

208.    Defendants' conduct in holding out its premises as a safe environment for young children with mental impairments when it had reason to know the School could be a dangerous place for children such as Adam due to the School's discriminatory treatment of students with disabilities, constitute extreme and outrageous conduct that was atrocious and went beyond all bounds of decency such that it is conduct utterly intolerable in a civilized society.

209.    Defendants acted extremely and outrageously in threatening to expel Adam on the basis of his mental impairments at the very time when he was the most fragile, despite the fact that Defendants purportedly provided a vast array of psychological and psychiatric services, including, but not limited to, crisis intervention.

210.    Defendants' conduct intentionally and/or recklessly caused Adam severe physical and emotional distress, including severe mental anguish and horror, because the

natural and probable consequences of Adam's proposed expulsion from the School was Adam's emotional distress.

## COUNT X - NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

**Plaintiff v. Defendants, The Milton Hershey School and The Hershey Trust Company, as Trustee of the Milton Hershey School Trust**

211.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

212.    Defendants, by and through their agents, servants and employees, knew or reasonably should have known of the dangerous conditions that existed by virtue of the School's discriminatory treatment of students with disabilities and their exclusion from campus events such as graduation ceremonies and celebrations.

213.    Defendants, by and through their agents, servants and employees, knew or reasonably should have known that Adam was being discriminated against by virtue of the School's custom, practice or policy requiring the expulsion of students suffering with mental impairments.

214.    Defendants breached the duty of care owed to Adam by failing to protect him from foreseeable pain and suffering related to his expulsion from MHS.

215.    Defendants' conduct resulted in Adam suffering severe physical and emotional distress, including severe mental anguish and horror.

## COUNT XI - CIVIL CONSPIRACY TO ENDANGER CHILDREN

**Plaintiff v. Defendants, The Milton Hershey School and The Hershey Trust Company, as Trustee of the Milton Hershey School Trust**

216.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

217.     Defendants The Milton Hershey School and The Hershey Trust Company, along with individual members of the Board of Managers not presently named as defendants and senior MHS administrators, acted with a common purpose, and conspired to endanger the welfare of children, including Adam, in violation of Pennsylvania law by continuing dangerous discriminatory policies unbeknownst to the public and contrary to their public pronouncements.

218.     In Pennsylvania, there is an implied civil cause of action for endangering the welfare of children by a child whose welfare was endangered.

219.     Also in Pennsylvania, there is a civil cause of action for negligence *per se* for violation of the statute against endangering the welfare of children.

220.     Adam has standing to bring this claim because he was one of the children who were discriminated against as a result of this conspiracy to endanger the welfare of children.

221.     Members of the Trust/MHS boards and senior leadership at the School had or should have had information that discriminatory customs, practices and policies were still in place and/or that the anti-discrimination requirements set forth in the ADA Settlement Agreement, the Equal Opportunity Policy and the Handbook had not been enacted, enforced or abided by, and that MHS mental health policies, procedures and practices were dangerous.

222.     The decision to continue discriminatory customs, practices and policies and the collective silence of various individuals at MHS in addition to Defendants were overt acts committed in pursuance of the common purpose to endanger the welfare of children, and concealed from Adam the unsafe living environment.

223.     These decisions and their concealment directly injured Adam because it caused Adam and his mother to keep Adam enrolled at the School to endure further discrimination.

224.    The above-described conduct directly caused Adam significant mental, emotional, physical and monetary harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

## COUNT XII – BREACH OF THE FIDUCIARY DUTIES OF CARE AND GOOD FAITH

**Plaintiff v. Defendants, The Milton Hershey School and The Hershey Trust Company, as Trustee of the Milton Hershey School Trust**

225.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

226.    Defendants owed Adam fiduciary duties of care and good faith to provide a safe environment for all children in their care, requiring them to exercise the kind of reasonable inquiry, skill and diligence that a person of ordinary prudence would use in overseeing the care of young at-risk children and protecting them from known dangers.

227.    Officers and key employees of Defendants also have a fiduciary relationship with the School and School Trust which requires that they act in good faith with regard to the School and School Trust's best interests, and also requires that they apply the highest moral, legal, and ethical standards in their conduct.

228.    Defendants breached their duties by: (1) failing to appoint residential childcare and mental health experts to their boards; (2) failing to hire qualified senior MHS administrators; (3) failing to implement policies or institutional controls that would prevent incidents of discrimination against disabled students and allow identification of such abuse once it had occurred; (4) not following through on the ADA Settlement Agreement, the Equal

Opportunity Policy or the Handbook by, among other things, failing to properly train staff and administrators on the requirements of Title III of the ADA; and (5) failing to monitor and comply with the ADA Settlement Agreement, the Equal Opportunity Policy, the Handbook and/or Title III of the ADA.

229.   Defendants, by and through their agents, servants and employees, as signatories to the ADA Settlement Agreement, and authors of the Equal Opportunity Policy and the Handbook, knew or reasonably should have known of the dangerous conditions that existed on campus by virtue of the active discrimination against disabled children.

