# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADAM DOBSON, | : | CIVIL ACTION NO. 1:16-CV-1958 |
| Plaintiff | : | (Chief Judge Conner) |
| v. | : | |
| THE MILTON HERSHEY SCHOOL, *et al.*, | : | |
| Defendants | : | |

## **MEMORANDUM**

Plaintiff Adam Dobson ("Dobson") seeks leave to file a second amended complaint. (Doc. 106). Defendants the Milton Hershey School and the Hershey Trust Company, as Trustee for the Milton Hershey School Trust (collectively, "the School"), oppose Dobson's motion. Although we reject Dobson's amendments as proposed, we will reinstate several of Dobson's tort claims, which were improvidently dismissed pursuant to the gist of the action doctrine.

## I.     Factual Background & Procedural History

Dobson is a former student of the School, which is a private, nonprofit institution that offers cost-free education to low income children from pre-kindergarten through twelfth grade. (Doc. 20 ¶¶ 2, 13, 17, 20, 56). The School also provides residential accommodations for students, housing them in group homes with supervisory "houseparents." (Id. ¶¶ 23-25). Dobson enrolled in the School in 2004 at the age of nine. (Id. ¶ 17). At that time, his legal guardian executed the School's "Enrollment Agreement," a three-page document setting forth terms and conditions of enrollment including, *inter alia*, attendance, conduct and discipline,

student dating, school-provided health care, release of personal information, visitation, textbooks, and religious services. (See Doc. 11-3 at 5-7).

Dobson avers that for much of his eight years at the School he was a "model student" and thrived both academically and socially. (Doc. 20 ¶¶ 17-18). He also worked in the School's admission office without pay, averaging 13 to 16 hours per week. (Id. ¶¶ 66-70). Dobson's likeness was even utilized by the School for promotional purposes. (Id. ¶¶ 71-72).

Dobson's emotional well-being began to deteriorate when he reached high school. (Id. ¶¶ 73-74). In ninth grade, he began to realize "his sexual orientation as a gay teenager" and struggled with peer relationships. (Id. ¶ 74). When he was caught viewing homosexual pornography on a residence computer, Dobson's houseparents allegedly forced him to watch a religious-based video intended to "cure" him of being gay. (Id. ¶ 75). During eleventh grade, Dobson became depressed and experienced suicidal ideation after he drifted apart from his only close male friend at the School. (Id. ¶¶ 75-76). When another friend learned of Dobson's suicidal expressions, she reported them to Dobson's houseparents, who in turn contacted the School's health services to intervene. (Id. ¶¶ 77-79). A School psychologist recommended inpatient care at a local mental and behavioral health care facility, and Dobson agreed to this proposed treatment plan. (Id. ¶ 80). A School official, Dobson's houseparents, and a speech therapist visited Dobson during his inpatient stay, and he was given assignments and homework to stay on track with his classes. (Id. ¶ 81).

Dobson appeared to be doing better over the following six months, but then suffered another bout of severe depression. (Id. ¶¶ 83-86). In March 2013, he expressed suicidal thoughts and the School required him to spend the night at the campus Health Center. (Id. ¶ 84). Dobson's depression worsened, and in May 2013, he wrapped a belt around his neck but did not carry out the suicide attempt. (Id. ¶¶ 86-87). Dobson self-reported his actions to the School and asked for help. (Id. ¶ 88). After seeing the School's lead psychologist, Dobson again agreed to the psychologist's recommendation of inpatient treatment at the same outside mental health care facility. (Id. ¶¶ 89-91). Dobson maintains that School medical staff assured him that a second course of inpatient treatment would not affect his enrollment. (Id. ¶ 90). During this second stay, no one from the School visited him or brought him coursework, and a nurse informed Dobson that the School generally enforced a two-hospitalization expulsion policy. (Id. ¶¶ 91-92). Dobson alleges that the School in fact had an official or unofficial "shadow policy" mandating that students be expelled after two mental health hospitalizations, even if those hospitalizations were recommended by School medical staff. (Id. ¶ 93).

