**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ADAM DOBSON, | : | |
| | : | 1:16-CV-1958 |
| Plaintiff, | : | |
| | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| THE MILTON HERSHEY SCHOOL, | : | |
| *et al.*, | : | |
| | : | |
| Defendants. | : | |

**<u>MEMORANDUM</u>**

**May 6, 2020**

Presently pending before the Court is a motion for summary judgment filed by Defendants in the above-captioned case ("the Motion").  (Doc. 198). The Motion has been fully briefed, (Docs. 199, 212, 215), and is ripe for disposition. For the reasons that follow, the Motion shall be granted.  Moreover, because we shall order the Clerk of Court to close the file on this case, we shall deny as moot F. Frederic Fouad's First Motion to Intervene. (Doc. 201).

## I.    BACKGROUND

The underlying facts of this case have been discussed at length in several previous Memoranda and Orders issued by this Court, but we reiterate herein several important details relevant to the instant motion.

Defendant the Milton Hershey School ("the School") operates a private, cost-free, residential academy for low-income children.  (Doc. 200 at ¶¶ 15, 23, 24, Doc. 212-1 at ¶¶ 15, 23, 24).  Plaintiff Adam Dobson ("Plaintiff" or "Dobson") enrolled at the School as a third-grader pursuant to an Enrollment Agreement signed by his mother.  (Doc. 200 at ¶¶ 58–59; Doc. 212-1 at ¶¶ 58–59; Doc. 199-4).  Relevant to the instant motion, the Enrollment Agreement provided that students "will be offered appropriate counseling and health services" and "all necessary medical, dental, psychological and psychiatric services while he or she is under the School's care."  (Doc. 199-4).  While enrolled at the School, ██████ ██████████████████████████████████████████████████████████ ██████████████████.  (Doc. 200 at ¶ 73; Doc. 212-1 at ¶ 74).[1]  Dobson was also ████████████████████.  (*Id*.).

In November 2010, Dobson informed his house parents, Mr. and Mrs. Slamans ("the Slamans"), that ██████████████████████████████████ ████████████████████.  (Doc. 200 at ¶ 74; Doc. 212-1 at ¶ 75).  Dobson was assessed by a School psychologist and the matter ████████████████████

---

[1]     Paragraph 71 of Dobson's Statement Response to Defendants' Statement of Facts, (Doc. 212-1), is blank.  This results in a mismatch between the numbered paragraphs provided by Defendants in their Statement of Undisputed Material Facts in Support of the Motion for Summary Judgment, (Doc. 200), and Dobson's response.  Thus, although citations to the parties' respective statements appear misaligned, the citations provided reflect Defendants' statements and Dobson's response thereto.

██████. (*Id*.).  Nonetheless, Dobson ████████████████████

████████████████ (*Id*.).

Around that time, in the fall of 2010, the Slamans discovered Dobson

watching gay pornography.  (Doc. 212-2 at 153–55).  Dobson told the Slamans that

he was confused, that he was not sure if he was gay, and hypothesized that ████████

████████████████████████████ (*Id*. at 154).  Dobson also told

the Slamans that ██████████████████████████████████████

██████████████. (*Id*.).

In the year that followed, Dobson avers that the Slamans subjected him to

what he characterizes as "gay-conversion therapy."  (*Id*. at 155).  According to

Dobson, the Slamans "prayed with [him]," "spoke to [him] on several occasions,"

and "showed [him] a Sy Rogers video."  (*Id*. at 155–56).  Dobson specified that the

Slamans prayed with him to "help [him] . . . figure [his] sexuality out," (*id*. at 163

and "to help with [his] confusion." (Doc. 199-8 at 166).  However, Dobson

confirmed that the Slamans never explicitly mentioned his sexual orientation

during the prayers or an aversion thereto, (*id*. at 163), and never indicated in the

prayers that they preferred that he be straight. (*Id*. at 166, 177, 212).  Rather,

according to Dobson, the prayers focused upon ████████████████████

████, resolving his confusion, and forgiving ██████████████████████.

(Doc. 212-2 at 164).  Nonetheless, Dobson believed that the prayers were "tie[d]

into" an attempt to "cur[e him] of being gay," (Doc. 212-2 at 156), inasmuch as "the Lord . . . would be more happy if [he] was straight." (*Id*. at 164).