230.   Defendants all knew of the numerous prior instances of discrimination against disabled students, and yet, indefensibly given this history, intentionally subjected Adam to the discriminatory custom, practice and/or policy requiring the expulsion of students suffering with mental impairments.

231.   Based on the explicit findings of the ADA Settlement Agreement, Adam's documented history of mental impairment and literature in the field of depression, it was reasonably foreseeable and, indeed, completely predictable, that if Defendants did not adequately exercise or provide the duty of care owed to young children suffering with mental impairments in their care, including but not limited to Adam, those children would be vulnerable to emotional, mental and physical harm.

232.   The aforementioned conduct by Defendants was negligent, careless, intentional, reckless, willful and malicious, and as to the Trustee, constituted a breach of trust, such that punitive damages are further warranted.

233.   The above-described conduct directly caused Adam significant mental, emotional and physical harm, including, but not limited to, severe mental anguish, emotional

distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

## COUNT XIII – NEGLIGENCE *PER SE*

**Plaintiff v. Defendants, The Milton Hershey School and The Hershey Trust Company, as Trustee of the Milton Hershey School Trust**

234.    Plaintiff incorporates by reference all of the preceding paragraphs of this Complaint as if each was individually set forth at length within this Count.

235.    Defendants have violated the ADA, the FHA, and the FLSA.

236.    The purpose of these statutes, at least in part, is to protect the interest of the Plaintiff individually, as he is an intended beneficiary of both statutes.

237.    The aforementioned statutes clearly apply to the conduct of the Defendants in this case.

238.    As described above, the Defendants have violated these statutes, which is negligence *per se*.

239.    The violation of these statutes has proximately cause Adam's injuries. Specifically, the above-described conduct directly caused Adam significant mental, emotional, physical and monetary harm, including, but not limited to, severe mental anguish, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life, conscious pain and suffering, and has denied Adam at least $120,000 worth of education at MHS and over $80,000 of post-secondary education benefits.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff requests the following relief:

(a)    A permanent injunction, or in the alternative an order, requiring that Defendants, their agents and employees abide by and comply in all respects with the terms of the FHA, the ADA and the ADA Settlement Agreement;

(b)    A permanent injunction, or in the alternative an order, requiring that Defendants, their agents and employees develop and implement a written anti-discrimination policy insuring that no student will be expelled or otherwise discriminated against because of his or her mental impairment in the future;

(c)    A permanent injunction, or in the alternative an order, requiring that Defendants, their agents and employees conduct mandatory School-wide sensitivity training for all staff regarding depression and other mental impairments;

(d)    A permanent injunction, or in the alternative an order, requiring that Defendants create a therapeutic student home for the seriously depressed children in its care, with 24 hour professional coverage;

(e)    A permanent injunction, or in the alternative an order, requiring that Defendants appoint an advocate for children to participate in all enrollment reviews;

(f)    A permanent injunction, or in the alternative an order, requiring that Defendants provide a commitment and assurance to continue care for children suffering from a mental health disability for a duration of at least twelve (12) months from diagnosis before any decisions on termination or enrollment are made;

(g)    Actual and punitive damages, attorney's fees, litigation expenses and costs consistent with 42 U.S.C. § 12205 and 28 CFR § 36.505, as well as 42 U.S.C. § 3613;

(h)    Unpaid minimum wages and an additional and equal amount as liquidated damages pursuant to the FLSA and the supporting United States Department of Labor regulations;

(i)    Compensatory and actual damages in an amount to be determined at trial;

(j)    Punitive damages in an amount to be determined at trial;

(k)    Cost and reasonable attorneys' fees; and

(l)      Such other and further relief as this Court deems just and proper.

Respectfully submitted:

/s/ Gregory F. Cirillo
Gregory F. Cirillo, Esquire
Alexander J. Nassar, Esquire
**DILWORTH PAXSON LLP**
Dated:  October 7, 2016          1500 Market Street, Suite 3500E
Philadelphia, PA 19102
215-575-7000
Emails:  gcirillo@dilworthlaw.com
         anassar@dilworthlaw.com
*Attorneys for Plaintiffs*

# EXHIBIT A

# MILTON HERSHEY SCHOOL

## Second Restated Deed of Trust

## (As of November 15, 1976)

Hershey, Pennsylvania 17033

# FOREWORD

    The original Deed of Trust providing for the establishment and operation of Milton Hershey School was executed by Milton S. Hershey and Catherine S. Hershey on November 15, 1909. Other parties to the instrument were Hershey Trust Company, Trustee and the original Managers of the School.

    The Deed of Trust has been modified on several occasions in order to meet changing conditions. The latest modifications were approved by the President Judge of the Orphans' Court Division of the Court of Common Pleas of Dauphin County, Pennsylvania, on November 15, 1976. In its decree on that date, the Court also approved a Second Restated Deed of Trust which incorporates all the modifications to that date. The Second Restated Deed of Trust is published herein.