Dobson avers that—in accordance with the two-hospitalization policy—the School abruptly expelled him and evicted him from his campus home while he was still receiving his second course of inpatient treatment. (Id. ¶ 98). Dobson learned of his expulsion from his mother, who informed him that he was being expelled because he was "a liability" to the School. (Id.) After release from inpatient treatment and due to his expulsion, Dobson was forced to return to Scranton,

3

Pennsylvania to live with his mother and siblings. (Id. ¶ 104). His mother, who was dealing with her own mental health and substance abuse issues, was soon evicted from her apartment and Dobson ended up "bouncing" from one living situation to another, finally settling at a friend's house where he paid rent by working a retail job. (Id. ¶¶ 105-06, 113). Dobson eventually finished his junior year at a public high school in Scranton and graduated from the school in 2014. (Id. ¶ 107).

Dobson alleges that his abrupt removal from his School home, community, and classes caused alienation, loneliness, and feelings of hopelessness. (Id. ¶ 112). He further contends that his wrongful expulsion prohibited him from receiving significant post-secondary financial aid that the School offers to students who graduate. (Id. ¶ 109). He avers that as a result of the School's actions he suffered significant mental anguish, humiliation, physical manifestations of severe emotional distress, and loss of self-esteem. (See, e.g., id. ¶¶ 184, 233, 239).

Dobson commenced this action in the United States District Court for the Eastern District of Pennsylvania. The Eastern District promptly transferred the matter to this district at the joint request of the parties. Dobson filed an amended complaint in October 2016, wherein he alleges violations of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq. (Count I), the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 et seq., (Count II), and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., (Count III), as well as state law tort claims for negligent breach of the duty of care (Count V), negligent misrepresentation (Count VII), intentional misrepresentation (Count VIII), intentional infliction of emotional

distress (Count IX), negligent infliction of emotional distress (Count X), civil conspiracy to endanger children (Count XI), breach of fiduciary duties of care and good faith (Count XII), and negligence *per se* (Count XIII).[1]

The School moved to dismiss Counts V, VII, VIII, IX, X, XI, and XII of the amended complaint. In a memorandum opinion dated August 10, 2017, the court granted the School's motion to dismiss. Dobson v. Milton Hershey Sch., No. 1:16-CV-1958, 2017 WL 3433638, at *1, 4 (M.D. Pa. Aug. 10, 2017). We held that the state law tort claims were barred by the gist of the action doctrine and that amendment would be futile. Id. at *2-3. Dobson moved to amend the August 10, 2017 order to permit interlocutory appeal pursuant to 28 U.S.C. § 1292(b), which the court denied. The School then moved for judgment on the pleadings in relation to the remaining claims. As briefing was nearing completion for that motion, Dobson moved for leave to file a second amended complaint, seeking to add claims for breach of contract and violation of Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 PA. STAT. AND CONS. STAT. ANN. §§ 201-1 to 201-9.3.[2] The motion to amend is fully briefed and ripe for disposition.

---

[1] Dobson's claims are not consecutively numbered; his amended complaint skips both Counts IV and VI. (See Doc. 20 ¶¶ 159-87).

[2] In his briefing in response to the motion for judgment on the pleadings and in support of his motion to amend, Dobson indicates that he is voluntarily withdrawing his FHA and FLSA claims. (See Doc. 99 at 8; Doc. 106 at 3).

5

## II. Legal Standards

### A. Leave to Amend

Under Federal Rule of Civil Procedure 15, leave to amend should be freely given "when justice so requires." FED. R. CIV. P. 15(a)(2). In the seminal case of Foman v. Davis, 371 U.S. 178 (1962), the Supreme Court of the United States provided guidance for when leave to amend may be denied. Circumstances that weigh against granting leave to amend include undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment. Foman, 371 U.S. at 182. Rule 15 aims to offer the "maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." United States v. Thomas, 221 F.3d 430, 435 (3d Cir. 2000) (citations omitted).

### B. Motion to Dismiss Under Rule 12(b)(6)

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for the dismissal of complaints that fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). When ruling on a motion to dismiss under Rule 12(b)(6), the court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In addition to reviewing the facts contained in the complaint, the court may also consider "exhibits attached to the

complaint, matters of public record, as well as undisputedly authentic documents" attached to a defendant's motion to dismiss if the plaintiff's claims are based upon these documents. Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. See Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32; see Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556); Twombly, 550 U.S. at 556. A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

### III. Discussion

Dobson seeks leave to amend his pleading to include contract and unfair trade practices claims, presumably in response to the court's earlier application of the gist of the action doctrine to foreclose his tort claims. We begin by addressing Dobson's motion for leave to amend. We then turn to our previous disposition of the School's proffered gist of the action defense.