Dobson also asserts that the Slamans had him watch a video of a lecture by a man named Sy Rogers in the fall of 2011. (*Id*. at 203). Dobson summarized the video as follows:

> [A]t one point in his life [Rogers] was gay and he was struggling with his sexuality and he was taking steps to become a woman . . . . And when he was driving on his way to . . . [either] the surgery or the initial appointment to help him change his sex basically, he was like listening to the radio and he felt like God spoke to him and he turned the car around. And then he went on about how he now has a wife and kids and . . . how God spoke to him and helped him change his life around.

(*Id*. at 203–204). Likewise, in the fall of 2011, Dobson claims that the Slamans had him watch a ██████████████████████████████████████████████████ ██████████████████████████████████████████. According to Dobson, the Slamans showed him the special "to help show [him] that just because ████████ ████████ doesn't mean [he] can't . . . be heterosexual." (Doc. 199-8 at 176).

In October 2012, Dobson ████████████████████████████████████ ██████████████████████████. (Doc. 200 at ¶ 75; Doc. 212-1 at ¶ 76). ████ ████████████████████████████████████████████████ ████████████████████████████████. (*Id*.). ████████████ ████████████████████████████████. (*Id*.). After further evaluation, the School recommended that Dobson ██████████████████████████████████



████████████. (Doc. 200 at ¶ 77; Doc. 212-1 at ¶ 78).  Dobson ████████

████████████████████████████████████████████████

████████████████. (Doc. 200 at ¶ 79–80; Doc. 212-1 at ¶ 80–81).

Upon his return to the School, Dobson ████████████████████

████████████████. (Doc. 200 at ¶¶ 81–92; Doc. 212-1 at ¶¶ 82–93).

However, on May 2, 2013, Dobson reported ████████████████████

████████████████████████. (Doc. 200 at ¶ 93, Doc. 212-

1 at ¶ 94).  Accordingly, School staff recommended ████████████

████████████████████████████████. (Doc. 200 at

¶¶ 94–101; Doc. 212-1 at ¶¶ 95–102).  A few days later, Dobson's mother

████████████████████████. (Doc. 200 at ¶¶ 108–11;

Doc. 212-1 at ¶¶ 109–112).  Dobson was dismissed from the School and did not

return.  (Doc. 200 at ¶¶ 104, 113; Doc. 212-1 at ¶ 105, 114)

More than three years after ████████████████ and dismissal from

the School, on June 30, 2016, Dobson filed a complaint in the United States

District Court for the Eastern District of Pennsylvania.  (Doc. 1).  Dobson sought

damages from the School for alleged violations of the Americans with Disabilities

Act, as well as for damages caused by their asserted negligence, negligent

misrepresentation, intentional misrepresentation, intentional infliction of emotional

distress, negligent infliction of emotional distress, civil conspiracy, breach of

fiduciary duty, breach of contract, and negligence *per se*.  In short, Dobson

contended that he was dismissed from the school pursuant to what he called a

"shadow policy" to expel any student that underwent two mental-health

hospitalizations even if that mental health hospitalization was recommended by

School staff. (*See* Doc. 131).   According to Dobson, his dismissal from the School

deprived him of significant opportunities and caused substantial emotional

damage.  In the complaint, Dobson also referenced what he characterized as gay-

conversion therapy but those facts did not appear to serve as the primary bases for

his claims.  The matter was transferred to this district on September 27, 2016.

(Docs. 14, 16).

On October 17, 2016, Dobson filed his first amended complaint.  (Doc. 20).

Defendants filed a motion to dismiss Dobson's amended complaint on November

1, 2016, (Doc. 22), and the matter was reassigned to Chief Judge Christopher C.

Conner for further proceedings.  (Doc. 36).  On August 10, 2017, Chief Judge

Conner granted Defendants' motion and dismissed several counts.  (Docs. 50, 51).

On December 7, 2018, however, Chief Judge Conner *sua sponte* vacated that

ruling and reinstated several of Dobson's tort claims.  (Docs. 127, 128).

On July 17, 2018, Defendants filed a motion for judgment on the pleadings.

(Doc. 92).  While that motion was pending, Dobson moved to amend his complaint

for the second time, which the Court granted, thereby mooting Defendants' then-pending motion.  (Docs. 106, 128).

On January 17, 2019, Defendants filed a motion to dismiss Dobson's second amended complaint. (Doc. 141).  The matter was reassigned to the undersigned on January 23, 2019.  On June 17, 2019, the Court granted in part and denied in part Defendants' motion to dismiss, (Doc. 150), and Defendants filed an answer to Dobson's second amended complaint on July 2, 2019.  (Doc. 162).