# SECOND RESTATED DEED OF TRUST

## November 15, 1909

---

THIS INDENTURE Made this Fifteenth day of November, in the year of our Lord One Thousand Nine Hundred and Nine (1909),

BETWEEN Milton S. Hershey and Catherine S. Hershey, his wife, of Hershey, Derry Township, Dauphin County, Pennsylvania, parties of the first part, and the Hershey Trust Company of the same place, hereinafter designated as Trustee, party of the second part, and M. S. Hershey, of Hershey, W. H. Lebkicher, and John E. Snyder, of Lancaster, John B. Curry, and A. W. Stauffer, of Swatara, John A. Landis, of Manada Hill, George M. Hocker, of Union Deposit, Israel Moyer, of Derry Church, and U. G. Risser, of Campbelltown, Pennsylvania, hereinafter designated as Managers, parties of the third part,

WITNESSETH: That the parties of the first part, with the purpose of founding and endowing in perpetuity an institution to be known as "Milton Hershey School", hereinafter designated as the School, to be located in Derry Township, aforesaid, do hereby make, constitute, and appoint M. S. Hershey, W. H. Lebkicher, John B. Curry, John A. Landis, George M. Hocker, A. W. Stauffer, John E. Snyder, Israel Moyer, and U. G. Risser, and their successors, appointed as hereinafter directed, to erect, equip, maintain, direct, and manage the School, upon, under, and subject to the trusts and conditions hereinafter declared of and concerning the same, which Managers and their successors shall be known as the Managers of Milton Hershey School, and for that purpose, and for other good and lawful considerations, hereby acknowledged, have granted, bargained, sold, aliened, enfeoffed, released, conveyed, and confirmed, and by these presents do grant, bargain, sell, alien, enfeoff, release, convey, and confirm unto the said party of the second part, its successors and assigns,—

ALL THOSE CERTAIN farms situated in the Township of Derry, Dauphin County, Pennsylvania, bounded and described in one tract of land, as follows:

BEGINNING at a point in line of land of Mrs. Michael Henry 497-6/10 [feet] Southeast of a stone a corner of said land and land of M. S. Hershey thence extending by said Henry's land, partly in and along a public road South 74 degrees 32 minutes East 1034-4/10 feet to a corner of land of estate of B. J. McGrann, thence extending by said McGrann land the following courses and distances:

South 39 degrees 12 minutes West 709-5/10 feet, South 20 degrees 10 minutes East 1027-3/10 feet to a point at or near the North side of a private lane, thence by said lane North 85 degrees 50 minutes East 458-7/10 feet to a point in a public road, thence along and in said public road South 21 degrees 40 minutes East 1215-5/10 feet, and South 57 degrees 19 minutes East 623-5/10 feet to a corner of land of Israel Hershey, thence by said Hershey's land the following courses and distances:— South 23 degrees 13 minutes West 918-7/10 feet to a stone on the South side of the Horseshoe Turnpike, thence along the South side of said Turnpike South 76 degrees 54 minutes East 498-2/10 feet to a stone, thence South 16 degrees 36 minutes West 368 feet and South 76 degrees 48 minutes East 714 feet to a stone, thence by lands of Israel Hershey and Samuel Kegerreis respectively South 13 degrees 58 minutes East 2541-5/10 feet to a stone in line of land of Estate of Christian Gingrich, thence by said land

2

North 80 degrees 24 minutes West 2343 feet to a stone at or near the centre of a public road, thence by land of Barbara Coble the two following courses and distances, the first extending along or near the centre of public road North 9 degrees 45 minutes East 1432-5/10 feet to a stone, and South 77 degrees 56 minutes West 1328-5/10 feet to a stone, thence by land of the Brombach Estate North 6 degrees 49 minutes East 1935 feet to a point on the North side of the Horseshoe Turnpike, thence crossing said Turnpike and extending still by land of said Estate North 81 degrees 59 minutes West 957 feet to a stone on the South side of said Turnpike, thence extending by land of Benjamin Flowers the three following courses and distances:— North 6 degrees 45 minutes East 1042-3/10 feet to a stone, North 86 degrees 20 minutes West 534 feet to a post and South 39 degrees 18-1/2 minutes West 1212-5/10 feet to a stone in the Horseshoe Turnpike, thence along and in said Turnpike by land of Frank Hocker South 89 degrees 24 minutes West 1349-2/10 feet to a stone, thence by land of Frank Hocker and the Estate of Samuel Peters respectively North 28 degrees 38 minutes West 2358-5/10 feet to a point in line of remaining land of M. S. Hershey, the grantor herein, thence by said remaining land by a line parallel to Chocolate Avenue and 1410 feet distant Southward therefrom North 70 degrees 58 minutes East 4319 feet to the beginning. CONTAINING 485-781/1000 acres.