#### A. Motion to Amend

##### 1. *Violation of the UTPCPL*

Pennsylvania's UTPCPL provides a private cause of action for persons aggrieved by violations of that statute. See 73 PA. STAT. AND CONS. STAT. ANN. § 201-9.2. The "underlying foundation" of the UTPCPL is prevention of fraud. Weinberg v. Sun Co., 777 A.2d 442, 446 (Pa. 2001) (citation omitted). Section 201-2(4) lists various types of conduct that qualify as unfair competition or "unfair or deceptive" practices. 73 PA. STAT. AND CONS. STAT. § 201-2(4)(i)–(xxi). To bring such a claim, a plaintiff must demonstrate that he or she "justifiably relied on the defendant's wrongful conduct or representation" and suffered harm as a result. Yocca v. Pittsburgh Steelers Sports, Inc., 854 A.2d 425, 438 (Pa. 2004) (citation omitted); Hunt v. U.S. Tobacco Co., 538 F.3d 217, 222-26 (3d Cir. 2008).

Dobson asserts that the School's alleged conduct constitutes "unfair or deceptive practice[s]" as defined by the UTPCPL. (Doc. 106-1 at 30). The proposed second amended complaint, however, fails to specify what practices were unfair or deceptive. Even if Dobson had adequately identified unfair or deceptive conduct,

he cannot maintain a UTPCPL claim against the School. Private actions based on the UTPCPL require "purchas[ing] or leas[ing] of goods or services primarily for personal, family or household purposes[.]" 73 PA. STAT. AND CONS. STAT. § 201-9.2(a); Balderston v. Medtronic Sofamor Danek, Inc., 285 F.3d 238, 241 (3d Cir. 2002) (quoting Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992)). Assuming *arguendo* that the benefits Dobson received from the School were "goods or services" within the meaning of the UTPCPL, Dobson did not purchase or lease those benefits—they were given to him free of charge. Accordingly, we will deny leave to amend to add a claim pursuant to the UTPCPL because, under the facts alleged, such amendment would be futile.

### 2. *Breach of Contract*

A breach of contract claim under Pennsylvania law consists of three elements: (1) the existence of a contract that includes its essential terms; (2) a breach of that contract; and (3) damages resulting from the breach. Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C., 137 A.3d 1247, 1258 (Pa. 2016). Dobson included breach of contract in his original complaint, (see Doc. 1 ¶¶ 184-91), but omitted the claim from his amended complaint. In his proposed second amended complaint, he reasserts breach but provides no details beyond reciting the bare elements of a claim. (See Doc. 106-1 ¶¶ 142-44). Such threadbare recitation of elements "will not do." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 555). Consequently, we will reject Dobson's breach of contract amendment—as proposed—due to its facial insufficiency.

9

We do not hold, however, that no breach of contract claim could survive Rule 12(b)(6) scrutiny. If Dobson wishes to reassert a breach of contract claim against the School, he must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" and which "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Twombly, 550 U.S. at 556, 570). This would include, at minimum, identifying the particular contractual provision—i.e., the contractually imposed duty—that the School allegedly breached. Law Firm of Malone Middleman, P.C., 137 A.3d at 1258; see also Hanaway v. Parkesburg Grp., LP, 168 A.3d 146, 150, 153, 158 (Pa. 2017); Feeney v. Disston Manor Pers. Care Home, Inc., 849 A.2d 590, 596-97 (Pa. Super. Ct. 2004); Cipolla v. Inst. for Psychoanalytic Psychotherapies, 33 F. App'x 617, 621 (3d Cir. 2002) (nonprecedential) (applying Pennsylvania law). Importantly, Dobson's motion to amend to add breach of contract presents the court with an opportunity to revisit our previous dismissal of Dobson's state law tort claims. Upon reconsideration, we believe that decision was legally incorrect and that justice requires rectification.[3]

### B. Tort Claims and "Gist of the Action" Doctrine

In our August 10, 2017 decision, we found—in abbreviated fashion—that Dobson's state law tort claims were barred by the gist of the action doctrine. Based

---

[3] So long as a district court has jurisdiction over a case, it has "the inherent power to reconsider prior interlocutory orders" when consonant with justice to do so. State Nat'l Ins. Co. v. County of Camden, 824 F.3d 399, 406 & n.14 (3d Cir. 2016) (citing United States v. Jerry, 487 F.2d 600, 605 (3d Cir. 1973)).