On October 17, 2019, Dobson filed a motion to amend his complaint for the third time.  (Doc. 174).  The Court denied that motion, (Doc. 181), and denied his subsequent request for reconsideration.  (Doc. 188).

Following the close of discovery, on February 3, 2020, Defendants filed a motion for summary judgment.  (Doc. 198).  Four days later, Proposed Intervenor F. Frederic Fouad[2] ("Fouad") filed a motion to intervene.  (Doc. 201).  Both pending motions, (Docs. 198, 201), have been fully briefed and are ripe for disposition.

Before diving into the merits of the instant motions, we first clarify the claims from Dobson's second-amended complaint that remain at issue after the

---

[2]      Fouad is the organizer of Protect The Hersheys' Children, Inc., a non-profit organization seeking to reform the Milton Hershey School.  Although Fouad is a party in a related action currently pending in this district, Fouad seeks to intervene in the instant case to preclude Defendants from using or in any way citing to an assertedly confidential memo that he alleges Defendants intercepted in 1999 after Fouad faxed the memo to himself while a guest at The Hotel Hershey.

long and winding procedural path that this case has taken and note several relevant preliminary matters addressed in Dobson's responsive brief to the instant motion for summary judgment. (Doc. 212 at 16). First, Dobson requests to withdraw his claims for intentional and negligent misrepresentation. Thus, from the outset, we shall dismiss as withdrawn Counts III and IV of Dobson's second-amended complaint. Second, Dobson requests to withdraw all claims against Defendant the Hershey Trust Company. Thus, we shall dismiss the Hershey Trust Company as a Defendant in this case. Third, Dobson notes that he no longer intends to pursue a theory of liability based upon an asserted shadow policy to dismiss students who undergo two mental-health hospitalization. Rather, Dobson intends to pursue only claims based upon the asserted gay-conversion therapy that he experienced.

In light of these changes, and in light of previous dispositive Orders issued by this Court, the following Counts from Dobson's second-amended complaint remain viable. In Count II, Dobson contends that the School was negligent in subjecting him to gay-conversion therapy. In Counts V and VI, Dobson posits that, by subjecting him to gay-conversion therapy, the School intentionally and negligently inflicted upon him emotional distress and, in Count VIII, Dobson claims that the School breached its fiduciary duties of care and of good faith in doing the same. Finally, in Count IX, Dobson asserts that, by subjecting him to gay-conversion therapy, the School breached its contractual duty under the

8

Enrollment Agreement to provide him with "appropriate" counseling services. We address each Count *seriatim*.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law. *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial. *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). In advancing their positions, the parties must support their

factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. Civ. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them. *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)). Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Layshock ex rel. Layshock v. Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477 U.S. at 247-48) (internal quotation marks omitted).

## III.   DISCUSSION

In their motion and principle brief, Defendants contend that Dobson has failed to substantiate through discovery a *prima facie* case for any of the still-viable Counts in his amended complaint. Relying upon Dobson's second-amended complaint, Defendants spend the bulk of their filings attacking the veracity of Dobson's theory that the School implemented a shadow policy to expel students who had undergone two mental health hospitalizations. As aforestated, however, in his brief in opposition, Dobson withdrew that theory of liability and instead

10

refocuses his arguments upon what he alleges amounted to gay-conversion therapy.

Awkwardly, Dobson spends most of his brief requesting that the Court decline to

exercise supplemental jurisdiction over his state-law claims and asks that we refer

the matter to the Pennsylvania state courts.[3]   In light of these mismatched

arguments, we address herein only Dobson's claims as they relate to the so-called

gay-conversion therapy and make every effort to construe the parties' arguments

liberally.