TOGETHER with all and singular the stock, implements, tools, machinery, apparatus, and all other personal property thereon, the buildings, improvements, woods, ways, rights, liberties, privileges, hereditaments, and appurtenances, to the same belonging, or in any wise appertaining, and the reversion and reversions, remainder and remainders, rents, issues and profits thereof, and every part and parcel thereof, and all the estate, right, title, interest, use, trust, property, possession, claim and demand whatsoever, both in law and equity, of the said parties of the first part, of, in, and to the said premises, stock, implements, tools, machinery, apparatus, and personal property, with the appurtenances, to have and to hold the said premises, stock, implements, tools, machinery, apparatus, and personal property, with all and singular the appurtenances, unto the said party of the second part, its successors and assigns, to the only proper use, benefit and behoof of the said party of the second part, its successors and assigns forever, upon and subject to the trusts and confidences and for the several uses, intents, and purposes hereinafter mentioned declared of and concerning the same, that is to say: in trust for a permanent institution for the residence and accommodation of poor children, and the requisite teachers and other persons necessary in and about such an institution, and the maintenance, support, and education, as hereinafter prescribed of such children: to collect and receive the rents, revenues, and income therefrom and apply the entire net revenue, income, rents, issues and profits thereof to support and maintain the said institution, and increase the facilities and efficiency thereof according to the directions hereinafter contained; to permit the said Managers, and their agents and employees under their direction, to take charge of, farm and operate the lands hereby conveyed, under such terms and conditions as they think proper, and to use the same in such manner as is in their discretion most advantageous to the purposes of the trust, to keep the said lands and buildings thereon in good repair, to renew and improve the same when necessary by erecting new buildings thereon, to direct and supervise the disposition of the products thereof, the revenues or income derived therefrom to be paid to and received and collected by the Trustee as hereinbefore provided.

1.  If it so happen in the future that gifts, bequests, devises of real or personal property may be made to or for the benefit of the School, the Trustee and the Managers are authorized to accept all such gifts, bequests, devises, whenever the terms, conditions, restrictions, or limitations of such gifts, bequests, devises, are not in the opinion of the Trustee and Managers in contravention of the objects and purposes of this deed, and all such gifts,

bequests, devises, whether made to the School by name, or to the Trustee, or to the Managers, or in any manner whatever, shall be paid or transferred by proper conveyance to the Trustee, and be added to and become part of the corpus or principal of the trust estate or of the income, in aid of which the said gifts, bequests, devises, or any of them may have been made; in the absence of any direction accompanying any such gift, bequest, devise, as to whether the corpus or principal of the trust estate or income is intended to be the recipient of such gift, bequest, devise, the Managers shall have the power to determine to which of the funds, or in what proportion to both, such gift, bequest, or devise, shall be paid or transferred, provided however, that if any lands or other real property shall be given, conveyed, or devised, to be held, enjoyed or used for the benefit or purposes of the School, the title to the same shall be held by the Trustee under the same trusts as are herein declared of and concerning the lands conveyed to the Trustee, and with the same power to sell and dispose of the said lands or other real property so given, conveyed, or devised, and under the same trusts, as to the proceeds thereof, as are hereinafter declared of and concerning lands which may be sold by the said Trustee and Managers.

2.  The Trustee shall on or before the first day of September in each year make out and deliver to the Managers separate statements of principal and income of the trust estate, showing the revenues, receipts, expenses, and disbursements for the year ending with the thirty-first day of July immediately preceding, showing what investments have been sold, redeemed, or paid, and what securities have been bought, acquired, or received, during the year, and a statement showing in detail in what property and securities the trust estate was invested on the preceding thirty-first day of July.

3.  The corpus or principal, and the income of the trust estate shall at all times be kept separate and apart from each other by the Trustee, and separate and true accounts of the corpus or principal and income shall be kept by the Trustee, and at all times during the customary business hours of the Trustee, the Managers shall have access to the said accounts. At least once in every year it shall be the duty of the Trustee to exhibit to the Managers, and the duty of the Managers carefully to examine and count the several securities, and to verify them with the statements and accounts furnished and kept by the Trustee, or, in lieu thereof, to receive from reputable certified public accountants selected by the Managers a written certification that such securities have been examined, counted, and verified with the statements and accounts furnished and kept by the Trustee.

4.  The Trustee shall pay from time to time, upon request of the Managers, the net income from the premises hereby conveyed, and of any future gifts, bequests, and devises, when, and as the same may be required by them, or so much thereof as in the opinion of the Managers may be necessary, to furnish the amount or amounts of money required by the Managers for the purpose of erecting on the premises above mentioned, buildings and improvements for the farms and School, and procuring furniture, stock, materials, machinery, tools, implements, plant, and equipment for the same, for the expenses, support, maintenance, management, renewals, and repairs of the farms and School, its furniture, plant, and equipment, or for the purpose at any time of enlarging, extending or adding to either or all of said buildings, furniture, plant, and equipment,—the decision of the Managers when expressed in writing and delivered to the Trustee, as to whether the said income, or any part thereof, is or is not required for the purposes mentioned, shall be final and conclusive and binding upon the Trustee, and the receipt of the Managers to the

4

Trustee for all moneys paid to them by the Trustee out of the income, shall be full and sufficient acquittance and discharge of the sums so paid, without any obligation on the part of the Trustee to look to the application of the said moneys.