10

upon the information now presented, we conclude that our dismissal of these claims was improvidently rendered. For the following reasons, we will vacate our prior memorandum and order and permit Dobson to file a second amended complaint in accordance with our discussion *infra*.

### 1. *Gist of the Action Doctrine*

Under the gist of the action doctrine, a contracting party cannot assert a tort claim against another party to the contract when the gravamen of such a claim is, in actuality, breach of contract. Bruno v. Erie Ins. Co., 106 A.3d 48, 68 (Pa. 2014).[4] When distinguishing between tort and breach of contract claims at the motion to dismiss stage, the determinative factor is "the nature of the duty alleged to have been breached" as pleaded by the plaintiff. Id. If the duty is created by the terms of the parties' agreement, then the claim sounds in breach of contract; if it derives from a defendant's "broader social duty owed to all individuals," the claim must be regarded as a tort. Id. at 68-69.

It is true, as we previously observed, that the Pennsylvania Superior Court has described the relationship between a student and a private school as "contractual in nature." McCabe v. Marywood Univ., 166 A.3d 1257, 1262 (Pa. Super. Ct. 2017) (quoting Swartley v. Hoffner, 734 A.2d 915, 919 (Pa. Super. Ct. 1999)). But the Superior Court rendered that holding in the context of the viability of a student's breach of contract claim against a private school when that school allegedly violates "guidelines, polices, and procedures as contained in the written

---

[4] The parties agree that Pennsylvania law governs the instant state law claims.

11

materials distributed to the student over the course of their enrollment in the institution." Swartley, 734 A.2d at 919. That contractual association, however, does not exclusively define the relationship between a private school and its students. A contract between a student and a private institution may establish certain rights and obligations, but it is axiomatic that there may be *other* legal duties owed by private institutions to their students defined by different sources of law, including tort law. See, e.g., Feleccia v. Lackawanna Coll., 156 A.3d 1200, 1216 (Pa. Super. Ct. 2017) (holding private college owed tort-based duty of care to students participating in school-sponsored, school-supervised athletic activities on college property); RESTATEMENT (SECOND) TORTS §§ 342, 343A (AM. LAW INST. 1965).

The question then is whether Dobson's negligence, emotional distress, misrepresentation, civil conspiracy, and fiduciary duty claims implicate contractually based obligations or "broader social dut[ies]" owed by the School to its students. We find the latter to be the case, and now hold that the gist of the action doctrine does not bar Dobson's tort claims.

In Count V, Dobson asserts a standard negligence claim against the School. He alleges the School exercised year-round custody, care, and control over him and functioned as primary caregiver—providing education, housing, food, clothing, and medical, dental, and psychological care. Dobson avers that the School, in this "*in loco parentis*" status,[5] owed him a duty of care, independent of any contractual obligation, to protect him from harm. Dobson asserts that the School breached this

---

[5] (See Doc. 20 ¶¶ 29-34, 175-76); see also Peters v. Costello, 891 A.2d 705, 710 (Pa. 2005) (defining "*in loco parentis*"); RESTATEMENT (SECOND) TORTS § 314A(4).

12

duty by, *inter alia*, expelling him due to his inpatient mental health treatment; permitting him to be discharged from inpatient care to his mother rather than maintaining custody over him to provide further necessary psychological treatment; failing to develop a care plan for him before he was discharged to his mother; failing to provide adequate psychological care for him prior to his discharge from the inpatient facility; and causing further harm to him by implementing "conversion therapy" after learning of his homosexual orientation. Dobson contends that the School's breaches resulted in significant mental, emotional, physical, and financial injury. These allegations implicate social duties which are broader in scope than applicable contractual obligations. Notwithstanding the existence of the Enrollment Agreement (and any other written policies or guidelines), we conclude that the nature of the duty alleged in Dobson's negligence claim is based on custodial care and protection of minor children and exists independent of any contractual obligation.[6] The gist of the action doctrine does not apply to such a claim.

The same is true for Dobson's infliction of emotional distress claims in Counts IX and X. Dobson avers that the School negligently or intentionally caused him emotional distress and physical harm. The alleged conduct includes ignoring Dobson's serious mental health issues, consciously disregarding prior settlement

---

[6] We note that even if some of Dobson's allegations implicate portions of the Enrollment Agreement regarding school-provided healthcare, (see Doc. 11-3 at 6, ¶ 7), and thus appear to assert a breach of that agreement, Pennsylvania law is clear that negligent *performance* of a contractual duty still sounds in tort. Bruno, 106 A.3d at 69-70.