### a.  Count II – Negligence

Under Pennsylvania law, "[i]t is axiomatic that the elements of a negligence-

based cause of action are a duty, a breach of that duty, a causal relationship

between the breach and the resulting injury, and actual loss." *Campo v. St. Luke's

Hosp*., 755 A.2d 20, 23–24 (Pa. Super. 2000) (citing *J.E.J. v. Tri–County Big

Brothers/Big Sisters*, 692 A.2d 582 (Pa. Super. 1997)).  Assuming the moving

party demonstrates the absence of a genuine dispute of material fact, to survive a

motion for summary judgment on a garden-variety negligence claim, the non-

movant must go beyond the pleadings, pointing to particular facts established in

---

[3]      We note that, because the instant case comes before us on diversity jurisdiction and not
federal question, the Court has original jurisdiction over Dobson's state-law claims.  *See* 28
U.S.C. § 1332.  We thus have no basis to decline to exercise supplemental jurisdiction over
Dobson's state-law claims inasmuch as we never needed to exercise supplemental jurisdiction
over them in the first instance.  *See* 28 U.S.C. § 1367.

the record that evidence a genuine dispute for trial as to each of the elements of the cause of action.  *See Guidotti*, 716 F.3d 764, 773 (citing *Celotex*, 477 U.S. at 324).

In the instant case, Defendants argue that Dobson's allegations concerning the so-called gay conversion therapy he experienced are "100% false." (Doc. 199 at 12).  According to Defendants, "there is absolutely no record evidence" to support Dobson's accusation, his "allegation was never disclosed to anyone prior to the commencement of this lawsuit, and more importantly is completely absent from any medical or mental health record[s]." (*Id*. at 12–13).  Indeed, Defendants reason, Dobson testified at his deposition that the only person he ever talked to about the gay-conversion therapy was his attorney, (Doc. 215-9 at 125), and he admits that the thrust of the prayers and conversations which he claims amounted to gay-conversion therapy actually focused upon ███████████████████ ████████████████ and never mentioned homosexuality.  (Doc. 199-8 at 156).  Therefore, Defendants conclude, "Plaintiff's subjective accusation that Defendants engaged in 'gay conversion therapy' does not make it so," and "[t]he record evidence does not show 'any form of treatment that could even remotely be construed [as] 'gay conversion therapy,' especially given that [Plaintiff], by his own account, never explicitly acknowledged any homosexual feelings to anyone at the school.'"  (Doc. 215 at 13–14 (quoting (Doc. 215-2)).

Moreover, Defendants continue, even if Dobson's claim that he suffered gay-conversion therapy had been substantiated in discovery, "there is no record evidence to establish any causal link between the unsupported allegations of 'conversion therapy' and any damage generically alleged by Plaintiff." (*Id*. at 12). In fact, Defendants contend, not only has Dobson failed to note how the Slamans' behavior caused his injuries through his own testimony—the only testimony he offers in support of his claim—but Dobson has failed to provide any expert testimony to refute the expert testimony offered by Defendants which "establishes [that] Plaintiff's mental health issues are unrelated to his allegation . . . and [that] Plaintiff otherwise has no cognizable loss." (Doc. 215 at 14–15 (citing (Doc. 215-2 (opining that "[a]lthough Mr. Dobson has alleged that he received a form of 'gay conversion therapy' from his house parents at the Milton Hershey School, he did not receive any therapy that could reasonably be considered to be a form of 'gay conversion therapy'" and that "[t]here is no satisfactory evidence that any of Mr. Dobson's current psychiatric symptoms can be attributed to his termination from the Milton Hershey School or to any alleged 'gay conversion therapy' at the Milton Hershey School"))).

In response, and cursorily citing to his own response to Defendants' statement of material facts, Dobson simply avers that "[d]isputes of material fact exists as to whether [the School's] agents subjected [him] to gay conversion

therapy." (Doc. 212 at 8).  Moreover, Dobson contends, in this case, where a jury could conclude that emotional harm is a "natural and probable" result of gay-conversion therapy, he need not provide expert medical testimony of the same under Pennsylvania law.  (Doc. 212 at 9 (citing *Lattanze v. Silverstrini*, 448 A.2d 605, 608 (Pa. Super. 1982)).  In support of his view that emotional harm is a natural and probable result of gay-conversion therapy, Dobson attaches an academic summary from The Williams Institute discussing gay-conversion therapy generally and a public declaration from several national medical organizations concerning "the impropriety and dangers of sexual orientation and gender identity change efforts."  (Doc. 212-2 (capitalization modified)).