5. The funds of the principal of the trust estate and the unexpended income of the property held in trust, not immediately needed for the purposes of the School, shall be invested, and the Trustee at all times by and with the authority and approval of the Managers shall have full power and authority to invest all or any part thereof in any securities which the Trustee and the Managers together may consider safe, whether the said securities or any of them are legal investments for trust funds or not, and neither the Trustee nor the Managers shall be held accountable for the exercise of its and their discretion, exercised in good faith, as to the character of the investments which may be made by the authority and approval of both. No sale of any securities shall at any time be made by the Trustee, without the authority and approval of the Managers or of the investment committee for which provision is hereinafter made, and no investments of any money shall at any time be made by the Trustee except by and with the approval of the Managers or of said investment committee. The Managers shall from time to time establish a general investment policy, and approval of investments shall be made pursuant to such policy and in conformity with this and other investment provisions of this deed, either by the Managers or by an investment committee appointed by the Managers and consisting solely of members of the Board of Managers in such number as the Managers may from time to time deem proper, having due regard for the investment expertise of potential members of the committee. The investment committee shall have such power as the Managers shall determine, to approve investments pursuant to the general investment policy of the Managers, but shall have no authority to deviate from that policy under any circumstances. The committee shall periodically report its actions to the Managers and the Managers shall keep themselves informed of the actions of the committee. The Managers shall have a veto power over any proposed action of the committee and may at any time, with or without notice, abolish, or alter the size or membership of, the committee and/or withdraw from the committee any part or all of the authority vested therein. No grant of authority to the committee shall in any way decrease the power of the Managers under this deed.

6. The Trustee may from time to time, but only with the approval of the Managers, sell and convey in fee simple any part or portion of the lands conveyed by this deed, or which may have been bought or otherwise acquired, which in the judgment of the Managers is not necessary to be kept for the purposes of the School, or which it may be advisable and advantageous to sell, and may execute and deliver a deed, or deeds, or other conveyance for the lands so sold, to the purchaser or purchasers in fee simple, free and discharged of all trusts, and without any obligation on the part of the purchaser or purchasers to look to the application of the purchase money; the purchase money of land so sold shall be held by the Trustee, and invested as herein provided for, and the income therefrom applied to the maintenance of the School.

7. The Trustee may from time to time, and at any time, but only with the approval of the Managers, purchase any additional land adjoining the School property, or conveniently near to it, and take title to the same in itself as Trustee under this deed, and hold the same under and subject to the trusts herein set forth, if they consider such land necessary or convenient for the purposes of the School.

5

8. No part of the corpus or principal of the trust estate, or of the income, or of the proceeds of any real estate sold, arising from the property hereby conveyed, or gifts, bequests, or devises, or other accretions thereto, and all moneys and securities arising therefrom, or made with or acquired by the principal or income thereof, or accretions thereto, shall at any time be applied to any other purpose or purposes than those herein mentioned and appointed; and in no event shall any part of the corpus or principal of the trust estate ever be used or sold, disposed of or pledged to meet current expenses of the institution for which the current and accumulated income and revenues are exclusively devoted.

9. The Trustee shall receive as its full compensation for the duties required to be performed by it under this deed a commission of five percent of the income received by it as Trustee, not exceeding however the sum of One Thousand Dollars per annum, and shall make no charge against, and receive no compensation from the corpus or principal of the trust estate.

   All moneys received by the Managers from the Trustee shall be received, held, and used by the Managers for, upon, and subject to the trusts and confidences, and for the uses and purposes hereinafter declared of and concerning the same, and for none other, that is to say:——

10. Out of the moneys received by the Managers from the Trustee, from the revenue or income, to erect suitable buildings, and appurtenances, to lodge, board, and instruct, as many children as, in the opinion of the Managers, the revenue and other sources of income, authorized to be expended for the purpose, will provide for, and to lodge and board as many other persons, such as officers, teachers, agents, workmen, and servants, as in the opinion of the Managers it may be necessary or convenient shall reside upon the premises, for the purpose of fully carrying out the design in view, and of completely establishing and successfully maintaining the School herein intended to be founded; to furnish and fully equip the School with such furniture, materials, machinery, tools, books, equipment, and all things needful to carry into effect the general purpose, as in the judgment of the Managers may be necessary or convenient for the purpose; to pay the insurance, repairs, and renewals of the property, to pay the compensation of officers, agents, teachers, workmen, servants, or other employees, materials and supplies, the maintenance, clothing, and instruction of the children, the expense of boarding and lodging such officers and employees whom the Managers may think it proper shall reside at the School, and any other charge or expense contracted or payable by the Managers, for, or by reason of the management, maintenance, support, renewal, improvement or repair of the School, its appurtenances, the plant, and equipment thereto belonging, and of the lands, buildings and improvements under their care and management. The decision of the Managers as to what are or may be necessary expenses for the maintenance, support, management, renewal, or repairs of the School, and its appurtenances, the plant and equipment thereto belonging or appertaining, and of the lands, buildings, and improvements under their care and management, shall be final and conclusive upon the subject.