13

agreements involving discrimination against students with disabilities, excluding students with mental health disabilities from campus events like graduation ceremonies and celebrations, attempting a crude form of "conversion therapy" on Dobson, threatening to expel him on the basis of his mental impairments when he was most fragile, and expelling him due to his hospitalizations while he was still undergoing inpatient mental health treatment. We reject the School's argument that these claims sound in contract merely because they reference School policies or guidelines. Dobson's allegations may imply that the School violated some of its own anti-discrimination guidance contained in the School's Student/Sponsor Handbook (the "Handbook") or its Student, Applicant and General Public Non-Discrimination and Equal Opportunity Policy ("EOP"). But even if this were true, it would not transform Dobson's emotional distress claims into contract claims. Dobson is alleging that the School inflicted severe emotional distress—either negligently or intentionally—through its purportedly egregious conduct toward him. The essence of his claims derives from tort law and the broader social policies implicated thereby, not contract law.

Dobson's misrepresentation, civil conspiracy, and breach of fiduciary duty claims are no different. The allegations underlying these claims involve purported wrongdoing by the School outside of any "contractual" obligations that may have existed under the Enrollment Agreement, the Handbook, the EOP, or any other written materials provided to Dobson. For example, Dobson avers that the School made the material misrepresentation that complying with its doctors'

recommendations for inpatient mental health treatment would benefit Dobson when in fact it automatically induced Dobson's expulsion under the School's two-hospitalization policy. Dobson likewise contends that School officials and administrators knowingly conspired to endanger the welfare of its students by implementing the discriminatory two-hospitalization policy regardless of the foreseeable risks it posed to students with mental health disabilities. The gravamen of these claims implicates a more fulsome social duty to all individuals not falling within the ambit of any contractual duty that may exist between Dobson and the School. Consequently, the gist of the action doctrine does not bar Dobson's tort claims.

### 2. *Sufficiency Challenges Under Rule 12(b)(6)*

In its initial Rule 12(b)(6) motion to dismiss, the School also challenged the sufficiency of Dobson's misrepresentation and intentional infliction of emotional distress claims. We did not previously reach those challenges but will do so now.

#### a. <u>Misrepresentation</u>

The elements for intentional misrepresentation are: (1) the defendant made a material misrepresentation of fact; (2) the defendant knew the representation was false or acted recklessly as to its falsity; (3) the defendant intended to mislead the plaintiff into relying on the misrepresentation; (4) the plaintiff justifiably relied on the misrepresentation; and (5) the resulting injury was proximately caused by the plaintiff's justifiable reliance. See <u>Porreco v. Porreco</u>, 811 A.2d 566, 570 (Pa. 2002) (citing <u>Bortz v. Noon</u>, 729 A.2d 555, 560 (1999)). Negligent misrepresentation

15

consists of nearly identical elements, except the negligence version only requires that the defendant "ought to have known" the representation was false. Bilt-Rite Contractors, Inc. v. Architectural Studio, 866 A.2d 270, 277 (Pa. 2005) (quoting Bortz, 729 A.2d at 561). The existence of a duty of care owed by one party to the other is, logically, a precondition for a "negligent" misrepresentation claim. Id. at 277, 280.

The School contends that Dobson's misrepresentation claims are insufficient because he fails to allege facts showing justifiable reliance on a representation or that the School had the requisite intent of inducing Dobson to act in response to its representations. We find that Dobson's amended complaint adequately pleads, in the alternative, intentional or negligent misrepresentation. Specifically, Dobson alleges that the School's psychologists represented to him that consenting to inpatient mental health treatment would be the best course of action for success at the School and would not cause him to be expelled, when in fact the School knew that Dobson's second inpatient stint would result in automatic expulsion. Dobson avers that he reasonably relied on the School's representations, agreed to inpatient treatment, and was swiftly expelled, causing emotional, physical, and financial injuries. Moreover, Dobson alleges that the School intended this result to avoid the potential "liability" of dealing with a student with depression and suicidal tendencies. These allegations, taken as true, plausibly state a claim for intentional or negligent misrepresentation.