In this case Dobson has failed to provide any basis in the record to conclude that the asserted gay-conversion therapy he experienced was the actual and proximate cause of the harms alleged in his second-amended complaint.  The only evidence of record that Dobson proposes in support thereof is his own testimony. Having reviewed all of the excerpts the parties provided from Dobson's deposition, we are unable to find a single mention that his experiences with the Slamans caused any type of injury—emotional or otherwise.  This failure is fatal to his claim.  Thus, even were we to assume *arguendo* that Dobson need not provide expert medical testimony to support his claim under Pennsylvania law—which we need not decide at this juncture—Dobson has still failed to identify any basis in the

record to conclude that what he characterizes as gay-conversion therapy resulted in the injuries he alleges in his second amended complaint.  *See Wiest v. Tyco Elecs. Corp.,* 812 F.3d 319, 330 (3d Cir. 2016) ("[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party who must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument.") (internal quotation marks omitted); *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322) (stating that it is not enough to "merely [ ] restat[e] the allegations" in the complaint and that, to defeat summary judgment, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case"); J*ones v. United Parcel Serv*., 214 F.3d 402, 407 (3d Cir. 2000) (noting that a non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial").

We are unpersuaded by Dobson's insistence that one could infer from the academic summaries he attaches to his brief in opposition that his injuries were the "natural and probable" result of what he characterizes as gay-conversion therapy. In our view, although Dobson characterizes his experiences as "gay-conversion therapy" and the papers attached to Plaintiff's brief in opposition suggest that "gay-conversion therapy" results in negative emotional outcomes for its

participants, we are inclined to agree with Defendants that Dobson's experiences with the Slamans does not necessarily amount to the same "gay-conversion therapy" designated in those papers.  In other words, "Plaintiff's subjective accusation that Defendants engaged in 'gay conversion therapy' does not make it so."  (Doc. 215 at 13).  Thus, even were we to consider the academic reports Dobson submitted and even were we to construe Dobson's testimony liberally, Dobson has failed entirely to identify anything in the record that demonstrates that the supposed gay-conversion therapy he subjectively experienced was the actual or proximate cause of his harm.  Accordingly, Dobson has failed to demonstrate an essential element of his negligence cause of action and we shall grant Defendants summary judgment as to Count II.

### b.  Counts V and VI – IIED and NIED

In their next set of issues, Defendants argue that Dobson has failed to demonstrate an essential element of his claim for intentional infliction of emotional distress ("IIED"). Specifically, Defendants contend, Dobson has failed to present any competent medical evidence demonstrating that he suffered the emotional distress alleged as required by Pennsylvania law.  (Doc. 199 at 28 (citing *Shumosky v. Lutheran Welfare Servs. of Ne. Pa*., 784 A.2d 196, 199 (Pa. Super. 2001) ("In order to recover for negligent infliction of emotional distress a plaintiff must establish, as in any other negligence case, the defendant's breach of a duty and

16

damages proximately caused thereby.")).  According to Defendants, to support a claim for IIED under Pennsylvania law, a Plaintiff must submit "objective proof supported by competent medical evidence that the plaintiff actually suffered the claimed distress."  (Doc. 215 at 19 (citing *Esposito v. Galli*, 2006 WL 2322487, *15 (M.D. Pa. 2006)).

In response, Dobson reiterates his view that emotional harm is the "natural and probable" result of gay conversion therapy and that expert testimony is therefore not required to support his IIED claim.  According to Dobson, "[a] reasonable jury could find that emotional harm, including suicidal thoughts and attempts, would be the 'natural and probable' result of gay conversion therapy," and that a "jury could reasonably find that the severe emotional harm Plaintiff suffered was the 'natural and probable' result of gay conversion therapy he experienced.  (Doc. 212 at 13).  We disagree.

Under Pennsylvania law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."  *Dixon v. Boscov's Inc.*, 2002 WL 1740583 at *3 (E.D. Pa. 2002) (quoting RESTATEMENT (SECOND) OF TORTS § 46).  To state a claim for IIED under Pennsylvania law, a plaintiff must demonstrate a physical injury, harm or illness caused by the defendant's conduct.  *Id*.; *see also Rolla v. Westmoreland*

*Health Sys.*, 651 A.2d 160, 163 (Pa. Super.1994). "There must be objective proof supported by competent medical evidence that the plaintiff actually suffered the claimed distress." *Esposito v. Galli*, No. 4:04-CV-475, 2006 WL 2322487, at *15 (M.D. Pa. Aug. 9, 2006) (quoting *Gleeson v. Robson*, No. 3:CV-02-1747, 2005 WL 1210948, at *30 (M.D. Pa. May 6, 2005)); *see also Kazatsky v. King David Mem'l Park, Inc.*, 527 A.2d 988, 995 (Pa. 1987) ("Given the advanced state of medical science, it is unwise and unnecessary to permit recovery to be predicated on an inference based on the defendant's 'outrageousness' without expert medical confirmation that the plaintiff actually suffered the claimed distress. Moreover, the requirement of some objective proof of severe emotional distress will not present an unsurmountable obstacle to recovery. Those truly damaged should have little difficulty in procuring reliable testimony as to the nature and extent of their injuries.").