11. The institution shall be known as "Milton Hershey School", and shall be permanently located in Derry Township, Dauphin County, Pennsylvania, upon the land hereby conveyed, and upon such other land as the Trustee has received or purchased and/or may from time to time receive, by gift or otherwise, or purchase for the purposes of the School pursuant to the terms of Paragraph 7 of this deed.

6

12. The Managers shall employ from time to time, at proper compensation to be fixed and established by them, a competent number of teachers, agents, mechanics, workmen, and servants, necessary to take charge of the said farms and School, and to feed, clothe, educate, and instruct in trades, as hereinafter provided, all children admitted to the School, and for other purposes necessary to carry out the objects in view; but no person shall be employed who shall not be of tried skill in his or her proper department, and of established moral character.

13. The institution shall be organized as soon as practicable, and when prepared to receive children, the Managers shall from time to time receive and admit to the School as many poor, healthy children as may from time to time be determined by the Managers, as in the opinion of the Managers, the extent, capacity, and income of the School will provide for, and shall be adequate to maintain, and from time to time as there may be vacancies, or increased ability from income may warrant, others shall be admitted; provided that any such child shall have attained his or her fourth birthday but shall not yet have attained his or her sixteenth birthday at the time of his or her admission. Consistent with the purposes of this deed, only a child deemed poor and healthy by the Managers, and who, in the opinion of the Managers, is not receiving adequate care from one of his or her natural parents, is of good character and behavior, has potential for scholastic achievement, and is likely to benefit from the program then offered by the School, in addition to meeting the other qualifications set forth herein, shall be admitted to the School. The Managers shall make all decisions as to admission to the School, and their decisions shall be final and conclusive upon the subject.

14. On application for admission, an accurate statement shall be taken, in a book prepared for the purpose, of the name, birthplace, age, health, condition as to relatives, and other particulars useful to be known of each child.
    Those children for whose admission application shall first be made, shall be first introduced, all other things concurring, and at all future times, priority of application shall entitle the applicant to preference of admission, all other things concurring, but if there should be at any time more applicants than vacancies, and the applying children shall have been born in different places, preference shall be given in the admission: First,—to those born in the Counties of Dauphin, Lancaster, and Lebanon, State of Pennsylvania; Second,—to those born elsewhere in Pennsylvania; Third,—to those born elsewhere in the United States. No child who has been properly admitted with reference to the order of preference shall thereafter be displaced to make way for any later or subsequent applicant who may be higher in the order of preference hereinbefore directed to be observed. The decision of the Managers as to the number of children to be admitted, and as to the conflicting claims of any or all applicants for admission, shall be final and conclusive.

15. Those children who, in the opinion of the Managers, are worthy students making satisfactory progress, may remain in the School until they complete the full course of secondary education being offered.

16. All children admitted to the School shall be fed with plain, wholesome food; plainly, neatly, and comfortably clothed, without distinctive dress, and fitly lodged. Due regard shall be paid to their health; their physical training shall be attended to, and they shall have suitable and proper exercise and recreation. They shall be instructed in the several branches of a sound education, agriculture, horticulture, gardening, such mechanical trades and

7

handicrafts as the Managers may determine, and such natural and physical sciences and practical mathematics as in the opinion of the Managers it may be important for them to acquire, and such other learning and science as the tastes, capacities, and adaptability of the several scholars may merit or warrant, to fit themselves for the trades they are to learn, and a useful occupation in life. No one fixed or established course shall be taken by all scholars, this being in the discretion of the Managers, bearing in mind that the main object in view is to train young men and women to useful trades and occupations, so that they can earn their own livelihood. Each and every scholar shall be required to learn, and be thoroughly instructed in some occupation or mechanical trade, so that when he or she leaves the School on the completion of the period for which he or she is to remain, he or she may be able to support himself or herself.

The Managers shall determine the several kinds of mechanical trades to be taught, and the determination of the particular one that shall be taught to and acquired by each scholar,—the taste, capacity, intelligence, and adaptability of each scholar being ascertained and considered before assigning him or her to any particular trade; one of the objects of the School being to teach and instruct in agriculture, horticulture, and gardening, each child admitted to the School shall at such time or times as may be required, do such work upon the farms as may suit his or her capacity and ability.