### b. **Intentional Infliction of Emotional Distress**

A claim for intentional infliction of emotional distress requires proof that: (1) the defendant's conduct was extreme and outrageous; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress or with knowledge that same was "substantially certain" to occur. Brown v. Muhlenberg Township, 269 F.3d 205, 217-18 (3d Cir. 2001) (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d).[7] Whether conduct could reasonably be regarded as extreme and outrageous is a threshold inquiry for the court's determination. M.S. *ex rel.* Hall v. Susquehanna Twp. Sch. Dist., 43 F. Supp. 3d 412, 430 (M.D. Pa. 2014) (citing Reimer v. Tien, 514 A.2d 566, 569 (Pa. Super. Ct. 1986)). The Supreme Court of Pennsylvania has cited approvingly the Superior Court's requirement that "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998) (alteration in original) (quoting Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).

The School argues that Dobson's intentional infliction of emotional distress claim fails because he has not pleaded physical harm and because the conduct

---

[7] The Pennsylvania Supreme Court has not yet explicitly recognized the tort of intentional infliction of emotional distress. See Taylor v. Albert Einstein Med. Ctr., 754 A.2d 650, 652 (Pa. 2000). The Third Circuit has predicted that the state's high court will ultimately adopt the Restatement (Second) of Torts' formulation. Williams v. Guzzardi, 875 F.2d 46, 50-51 (3d Cir. 1989); see also Mills v. City of Harrisburg, 589 F. Supp. 2d 544, 558 n.13 (M.D. Pa. 2008) (citing Taylor, 754 A.2d at 652).

alleged does not rise to the extreme degree necessary to state a claim. In his amended complaint, Dobson pleads that he suffered "physical harm," "physical manifestations of emotional distress," and "conscious pain and suffering" as a result of the School's conduct. (See, e.g., Doc. 20 ¶¶ 184, 198). These averments, without more, do not suffice under Pennsylvania law. In Abadie v. Riddle Memorial Hospital, 589 A.2d 1143, 1145 (Pa. Super. Ct. 1991), the Superior Court found that allegations of psychological factors affecting a plaintiff's "physical condition" and causing "injuries" that would require future medical care were inadequate to plead physical harm. Conversely, in Love v. Cramer, 606 A.2d 1175, 1179 (Pa. Super. Ct. 1992)—a case cited by Dobson—the plaintiff pled actual physical manifestations including "nightmares, stress[,] and anxiety," which the court found sufficient to state physical harm. Dobson's conclusory allegations fail to establish the "nature" of his purported physical injuries. See Abadie, 589 A.2d at 1145; M.S. *ex rel.* Hall, 43 F. Supp. 3d at 430-31.

As to the School's second contention, however, we find that the conduct as alleged rises to the requisite "outrageous" level. Dobson avers that the School threatened to expel him due to his mental impairments, and did in fact expel and evict him while he was still receiving inpatient treatment for severe depression. The School purportedly took these actions despite knowing that Dobson would be forced to live with his mother who had her own mental health and substance abuse issues. This conduct occurred on the heels of a settlement with the Department of Justice regarding the School's mistreatment of students with disabilities. Dobson

also alleges that after his homosexual orientation became known to the School and his houseparents, he was forced to watch a religious-based "conversion therapy" movie intended to "cure" him from being gay. The School also purportedly chose to terminate Dobson's enrollment and force him out of his home of eight years, without regard for his mental health or well-being, to avoid the liability of keeping him as a student. Moreover, Dobson contends the School encouraged him to get inpatient mental health care while knowing that such treatment would result in automatic expulsion under the two-hospitalization policy. These allegations, taken together, are sufficiently extreme and outrageous as to be considered "utterly intolerable in a civilized society." Hoy, 720 A.2d at 754 (quoting Buczek, 531 A.2d at 1125). Nonetheless, because Dobson failed to adequately plead physical harm, we will dismiss his intentional infliction of emotional distress claim without prejudice.

## IV. Conclusion

We will deny Dobson's motion (Doc. 106) to file a second amended complaint to the extent that we deny leave to add a claim under the UTPCPL and to add a breach of contract claim as currently set forth in the proposed second amended complaint. We will grant the motion insofar as we will permit Dobson to file a second amended complaint consistent with the foregoing discussion. We will vacate our August 10, 2017 memorandum and order (Docs. 50, 51) and reinstate Dobson's state law tort claims with the exception of intentional infliction of emotional distress (Count IX), with leave to amend. In light of today's decision, we will dismiss as moot, and without prejudice, the School's motion (Doc. 92) for judgment on the pleadings. An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated: December 7, 2018