Here, Dobson has not provided any basis to conclude that he suffered any physical injury, harm, or illness caused by the Defendants' assertedly-outrageous conduct. Rather, in his brief, Dobson simply concludes that he has adequately supported his IIED claim because he claims that he suffered an "increased risk of anxiety, depression, decreased self-esteem, social withdrawal and isolation, homelessness, substance abuse, and suicidality" and that "a jury could reasonably find that the severe emotional harm [he] suffered was the 'natural and probable'

result of gay conversion therapy." (Doc. 212 at 13). Other than his own testimony—which tellingly never mentions the harm Dobson allegedly suffered at the hands of the Slamans—Dobson offers no competent medical evidence which suggests that he suffered any harm as a result of what he characterizes as gay-conversion therapy. This failure is fatal to his claim. *See Kazatsky*, 527 A.2d 995. Absent some "expert medical confirmation that the plaintiff actually suffered the claimed distress," Dobson's claim is insufficient as a matter of Pennsylvania law to survive summary judgment.

We are unpersuaded by Dobson's insistence that he need not provide expert medical testimony in support of his IIED claim because the harm alleged is a "natural and probable" result of his experiences. First, Dobson appears to have conflated an exception to the standard for demonstrating causation in negligence claims, *see e.g., Lattanze*, 448 A.2d at 608–609 (citing cases), and the independent requirement to provide expert medical evidence imposed upon IIED claimants under Pennsylvania law. *See Kazatsky*, 527 A.2d 995. Dobson has not identified any precedent which suggests that the competent medical testimony requirement is excused in IIED claims when the harm alleged is a "natural and probable" result of Defendants' alleged conduct. Second, as noted *supra*, even were we inclined to extend the scope of the "natural and probable" exception, Dobson has failed to demonstrate that the harms he alleges were the "natural and probable" result of his

experiences with the Slamans in that he has failed entirely to draw a connection between the generic gay-conversion therapy outlined in the academic summaries he provides and his specific experiences.  Thus, Dobson has failed to demonstrate an essential element of his IIED claim and we shall grant Defendants summary judgment as to Count V.

Because we granted Defendants summary judgment as to Dobson's negligence claim, Dobson's negligent infliction of emotional distress claim outlined in Count VI necessarily fails as well. *See Brown v. Philadelphia Coll. of Osteopathic Med.*, 760 A.2d 863, 868 (Pa. Super. 2000) ("In order to recover under . . . negligent infliction of emotional distress . . . [a party] must prove the elements of a cause of action for negligence.").  Accordingly, we shall grant Defendants summary judgment to Defendants as to Count VI.

### c.  Count VIII – Breach of Fiduciary Duty

In his second amended complaint, Dobson avers that Defendants breached their fiduciary duties of care and of good faith by:

> (1) failing to appoint residential childcare and mental health experts to their boards; (2) failing to hire qualified senior MHS administrators; (3) failing to implement policies or institutional controls that would prevent incidents of discrimination against disabled students and allow identification of such abuse once it had occurred; (4) not following through on the ADA Settlement Agreement, the Equal Opportunity Policy or the Handbook by, among other things, failing to properly train staff and administrators on the requirements of Title III of the ADA; and (5) failing to monitor and comply with the ADA Settlement

Agreement, the Equal Opportunity Policy, the Handbook and/or Title
III of the ADA.

(Doc. 131 at ¶ 205).  In his brief in opposition, however, Dobson does not address

these breaches but instead contends that Defendants breached their duty of care

and of good faith by subjecting him to gay-conversion therapy.

Although several Counts in Dobson's second amended complaint made at

least some passing reference to gay-conversion therapy thereby fairly placing

Defendants on notice of that theory of liability as it relates to that Count, Dobson

does not address gay-conversion therapy in Count VIII.  In fact, Dobson explicitly

delineates in Count VIII the actionable breaches he intended to pursue, none of

which mentioned gay-conversion therapy.  Thus, permitting Dobson to pursue this

theory of liability at this juncture as to Count VIII would effectively allow him to

amend his complaint and allege a new theory of liability that was not pleaded.