17. The School shall be non-sectarian, but the moral and religious training of the scholars shall be properly looked after and cared for by the Managers. No favoritism shall be shown; by the Managers to any particular sect or creed. Each scholar shall be taught to speak the truth at all times, and each and every scholar shall be thoroughly trained to habits of economy, and industry.

18. All the advantages and benefits to be derived by the scholars under this deed, shall be in every respect gratuitous, and under no circumstances shall any charge be made to any scholar, or any fees, rewards, or other compensations be accepted by the Managers from or on account of any scholar.

19. The Trustee shall pay the reasonable expenses which the Managers shall incur in the performance of their duties.

20. If, in the opinion of the Managers, any child admitted to the School should become incompetent to learn, or to master a trade, or from physical ailments it would be inexpedient for him or her to continue his or her studies and training, or become insubordinate, or be guilty of vice or crime, or become an unfit companion for the others, or has so conducted himself or herself as not worthy of future and continued support and education, or is so competent to work at his or her chosen trade, that he or she is qualified to be self-supporting, he or she may be removed or expelled from the School by the Managers. The decision of the Managers as to whether a scholar deserves removal or expulsion, shall be final and conclusive upon the subject. The Managers may dismiss any child from their care, and remove him or her from the School for any reason which in their judgment is good and sufficient.

8

21. All children shall leave the institution and cease to be the recipients of its benefits upon their completion of the full course of secondary education being offered at the School.

   The Managers may in their discretion provide for such a system of premiums and rewards dependent upon good behavior, character, and proficiency, as shall enable those of the scholars entitled to its benefits to receive from the Managers, when they leave the School at the full expiration of their term, a sum of money not exceeding One Hundred Dollars to any one scholar, which sum of money shall be paid by the Managers out of any of the moneys received by them as income of the School, or the Managers may, out of the income, if sufficient for the purpose, provide for or contribute toward the further education of the scholar at some other school, college, or university.

22. All moneys received by the Managers from the sale of products, stock, material, or manufactured articles, or from any source other than those hereinabove described, shall be paid to the Trustee, and expended for the same purposes as are hereinabove prescribed and directed for the expenditure of the income.

23. The Managers shall at all times keep full and accurate statements, in books to be provided by them for the purpose, of all children entering, remaining in, and leaving the School, showing their several names, parentage, birthplaces, ages, admission, and departure, and designation of trade learned; and so far as any information upon the subject can readily and without unnecessary expense be obtained, the Managers shall cause a record to be kept and preserved of the residence, occupation, condition, and success in life of all scholars who have fully completed their term, for a period of ten years after their departure from the School.

24. The Managers shall at all times keep books and accounts of the financial condition of the farms and School, showing the amount and value of all real and personal property belonging thereto, and exhibiting in detail all receipts and disbursements.

   In the month of September of each year the Managers shall make a report of the operations of the farms and School for the year ending with the preceding thirty-first day of July, showing the receipts and expenditures of the Managers and the operations of the farms and School during the year. The report must include a statement showing the exact financial condition of the farms, and School at the end of the year, and an inventory and valuation of all the property, stock, implements, machinery, tools, apparatus, and shall be accompanied by other information of the condition of the School, the number of scholars, which the Managers may desire to give, and a copy of said report, signed by the Managers, shall be delivered by the Managers to the Trustee, in the said month of September, and be filed and preserved by the Trustee among the records of its trust.

25. Should any one or more of the individual Managers hereinabove appointed, die, resign, or become incapacitated to act, or decline or refuse to act, his, or their place or places shall be filled by an appointment to be made by the Trustee, from the members of its own Board of Directors, and any vacancy occurring at any time in the number of Managers by any of the above causes, or otherwise howsoever, whether among the Managers herein appointed, or among those that may be selected to fill a vacancy as herein prescribed, or among their successors to be appointed as aforesaid, shall be filled by an appointment to be made by the Trustee, from the members of its own Board of Directors. The Trustee may at any time hereafter revoke the appointment of any person or persons herein designated as Managers, or of those who become their successors, and remove such persons from the

9

Managers, and thereafter the person or persons whose appointment is revoked shall no longer exercise the duties of the appointment; the vacancy or vacancies so created shall be filled by an appointment to be made by the Trustee in the manner hereinabove described from the members of its own Board of Directors. The Managers and the Trustee may at any time hereafter increase the number of Managers to such a number as they determine, not greater than the membership of the Board of Directors of the Trustee.

26. The Managers shall annually elect one of their number as Chairman. The person acting at the time as Treasurer to the Trustee shall be Treasurer of the Board of Managers. They shall appoint a Secretary, and prescribe the duties of the Treasurer and Secretary. The Treasurer shall give bond with good surety in such penal sum as the Managers shall determine, conditioned for the faithful performance of his duties. The offices of Treasurer and Secretary may be filled by one person, and in case of vacancy in the offices of Chairman or Secretary at any time, the Managers shall elect a successor to fill the vacancy. The Managers shall notify the Trustee in writing of their organization, and of the election of Chairman and Secretary, and of any changes in either office as the same may occur. The assent of a majority of the Managers shall be necessary for the approval of any act.