Such eleventh-hour changes shall not be permitted.  *Warfield v. SEPTA*, 460

F.App'x 127, 132 (3d Cir. 2012) ("A plaintiff may not amend a complaint by

raising arguments for the first time in a brief in opposition to a motion for

summary judgment.") (citing *Shanahan v. City of Chi.*, 82 F.3d 776, 781 (7th

Cir.1996); *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 641–42 (3d Cir.

1993)).  Because Dobson does not address this problem in his brief in opposition

but instead jumps head on into this newly pleaded theory of liability, we deem

Defendants' motion as to Count VIII to be unopposed and we shall grant

Defendants summary judgment as to Count VIII.

In closing, we note that, even were we inclined to find that the School's

alleged failures to "appoint residential childcare and mental health experts to their

boards" or to "hire qualified senior MHS administrators" could be construed to

have some bearing on Dobson's theory of gay-conversion therapy or even were we

inclined to conclude that Dobson somehow incorporated allegations of gay-

conversion therapy into Count VIII by reference, we would nonetheless find that

Dobson has failed to substantiate those allegations in discovery. Indeed,

throughout Dobson's cursory analysis of this claim in his brief, he fails to provide

a single record cite in support of his bald conclusions.  (Doc. 212 at 16).

Accordingly, and for the aforementioned reasons, we find there to be no genuine

issue of material fact and conclude that Defendants are entitled to judgment as a

matter of law as to Count VIII.

### d.  Count IX – Breach of Contract

It is axiomatic that, "[a] plaintiff must generally establish three elements to

support a breach of contract claim: (1) the existence of a contract, including its

essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant

damages. *Fortunato v. CGA Law Firm*, No. 1:17-CV-00201, 2018 WL 4635963, at

*3 (M.D. Pa. Sept. 27, 2018) (quoting *Gorski v. Smith*, 812 A.2d 683, 692 (Pa.

Super. 2002)) (internal quotation marks omitted).  According to Dobson,

Defendants breached their contractual obligation under the Enrollment Agreement

by subjecting him to gay-conversion therapy.  Dobson explains that the Enrollment

Agreement specified that students "will be offered *appropriate* counseling and

health services," (Doc. 199-4), and that gay-conversion therapy is anything but.  In

support thereof, Dobson presents his own testimony and the academic papers

attached to his brief which note that engaging in gay-conversion therapy results in

negative emotional outcomes for its participants.

In our view, however, Dobson has failed to provide any evidence of record

in support of his conclusions.  As noted *supra*, even were to assume that

everything that Dobson claims occurred between himself and the Slamans in fact

occurred, Dobson has failed to provide any basis to conclude that such conduct

was "inappropriate" to the extent it could constitute a breach of the Enrollment

Agreement.  Dobson never says as much at his deposition and Dobson has not

provided any expert testimony suggesting the same.  Indeed, Defendants expert

testimony which says otherwise stands unrebutted.  Likewise, even if Dobson

could demonstrate that his interactions with the Slamans amounted to a breach of

the Enrollment Agreement, he has not provided any basis in the record to conclude

that said breach resulted in the damages he alleges in his second-amended

complaint.  Thus, although the parties do not contest the existence of a valid

contract, Dobson has failed entirely to provide any evidence of record to suggest that Defendants' conduct amounted to a breach or that said breach resulted in the damages alleged and we shall grant Defendants summary judgment as to Count IX.

**e.  F. Frederic Fouad's Motion to Intervene**

On February 7, 2020, F. Frederic Fouad filed a motion to intervene in the instant action for "the limited purposes of protecting [his] enduring rights of privacy and opinion work-product protections from [the School]'s ongoing misuse and any trial in this case."  (Doc. 201 at 1–2).  Fouad's motion was fully briefed. (Docs. 202, 204, 210).  Because for the reasons discussed *supra* we shall Order the Clerk of Court to close the file on this case, there will be no trial in this case and any concerns related to the use or misuse of any alleged work product are necessarily moot.  Accordingly, we shall deny Fouad's motion as moot.

## IV.   CONCLUSION

For the aforementioned reasons, Defendants' motion for summary judgment, (Doc. 198), shall be granted.  Moreover, F. Frederic Fouad's First Motion to Intervene, (Doc. 201), shall be denied as moot.  An appropriate Order shall issue.