27. All and several the trusts herein created and declared shall be held in perpetuity.

28. If in the opinion of the Managers it may be advantageous and convenient that they should be incorporated, and as a corporation hold and exercise the trusts herein created and directed to be held and exercised by the Managers as individuals, the Managers shall have full power and authority at their option to apply for and obtain and take corporate powers and become a corporation under the laws of the State of Pennsylvania existing at the time of the application for such corporate powers: Always provided however, and subject to the following express conditions, viz:— that the said corporation shall hold its charter in perpetuity, that it shall be called "Milton Hershey School", that the Managers holding the trust at the time of the granting of the charter, shall be the sole incorporators and Managers of said corporation; that the rights and powers to fill vacancies in their numbers as such incorporators and Managers, be subject to the same restrictions as are hereinabove given and imposed in cases of vacancies among the individual Managers, and that the said corporation, under and by virtue of the law or laws of the Commonwealth of Pennsylvania existing at the time of its creation, shall have full and complete legal authority to take and execute the trusts hereinabove created and intended to be exercised and held by the Managers as individuals, to exercise and enjoy as such corporation all the trusts herein created to be exercised and enjoyed by the said individual Managers, with all the powers and authorities, and under and subject to all the conditions, restrictions, and limitations as are herein given, granted, created, prescribed, and declared of and concerning the said trusts to be held and exercised by the said individual Managers; and upon such corporation being formed as aforesaid, it, the said corporation, by name shall thenceforth hold and enjoy all the trusts hereinabove declared and created and intended to be held and exercised by the individual Managers aforesaid, and be and become the successors in the trust of the said Managers. And upon said corporation being formed as aforesaid, the said Managers shall forthwith give notice thereof in writing to the Trustee, and thereafter the said corporation shall be consulted by the Trustee in the matter of the sale and purchase of securities and have the same power and authority in the matter of the sale and purchase of securities and investments and reinvestments, and in all other matters, as is given to the

10

Managers under this deed; and the said corporation shall thenceforth be entitled to receive from the Trustee, and the Trustee shall pay over to the corporation, all moneys which by this deed are hereinabove directed to be paid by the Trustee to the Managers, and the corporation shall take, receive and hold the said money subject to all the trusts and confidences hereinabove declared of and concerning the same with like effect to all intents and purposes as if the said corporation had been named in this deed instead of the Managers hereinabove named.

29. No person employed by the School, in any capacity other than as an officer, counsel or consultant, in connection with which any compensation or expenses are directly or indirectly paid, shall at the same time serve as a member of the Managers of Milton Hershey School.

IN WITNESS WHEREOF the parties of the first part hereto have hereunto set their hands and affixed their seals this fifteenth day of November, in the year of our Lord one thousand nine hundred and nine.

      Milton S. Hershey     (Seal)
      Catherine S. Hershey   (Seal)

Signed, sealed and delivered
   in the presence of:
      H.C. Tuxbury
      E.E. Yunge

STATE OF NEW YORK    :
                : ss:
COUNTY OF NEW YORK  :

On the 15th day of November A.D. 1909, before me, a Notary Public of the State of New York, residing in New York City, personally appeared the within-named Milton S. Hershey and Catherine S. Hershey, his wife, and in due form of law acknowledged the within deed to be their and each of their act and deed, and desired the same might be recorded as such; and the said Catherine S. Hershey being of full age, and separate and apart from her said husband by me thereon privately examined, and the full contents of the within deed being by me first made known unto her, did thereupon declare and say that she did voluntarily and of her own free will and accord, sign, seal, and as her act and deed, deliver the within-written Indenture, Deed or Conveyance, without any coercion or compulsion of her said husband.

WITNESS my hand and official seal the day and year aforesaid.
      H.C. Tuxbury
(SEAL)     Notary Public 530
        N.Y. County

My commission expires March 30, 1910.

11

The Hershey Trust Company of Hershey, in the County of Dauphin, Pennsylvania, hereby accepts the trusts declared in the above deed on its part to be observed, kept, and performed.

IN WITNESS WHEREOF the Hershey Trust Company has hereunto affixed its corporate seal duly attested at Hershey, Pa., this fourteenth day of April A.D. 1910.

(CORPORATE                    Milton S. Hershey, President,
    SEAL)                     S. C. Stecher, Secretary

We hereby accept the trusts declared in the above deed on our part to be observed, kept, and performed.

IN WITNESS WHEREOF we have hereunto set our hands and seals this fourteenth day of April A.D. 1910.

Milton S. Hershey      (Seal)
Wm. H. Lebkicher       (Seal)
Jno. B. Curry          (Seal)
J.A. Landis            (Seal)
Geo. M. Hocker         (Seal)
A.W. Stauffer          (Seal)
John E. Snyder         (Seal)
Israel Moyer           (Seal)
U.G. Risser            (Seal)